# EXHIBIT E

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 14/823,157 | 08/11/2015 | Micah Bergdale | Bytemark-102 | 3257 |

| | | | | |
|---|---|---|---|---|
| 30332       7590       06/01/2018 | | | EXAMINER | |
| MEREDITH & KEYHANI, PLLC | | | | |
| 125 Park Avenue | | | OJIAKU, CHIKAODINAKA | |
| 25TH FLOOR | | | | |
| NEW YORK, NEW YORK 10017 | | | ART UNIT | PAPER NUMBER |
| UNITED STATES OF AMERICA | | | 3696 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 06/01/2018 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

JMEREDITH@MEREDITHKEYHANI.COM
USPTO@MEREDITHKEYHANI.COM

| *Office Action Summary* | Application No. | Applicant(s) |
| | 14/823,157 | Bergdale et al. |
| | Examiner | Art Unit | AIA Status |
| | CHIKA OJIAKU | 3696 | No |

-- *The MAILING DATE of this communication appears on the cover sheet with the correspondence address* --

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☑ Responsive to communication(s) filed on <u>1/8/2018</u>.
  ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2a)☑ This action is **FINAL.**  2b)☐ This action is non-final.

3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

5) ☑ Claim(s) <u>1-28</u> is/are pending in the application.

  5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6) ☐ Claim(s) _____ is/are allowed.

7) ☑ Claim(s) <u>1-28</u> is/are rejected.

8) ☐ Claim(s) _____ is/are objected to.

9) ☐ Claim(s) _____ are subject to restriction and/or election requirement

\* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to **PPHfeedback@uspto.gov.**

**Application Papers**

10)☐ The specification is objected to by the Examiner.

11)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.

  Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

  Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
  **Certified copies:**

  a)☐ All  b)☐ Some**  c)☐ None of the:

  1.☐ Certified copies of the priority documents have been received.

  2.☐ Certified copies of the priority documents have been received in Application No. _____.

  3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

\*\* See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☑ Notice of References Cited (PTO-892)

2) ☐ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b)
  Paper No(s)/Mail Date _____.

3) ☐ Interview Summary (PTO-413)
  Paper No(s)/Mail Date _____.

4) ☐ Other: _____.

## DETAILED ACTION

### Status of Claims

The present application is being examined under the pre-AIA first to invent provisions. This office action is in response to a response dated January 8, 2018. Claims 1-28 are pending. All pending claims are examined.

### Continued Examination Under 37 CFR 1.114

This application is a continuation of 13901243, filed 05/23/2013 now U.S. Patent No. 9239993 which is a continuation of 13475881, filed 05/18/2012, now U.S. Patent No. 8494967 which is a continuation in part of 13110709, filed 05/18/2011, which is a continuation in part of 13046413, filed 03/11/2011. See MPEP §201.07. In accordance with MPEP §609.02 A. 2 and MPEP §2001.06(b) (last paragraph), the Examiner has reviewed and considered the prior art cited in the Parent Application.

Also in accordance with MPEP §2001.06(b) (last paragraph), all documents cited or considered 'of record' in the Parent Application are now considered cited or 'of record' in this application. Additionally, Applicant(s) are reminded that a listing of the information cited or 'of record' in the Parent Application need not be resubmitted in this application unless Applicant(s) desire the information to be printed on a patent issuing from this application. See MPEP §609.02 A. 2.

### *Response to Arguments*

#### 101 Rejection

The analysis in line with current 101 guidelines.  The two-part Mayo test in step 2A

requires the defining of the abstract idea.  All elements considered to be directed to the

abstract idea are considered in step 2a and are therefore not under consideration in step

2b which is directed to whether there is something "significantly more" than the abstract

idea. (…first-stage inquiry as looking at the "focus" of the claims, their "'character as a

whole,'" and the second-stage inquiry (where reached) as looking more precisely at what

the claim elements add—specifically, whether, in the Supreme Court's terms, they identify

an "'inventive concept'" in the application of the ineligible matter to which (by assumption

at stage two) the claim is directed. *See Enfish*, 822 F.3d at 1335–36).  Even if the abstract

idea is deemed, novel, the abstract idea is no less abstract (see *Flook*- new mathematical

formula was an abstract idea).

Taking the broadest reasonable interpretation the invention is directed towards

verification, a fundamental economic practice.  The innovation as claimed appears to be

directed to the user's objective (ticket validation and verification) rather than the

technological solution to a technological problem wherein the boundaries are defined by

the inventor's disclosure. (See, *Mayo*, 132 S.Ct. 1289, 1303 - "the underlying functional

concern ... is a relative one: how much future innovation is foreclosed relative to the

contribution of the inventor.").

#### Claim 1 recites:

"1, (original) A method performed by a computer system for displaying visual validation of the possession of
a previously purchased electronic ticket for utilization of a service monitored by a ticket taker comprising:

transmitting a token associated with a previously purchased electronic ticket to a remote display device, wherein the token is a unique identifier and a copy of the unique identifier is stored on a central computer system;

validating the token by matching the token transmitted to the remote display device to the copy of the unique identifier stored on the central computing system to provide a ticket payload to the remote display device;

transmitting to the remote display device a validation display object associated with the ticket payload, the validation display object being configured to be readily recognizable visually by the ticket taker, in order to enable the remote display device to display the validation display object so that upon visual recognition by the ticket taker, the user of the remote display device is permitted to utilize the service monitored by the ticket taker..."

These steps describe the mechanism of verification and validation based on certain defined parameters, which corresponds to concepts identified as abstract ideas by courts, such as real-time monitoring gathering and display of data (*Electric Power Group*) and data recognition and storage (*Content Extraction*).

All of these concepts relate to data storage and exchange in which different types of data is transmitted between transacting parties or devices.  The concept described in claim 1 is not meaningfully different than those concepts found by courts to be abstract ideas.  As such the description in claim 1 for verification is an abstract idea.

Verification by visual inspection performed electronically does not necessarily result in a transformation of the abstract idea.  (see *Content Extraction and Transmission LLC v. Wells Fargo Bank*, 776 F.3d 1343, 1347, 2014 BL 361098, 113 U.S.P.Q.2d 1354 (Fed. Cir. 2014) – court identified as an abstract idea "1) collecting data, 2) recognizing certain data within the collected data set and 3) storing that recognized data in a memory").

Beyond identification of the abstract idea of verification, there is the analysis of the claims as whole to determine whether any element or combination of elements is sufficient to ensure the claims amount to more than the exception.

The addition of merely novel or non-routine components to the claimed invention does not necessarily turn an abstract idea into something concrete and moreover any novelty is factored in the second part of the 101 framework. (See *Ultramercial, Inc. v.*

*Hulu*, LLC, 772 F.3d 709 at 715 (Fed. Cir. 2014 – novelty in the implementation of an abstract idea was found insufficient to establish that the claimed invention was patent-eligible.    The additional features must be more than well–understood routine, conventional activity).

The claim recites the additional limitations of a central computer system and at least one remote display device connected to the central computer over a communication network configured to execute the steps as recited (see for example claim 10), the claims do no more than implement the abstract idea of electronic verification and validation.

The claims are merely directed to the managing of received data, analyzing or sorting and storing of information and absent is any advancement to the computing mechanism claimed. All of these computer functions are well understood, routine, conventional activities" previously known in the industry.  Each step does no more than require a generic computer to perform generic computer functions.  Using a computer to analyze electronic data and then based at least in part upon the result of the correlation analysis verifying and validating the information received on the display device, amounts to no more than electronic information processing, which is one of the most basic functions of a computer. " (General mechanism of tokenization used in the validation and verification process - See also *Geoff*, USP Pub. No. 20150213443, paras. 0056-0057; see also *Benaloh*, USP Pub. No. 2009022900 paras. 0002, 0011-0015, 0027, 0031).

The limitations on the instant application recite at a high level of generality.  Courts have found that claims directed to improving a technological field or computer itself  and where the abstract concept is tied to performing a specific function might survive the Alice two-step analysis thereby preventing such claims from preempting other applications of

the underlying idea (*DDR Holdings, LLC v. Hotels.com, L.P*, 773 F.3d at 1257, 1259 –

claims recited "a specific way to automate the creation of a composite web page by an

outsource provider that incorporates elements from multiple sources in order to solve a

problem faced by websites on the Internet").

Evaluating the token and validating the token associated with a previously

purchased ticket by matching it with a copy of the unique identifier does not necessarily

have a "concrete effect in the field of electronic communications. Although the electronic

validation/verification is a mechanism that is enhanced by the use of technology,

however, the technology is not where the invention resides. Analyzing received data and

extracting the information to see if there is match with previously stored information does

not suggest an improvement to an existing technology or a technological solution to a

problem wherein a computer is integral to the claimed process to facilitate the process in

a way that a person making such assessments could not.   (See *Bancorp Servs, LLC v*

*Sun Life Assr. Co. of Can.* (U.S.), 687 F.3d 1266, 1278, 2012 BL 186/164, 103

U.S.P.Q.2d 1425 (Fed. Cir. 2012, 103 U.S.P.Q. 2d 1425 (Fed Cir. 2012).

Although there is a computer network configured to execute the steps of the

claimed process (see for example claim 10), the claims do no more than implement the

abstract idea of validation and or verification.  Using a computer to analyze electronic

data and then based at least in part upon the result of the analysis executing instructions

for ticket validation processing is no more than electronic data processing, which is one

of the most basic functions of a computer.

None of the claims transform the abstract idea they recite into patent eligible

subject matter because the claims simply instruct the user to implement the abstract idea

with routine, conventional activity. "The mere recitation of a generic computer cannot

transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice Corp.*,

134 S.Ct. at 2358; *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1256 (Fed.

Cir. 2014). "The claims' invocation of the Internet also adds no inventive concept. As we

have held, the use of the Internet is not sufficient to save otherwise abstract claims from

ineligibility under § 101." (See *Ultramercial, Inc. v. Hulu*, LLC, 772 F.3d 709, 716 (Fed.

Cir. 2014) citing, *CyberSource*, 654 F.3d at 1370 (reasoning that the use of the Internet

to verify credit card transaction does not meaningfully add to the abstract idea of verifying

the transaction").

Expediting the ticket validation process by incorporating additional layers of security

where it is performed through a computer does not go beyond the routine and

conventional. The present invention directed to electronic data validation is not

"necessarily rooted in computer technology in order to overcome a problem specifically

arising in the realm of computer networks." (see App. Abstract - "ticket is verified at the

entrance to venues by means of an animation or other human perceptible verifying visual

object that is selected by the venue for the specific event. This removes the need to use

a bar-code scanner on an LCD display of a cell phone or other device and speeds up the

rate at which human ticket takers can verify ticket holders."). The transmittal of data via a

tokenization mechanism directly or indirectly to the ticket holder's device does not suggest

anything beyond the abstract idea of data transmission.

The claimed invention is similar to the class of claims found to be abstract in

*Electric Power Gro*up, where the court noted that information as such as an intangible.

(citing See *Microsoft Corp. v. AT & T Corp.*, 550 U.S. 437, 451 n.12 (2007); *Bayer AG v.*

Application/Control Number: 14/823,157                                      Page 8
Art Unit: 3696

*Housey Pharm., Inc.*, 340 F.3d 1367, 1372(Fed. Cir. 2003)) and rule that collecting

information even when limited to a particular content does not change the character as

information and within the realm of abstract ideas as (*Electric Power Group* citing *Internet*

*Patents*, 790 F.3d at 1349; *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363

(Fed. Cir. 2015); *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l*

*Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014); *Digitech Image Techs., LLC v. Elecs. for*

*Imaging, Inc.*, 758 F.3d 1344, 1351 (Fe d. Cir. 2014); Cybersource Corp. *v. Retail*

*Decisions, Inc.*. 654 F. 3d 1366, 1370 (Fed. Cir. 2011).

       In particular the court in *Electric Power Group* noted:

"In a similar vein, we have treated analyzing information by steps
people go through in their minds, or by mathematical algorithms, without
more, as essentially mental processes within the abstract-idea category.
*See, e.g., TLI Commc'ns*, 823 F.3d at 613; *Digitech*, 758 F.3d at 1351;
*SmartGene, Inc. v. Advanced Biological Labs., SA*, 555 F. App'x 950, 955
(Fed. Cir. 2014); *Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of*
*Canada (U.S.)*, 687 F.3d 1266, 1278 (Fed. Cir. 2012); *Cybersource Corp.*
*v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372 (Fed. Cir. 2011); *SiRF*
*Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1333 (Fed. Cir. 2010);
*see also Mayo*, 132 S. Ct. at 1301; *Parker v. Flook*, 437 U.S. 584, 589–90
(1978); *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972).  And we have
recognized that merely presenting the results of abstract processes of
collecting and analyzing information, without more (such as identifying
a particular tool for presentation), is abstract as an ancillary part of
such collection and analysis. *See, e.g., Content Extraction*, 776 F.3d at
1347; *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715 (Fed. Cir. 2014).

Here, the claims are clearly focused on the combination of those abstract-
idea processes. The advance they purport to make is a process of
gathering and analyzing information of a specified content, then
displaying the results, and not any particular assertedly inventive
technology for performing those functions. They are therefore directed to
an abstract idea."

       Similarly, the claimed invention is focused on gathering, storing and retrieval and

transmission of information, albeit in the context of electronic ticket data validation and

not on a particular inventive technology for performing these functions and therefore is a directed to an abstract idea.

Unlike the present invention, *MCro* looked at the specificity of the rules which involved a specific improvement in the computer-related technology (allowing computers to produce "accurate and realistic lip synchronization and facial expressions in animated characters" that previously could only be produced by human animators) and not in the abstract idea (see *McRo* p. 21-22).

The specification noted that the human artists did not use the claimed rules but rather relied on subjective determination.   The court relied on the specifications explanation of the how the claimed rules enabled the automation of the specific animation tasks, automation of tasks that previously could not be automated and the incorporation of the particular claimed rules in the computer animation that improved the existing technological process as opposed to where the computer was merely used as a tool to perform the existing process. (*Alice*)

Note that novelty in the abstract idea does not preclude the abstract idea.  A novel abstract idea, although very detailed similar to a specific business technology on a general  purpose  computer  does  not  necessarily  become  non-routine  and nonconventional.

The *McRo* decision specifically pointed out that the specific animation technique used was different and unique in comparison to other animation techniques used, and therefore the invention was not simply automating known manual animation techniques, but was using new techniques, and therefore even if a generic computer implemented the

animation techniques the computer was improved by its ability to perform technically improved animation.

In *Enfish,* the claimed invention, their self-referential table database format was clearly distinguished from the conventional relational table, wherein the specification disclosed how the information is stored in a single table and not multiple tables as is the case with the conventional relational database model. Further the specification identified with specificity how the improvements are offered by their invention in contrast with existing databases. In contrast, the present invention expedites the payment at checkout process by matching the presented request with existing information from a credentials vault while protecting the confidential information of the customer. Absent is any evidence to suggest how this method as a combination is unique in comparison to other payment processing mechanisms.

Further, in *Enfish,* the court found that the general-purpose computer components were not added after the fact to a fundamental economic practice or mathematical equation, where computers are invoked "merely as a tool.", but were directed to a specific implementation of a solution to a problem in the software arts, and concluded that the *Enfish* claims were thus not directed to an abstract idea. In contrast, the invention as disclosed fails to provide support for specific computer-functionality improvements distinct from existing computer capabilities.

Other examples include *Trading Technologies,* where the court also noted that "the claimed graphical user interface method imparts a specific functionality to a trading system "directed to a specific implementation of a solution to a problem in the software arts." Id at 1339"".

Application/Control Number: 14/823,157                                    Page 11
Art Unit: 3696

Abstract ideas can be narrow and even novel, but they are still abstract ideas and

then would still need significantly more than that to overcome the 101 rejection. Further,

an improvement in the computer because of the "better" abstract idea, is not significantly

more. For example, an abstract idea that can be done mentally or pen and paper and

happens to be quicker than another abstract idea done mentally/pen and paper because

of fewer steps and merely automating the new abstract idea by putting that on a generic

computer is still just using that generic computer merely as a tool to implement the

abstract idea. This does not alone improve the computer *itself*.

According to Applicant's Specification:

[0057] The system operates on one or more computers, typically one or more file servers connected to the Internet. The system is typically comprised of a central server that is connected by a data network to a user's computer. The central server may be comprised of one or more computers connected to one or more mass storage devices. A website is a central server that is connected to the Internet. The typical website has one or more files, referred to as web-pages, that are transmitted to a user's computer so that the user's computer displays an interface in dependence on the contents of the web-page file. The web-page file can contain HTML, or other data that is rendered by a program operating on the user's computer. That program, referred to as a browser, permits the user to actuate virtual buttons or controls that are displayed by the browser and to input alphanumeric data. The browser operating on the user's computer then transmits values associated with the buttons or other controls and any input alphanumeric strings to the website. The website then processes these inputs, in some cases transmitting back to the user's computer additional data that is displayed by the browser. The precise architecture of the central server does not limit the claimed invention. In addition, the data network may operate with several levels, such that the user's computer is connected through a fire wall to one server, which routes communications to another server that executes the disclosed methods. The precise details of the data network architecture does not limit the claimed invention. Further, the user's computer may be a laptop or desktop type of personal computer. It can also be a cell phone, smart phone or other handheld device. The precise form factor of the user's computer does not limit the claimed invention. In one embodiment, the user's computer is omitted, and instead a separate computing functionality provided that works with the central server. This may be housed in the central server or operatively connected to it. In this case, an operator can take a telephone call from a customer and input into the computing system the customer's data in accordance with the disclosed method. Further, the customer may receive from and transmit data to the central server by means of the Internet, whereby the customer accesses an account using an Internet web-browser and browser displays an interactive webpage operatively connected to the central server. The central server transmits and receives data in response to data and commands transmitted from the browser in response to the customer's actuation of the browser user interface.

[0058] A server may be a computer comprised of a central processing unit with a mass storage device and a network connection. In addition a server can include multiple of such computers connected together with a data network or other data transfer connection, or, multiple computers on a network with network accessed storage, in a manner that provides such functionality as a group. Practitioners of ordinary skill will recognize that functions that are accomplished on one server may be partitioned and accomplished on multiple servers that are operatively connected by a computer network by means of appropriate inter process communication. In addition, the access of the website can be by means of an Internet browser accessing a secure or public page or by means of a client program running on a local computer that is

connected over a computer network to the server. A data message and data upload or download can be delivered over the Internet using typical protocols, including TCP/IP, HTTP, SMTP, RPC, FTP or other kinds of data communication protocols that permit processes running on two remote computers to exchange

information by means of digital network communication. As a result a data message can be a data packet transmitted from or received by a computer containing a destination network address, a destination process or application identifier, and data values that can be parsed at the destination computer located at the destination network address by the destination application in order that the relevant data values are extracted and used by the destination application.

[0060] The method described herein can be executed on a computer system, generally comprised of a central processing unit (CPU) that is operatively connected to a memory device, data input and output circuitry (IO) and computer data network communication circuitry. Computer code executed by the CPU can take data received by the data communication circuitry and store it in the memory

device. In addition, the CPU can take data from the I/O circuitry and store it in the memory device. Further, the CPU can take data from a memory device and output it through the IO circuitry or the data communication circuitry. The data stored in memory may be further recalled from the memory device, further processed or modified by the CPU in the manner described herein and restored in the same memory device or a different memory device operatively connected to the CPU including by means of the data network circuitry. The memory device can be any kind of data storage circuit or magnetic storage or optical device, including a hard disk, optical disk or solid state memory.

[0061] Examples of well known computing systems, environments, and/or configurations that may be suitable for use with the invention include, but are not limited to, personal computers, server computers, hand-held, laptop or mobile computer or communications devices such as cell phones and PDA's,
multiprocessor systems, microprocessor-based systems, set top boxes, programmable consumer electronics, network PCs, minicomputers, mainframe computers, distributed computing environments that include any of the above systems or devices, and the like.

[0064] The invention may also be practiced in distributed computing environments where tasks are performed by remote processing devices that are linked through a communications network. In a distributed computing environment, program modules may be located in both local and remote computer storage media including memory storage devices. **Practitioners of ordinary skill will recognize that the invention may be executed on one or more computer processors that are linked using a data network, including, for example, the Internet.** In another embodiment, different steps of the process can be executed by one or more computers and storage devices geographically separated by connected by a data network in a manner so that they operate together to execute the process steps. In one embodiment, a user's computer can run an application that causes the user's computer to transmit a stream of one or more data packets across a data network to a second computer, referred to here as a server. The server, in turn, may be connected to one or more mass data storage devices where the database is stored. The server can execute a program that receives the transmitted packet and interpret the transmitted data packets in order to extract database query information. The server can then execute the remaining steps of the invention by means of accessing the mass storage devices to derive the desired result of the query. Alternatively, the server can transmit the query information to another computer that is connected to the mass storage devices, and that computer can execute the invention to derive the desired result. The result can then be transmitted back to the user's computer by means of another stream of one or more data packets appropriately addressed to the user's computer.

All of these computer functions are "well understood, routine, conventional activities" previously known in the industry. Each step does no more than require a generic computer to perform generic computer functions.

Unlike *Enfish* where there was some actual improvement in the technology and *McRo* where the rules improved the computer related the technology, the claimed invention is similar to *TLI Communication* in which the specification does not describe "new" components individually or in combination for executing the claimed method. The specification fails to provide any technical details for the tangible components, but instead describes the system and methods in purely functional terms.

In the instant invention, there is no support that specialized computer hardware is necessary to implement the claimed systems. (see also *Alice Corp.* See Alice Corp., 134 S.Ct. at 2360 (determining that the hardware recited in the claims was "purely functional

and generic," and did not "offer[] a meaningful limitation beyond generally linking the use

of the [method] to a particular technological environment, that is, implementation via

computers") (citations and internal quotation marks omitted). (("That some of the steps

were not previously employed in the art is not enough standing alone to confer patent

eligibility upon the claims at issue" - *Ultramercial, Inc. v. Hulu*, LLC, 772 F.3d 709, 714-

16 (Fed. Cir. 2014))).

Examiner maintains the 101 rejection of **claims 1-28.**

### *Claim Rejections - 35 USC § 101*

35 U.S.C. 101 reads as follows:

Whoever invents or discovers any new and useful process, machine, manufacture, or
composition of matter, or any new and useful improvement thereof, may obtain a patent
therefor, subject to the conditions and requirements of this title.

**Claims 1-28 are rejected under 35 U.S.C. 101** because the claimed invention is directed

to a judicial exception (i.e., a law of nature, a natural phenomenon, or an abstract idea)

without significantly more.

### **Analysis**

### **Claim 1: Ineligible**

The broadest reasonable interpretation of the claim encompasses components

that implement electronic ticketing verification.  The invention is directed to a method

which is a statutory category of invention (*Step 1: YES*).

The claim is analyzed to determine whether it is directed to a judicial exception. The claim recites a method performed by a computer system for displaying visual validation of the possession of a previously purchased electronic ticket for utilization of a service monitored by a ticket taker comprising: transmitting a token associated with a previously purchased electronic ticket to a remote display device, wherein the token is a unique identifier and a copy of the unique identifier is stored on a central computer system; validating the token by matching the token transmitted to the remote display device to the copy of the unique identifier stored on the central computing system to provide a ticket payload to the remote display device; transmitting to the remote display device a validation display object associated with the ticket payload, the validation display object being configured to be readily recognizable visually by the ticket taker, in order to enable the remote display device to display the validation display object so that upon visual recognition by the ticket taker, the user of the remote display device is permitted to utilize the service monitored by the ticket taker.

In other words, the claim describes method of verifying an electronic ticket through a visual display on the presenter's device. Electronic ticketing verification is the organization and comparison of information to process a request. It is a mental process that could be performed in the human mind, or by a human using a pen and paper. Such a basic concept is similar to other mental processes found abstract by the courts such as automating mental tasks (*Benson)* and data recognition and storage (*Content Extraction*). Therefore, claim 1 is directed to an abstract idea *(Step 2A: YES).*

Application/Control Number: 14/823,157                                                      Page 15
Art Unit: 3696

Next, the claim is analyzed to determine if there are additional claim limitations that individually, or as an ordered combination, ensure that the claim amounts to significantly more than the abstract idea. The only additional limitation in the claim is the processor configured to execute the visual verification of the presented electronic ticket.

Thus, the recited generic processor component performs no more than its basic processor functions. This additional element is well understood, routine and conventional limitation that amounts to mere instructions to implement the abstract idea on a computer. Taking the computer limitations as an ordered combination adds nothing that is not already present when the elements are taken individually. Therefore, the claim does not amount to significantly more than the recited abstract idea *(Step 2B: NO)*. The claim is not patent eligible.

The analysis above applies to all statutory categories of invention.  Furthermore, the dependent **claims 2-9 and 11-26** do not resolve the issues raised in the independent claim 1.  Accordingly, **claims 1-28** are rejected as ineligible for patenting under 35 U.S.C. 101 based upon the same analysis.

### *Double Patenting*

The nonstatutory double patenting rejection is based on a judicially created doctrine grounded in public policy (a policy reflected in the statute) so as to prevent the unjustified or improper timewise extension of the "right to exclude" granted by a patent and to prevent possible harassment by multiple assignees.

A nonstatutory obviousness-type double patenting rejection is appropriate where the conflicting claims are not identical, but at least one examined application claim is not patentably distinct from the reference claim(s) because the examined application claim is either anticipated by, or would have been obvious over, the reference claim(s). See, e.g., *In re Berg*, 140 F.3d 1428, 46 USPQ2d 1226 (Fed. Cir. 1998); *In re Goodman*, 11 F.3d 1046, 29 USPQ2d 2010 (Fed. Cir. 1993); *In re Longi*, 759 F.2d 887, 225 USPQ 645 (Fed. Cir. 1985); *In re Van Ornum*, 686 F.2d 937, 214 USPQ 761 (CCPA 1982); *In re Vogel*, 422 F.2d 438, 164 USPQ 619 (CCPA 1970); and *In re Thorington*, 418 F.2d 528, 163 USPQ 644 (CCPA 1969).

A timely filed terminal disclaimer in compliance with 37 CFR 1.321(c) or 1.321(d) may be used to overcome an actual or provisional rejection based on a nonstatutory double patenting ground provided the conflicting application or patent either is shown to be commonly owned with this application, or claims an invention made as a result of activities undertaken within the scope of a joint research agreement.

Effective January 1, 1994, a registered attorney or agent of record may sign a terminal disclaimer. A terminal disclaimer signed by the assignee must fully comply with 37 CFR 3.73(b).

**Claims 1-28** of the instant application substantially recites the limitations of **Claims 1-34** of the **Application No. 13475881 now U.S. Patent No. 8494967.**

**Claims 1-28** are provisionally rejected on the ground of nonstatutory double patenting over **claims 1-34** of the **Application Number 13475881** now **U.S. Patent No. 8494967.** This is a provisional double patenting rejection since the conflicting claims have not yet been patented.

The subject matter claimed in the instant application is fully disclosed in the referenced application now an issued patent and would be covered by any patent granted on that copending application since the referenced copending application and the instant application are claiming common subject matter, as follows related sections are shown in **bold**):

| Instant Application | Application 13475881 |
|---|---|
| 1. A method performed by a computer system for displaying visual validation of the possession of a previously purchased electronic ticket for utilization of a service monitored by a ticket taker comprising: transmitting a token associated with a previously purchased electronic ticket to a remote display device, wherein the token is a unique identifier and a copy of the unique identifier is stored on a central computer system; validating the token by matching the token transmitted to the remote display device to the copy of the unique identifier stored on the central computing system to provide a ticket payload to the remote display device; transmitting to the remote display device a validation display object associated with the ticket payload, the validation display object being configured to be readily recognizable visually by the ticket taker, in order to enable the remote display device to display the validation display object so that upon visual recognition by the ticket taker, the user of the remote display device is permitted to utilize the service monitored by the ticket taker. | 1. A method by a server system for obtaining visual validation of the possession of a purchased electronic ticket on a user's computer device for presentation to a ticket taker comprising: receiving from the user's computer device a request to verify purchase of a previously purchased electronic ticket and to obtain a visual validation display object that confirms that the user possesses the previously purchased electronic ticket for utilization of a service monitored by the ticket taker, the visual validation display object configured to be readily recognizable visually by the ticket taker; receiving from the user's computer device a token associated with the received request; determining whether a token associated with the purchased electronic ticket has been stored in a data record associated with received request, and if it has, whether the received token is valid; and in dependence on the determination that the received token is valid, causing an activation of the purchased electronic ticket by transmitting to the user's computer device a data file comprising the visual validation display object that causes upon visual recognition by the ticket taker, the user to be permitted to utilize the service monitored by the ticket taker. |
| 2. The method of claim 1, further comprising: receiving from the remote display device a request to verify the purchase of the previously purchased electronic ticket; determining the validity of the received request; and transmitting a response to the remote display device confirming the verification of the electronic ticket in order to cause the display of the validation display object on the remote display device. | 2. The method of claim 1 further comprising: in response to the determining whether a token associated with the purchased electronic ticket has been stored results in a determination that no such token has been stored, initiating confirmation that the purchased electronic ticket has been purchased; in dependence on such confirmation, storing a token in the data record associated with the purchased electronic ticket; and transmitting to the user's computer device a visual validation display object corresponding to the purchased electronic ticket. |

Application/Control Number: 14/823,157                    Page 18
Art Unit: 3696

3. The method of claim 2, further comprising: transmitting the validation display object to the remote display device prior to the step of receiving the request for verification.

4. The method of claim 3, further comprising: securing the validation display object prior to transmission of the validation display object so that it is secured against being displayable on the remote display device in the absence of the condition that the previously purchased electronic ticket has been verified.

5. The method of claim 4, wherein the securing step is comprised of: encrypting the validation display object.

6. The method of claim 1, further comprising: transmitting validation display object to the remote device prior to the device verifying the electronic ticket.

7. The method of claim 1, further comprising: transmitting security data to the remote display device in order to cause the remote device to authenticate the validation display object.

8. The method of claim 6, further comprising: securing the validation display object prior to its transmission so that it is secured against being displayable on the remote display device in the absence of the condition that the remote display device has verified the previously purchased electronic ticket.

9. The method of claim 8, where the securing step is comprised of: encrypting the validation display object.

10. A system for validating previously purchased electronic tickets for utilization of a service monitored by a ticket taker, comprising: a central computer system and at least one remote display device operatively connected to the central computer system over a data communication network, wherein the central computer system transmits a token associated with the previously purchased electronic ticket to the at least one remote display device wherein the token is a unique identifier and a copy of the unique identifier is stored on a central computer system and upon a request received in the at least one remote display device validates the token associated with the previously purchased electronic ticket by matching the token transmitted to the remote

3. The method of claim 1 further comprising: storing in the data record associated with the purchased electronic ticket a data value representing a predetermined lock time; determining whether a duration of time from the transmission of the visual validation display object to the predetermined lock time has expired; and in dependence on such determination, permitting or not permitting the visual validation display object to be transmitted to the user's computer device.

4. The method of claim 1 further comprising: transmitting an authorization key to the user's computer device that transmitted the received request.

5. The method of claim 4 further comprising: encrypting the visual validation display object using the authorization key.

6. The method of claim 4 further comprising: encrypting the visual validation display object with a public key of a public/private key pair for which the transmitted authorization key is an associated private key.

7. The method of claim 1 further comprising: establishing a persistent channel between the server system and the user's computer device, the persistent channel being configured to permit the server system to push data to the user's computer device in the absence of a specific request for such data being initiated by the user's computer device.

8. The method of claim 7 further comprising: transmitting a command to the user's computer device that causes the transmitted visual validation display object to be automatically deleted from the user's computer device.

9. The method of claim 7 further comprising: transmitting commands that cause the server system to control a computer process operating on the user's computer device in order to cause the user's computer device to receive the visual validation display object, display the validation display visual object on the user's computer device, and automatically delete the validation display visual object.

10. The method of claim 7 where the persistent channel is a bi-directional and full-duplex communications channel.

11. The method of claim 7 where the step of transmitting the visual validation display object is

display device to the copy of the unique identifier stored on the central computing system to provide a ticket payload to the at least one remote display device; wherein the central computer system is configured to transmit to the display device over the data communication network a validating display object associated with the ticket payload, the visual validation display object being configured to be readily recognizable visually by the ticket taker, and the remote display device being configured so that the device enables display of the validating display object so that upon visual recognition by the ticket taker, the user is permitted to utilize the service monitored by the ticket taker.

11. The system of claim 10, wherein the transmitted validating display object is further configured to be secure from being displayable in the absence of the condition of verification of the purchased electronic ticket.

12. The system of claim 11, wherein the transmitted validating display object is further configured to be secure from being displayable by means of being encrypted.

13. The system of claim 11, wherein the remote display device is further configured to receive and store the validation display object prior to verification of the purchase of the electronic ticket.

14. The system of claim 10, wherein the remote display device is further configured to display the validating display object in the absence of a connection with the central system.

15. The system of claim 14, wherein the transmitted validating display object is further comprised of data parameters that are configured to be used by the remote display device to perform the purchase validation.

16. The system of claim 10, wherein the validating display object is further configured to change based on a user of the remote display device actuating the user interface of the device in a predetermined manner.

17. The system of claim 16, wherein the predetermined manner of actuation is the user touching a predefined area of a display screen on the remote device.

further comprised of: transmitting in a manner to cause the visual validation display object to be automatically displayed on a screen without the user having to input a command to cause the transmission of the validating visual object.

12. The method of claim 7 further comprising: transmitting to the user's computer device through the persistent channel a visual image comprising one of an advertisement or a discount coupon.

13. The method of claim 12 further comprising: selecting a visual image for transmission to the user's computer device from a plurality of stored visual images, said selection step made in dependence on data associated with the purchased electronic ticket.

14. The method of claim 13 where the selection step is further comprised of determining predetermined features of the validated ticket or purchasing transaction and then making a selection on the basis of those features.

15. The method of claim 7 further comprising: transmitting an image that encodes a data value that corresponds to data representing an indicia of identity of the persistent channel.

16. The method of claim 15 further comprising: receiving from the user's computer device a request to provide a payment authorization, and in response, performing the transmitting an image step; receiving a request to verify a purchase transaction, said request containing a challenge data; determining whether the challenge data corresponds to the identity of the persistent channel used to transmit the image; and causing a payment to be made to a payment entity associated with the received request to verify the purchase transaction.

17. A non-transitory computer readable data storage medium containing computer program code that when loaded and executed by a computer system causes the computer system to perform a method for obtaining visual validation of the possession of a purchased electronic ticket on a user's computer device for presentation to a ticket taker comprising the steps of: receiving from the user's computer device a request to verify purchase of a previously purchased electronic ticket and to obtain a visual validation display object that confirms that the user possesses the previously purchased and valid electronic ticket for utilization of a service monitored by the ticket

Application/Control Number: 14/823,157                                     Page 20
Art Unit: 3696

18. The system of claim 17, wherein the predefined area of the display screen appears as a button.

19. The system of claim 16, wherein the predetermined manner of actuation is the input of a code into the remote device by the user.

20. The system of claim 16, wherein the predetermined manner of actuation is the input of a sound into the remote device.

21. The system of claim 16, wherein the predetermined manner of actuation is the detection of a predetermined location by means of a GPS detector incorporated within or attached to the remote device.

22. The system of claim 10, wherein the validating display object is further configured to display in different versions of appearance where the selection of version is dependent on a pre-determined schedule.

23. The system of claim 13, wherein the remote display device is further configured to display the validating display object in the absence of a connection with the central system.

24. The system of claim 10, further configured to transmit the validating display object to the remote device in dependence on completion of a purchase of the electronic ticket.

25. The system of claim 10, wherein the validation display object is configured to be unique to the specific remote device it is intended to be displayed on.

26. The system of claim 16, wherein the predetermined manner of actuation is input of a predetermined visual image.

27. The system of claim 10, wherein the data communication network is configured to have a persistent channel between the central system and the remote device through which the central system can push content.

28. The system of claim 27, wherein the content is an advertisement that is selected from a plurality of advertisements in dependence on the type of purchased electronic ticket.

taker, the visual validation display object configured to be readily recognizable visually by the ticket taker; receiving from the user's computer device a token associated with the received request; determining whether a token associated with the purchased electronic ticket has been stored in a data record associated with the received request, and if it has, whether the received token is valid; and in dependence on the determination that the received token is valid, causing an activation of the purchased electronic ticket by transmitting to the user's computer device a data file comprising the visual validation display object that causes upon visual recognition by the ticket taker, the user to be permitted to utilize the service monitored by the ticket taker.

18. A system for obtaining visual validation of the possession of a purchased electronic ticket on a user's computer device for presentation to a ticket taker comprising one or more computers operatively connected that are configured to: receive from the user's computer device a request to verify purchase of a previously purchased electronic ticket and to obtain a visual validation display object that confirms that the user possesses the previously purchased and valid electronic ticket for utilization of a service monitored by the ticket taker, the visual validation display object configured to be readily recognizable visually by the ticket taker; receive from the user's computer device a token associated with the received request; determine whether a token associated with the purchased electronic ticket has been stored in a data record associated with the received request, and if it has, whether the received token is valid; and in dependence on the determination that the received token is valid, cause an activation of the purchased electronic ticket by transmitting to the user's computer device a data file comprising the visual validation display object that causes upon visual recognition by the ticket taker, the user to be permitted to utilize the service monitored by the ticket taker.

19. The system of claim 18 where the one or more computers are further configured to: responsive to the determination that no token associated with the purchased electronic ticket has been stored, initiate confirmation that the purchased electronic ticket has been purchased; in dependence on such confirmation, store a token in the data record associated with the purchased electronic ticket; and transmit to the user's

Application/Control Number: 14/823,157                                                    Page 21
Art Unit: 3696

computer device a visual validation display object
corresponding to the purchased electronic ticket.

20. The system of claim 18 where the one or
more computers are further configured to: store in
the data record associated with the purchased
electronic ticket a data value representing a
predetermined lock time; and determine whether a
duration of time from the transmission of the visual
validation display object to the predetermined lock
time has expired; and in dependence on such
determination, permit or not permit the visual
validation display object to be transmitted to the
user's computer device.

21. The system of claim 18 where the one or
more computers are further configured to: transmit
an authorization key to the user's computer device
that transmitted the received request.

22. The system of claim 21 where the one or
more computers are further configured to: encrypt
the visual validation display object using the
authorization key.

23. The system of claim 21 where the one or
more computers are further configured to: encrypt
the visual validation display object with a public
key of a public/private key pair for which the
transmitted authorization key is an associated
private key.

24. The system of claim 18 where the one or
more computers are further configured to:
establish a persistent channel between a server
system and the user's computer device, the
persistent channel being configured to permit the
server system to push data to the user's computer
device in the absence of a specific request for such
data being initiated by the user's computer device.

25. The system of claim 24 where the one or
more computers are further configured to: transmit
a command to the user's computer device that
causes the transmitted visual validation display
object to be automatically deleted from the user's
computer device.

26. The system of claim 24 where the one or
more computers are further configured to: transmit
commands that cause the server system to control
a computer process operating on the user's
computer device in order to cause the user's
computer device to receive the visual validation
display object, display the validation display visual
object on the user's computer device, and

automatically delete the validation display visual object.

27. The system of claim 24 where the persistent channel is a bi-directional and full-duplex communications channel.

28. The system of claim 24 where the one or more computers are further configured to: transmit in a manner to cause the visual validation display object to be automatically displayed on a screen without the user having to input a command to cause the transmission of the validating visual object.

29. The system of claim 24 where the one or more computers are further configured to: transmit to the device through the persistent channel a visual image comprising one of an advertisement or a discount coupon.

30. The system of claim 29 where the one or more computers are further configured to: select a visual image for transmission to the device from a plurality of stored visual images, said selection step made in dependence on data associated with the purchased electronic ticket.

31. The system of claim 30 where the one or more computers are further configured to select a visual image by means of determining predetermined features of the validated ticket or purchasing transaction and then making a selection on the basis of those features.

32. The system of claim 24 where the one or more computers are further configured to: transmit an image that encodes a data value that corresponds to data representing an indicia of identity of the persistent channel.

33. The system of claim 32 where the one or more computers are further configured to: receive from the user device a request to provide a payment authorization, and in response, performing the transmitting an image step; receive a request to verify a purchase transaction, said request containing a challenge data; determine whether the challenge data corresponds to the identity of the persistent channel used to transmit the image; and cause a payment to be made to a payment entity associated with the received request to verify the purchase transaction.

34. The system of claim 18 where the visual validation display object is an animation that

Application/Control Number: 14/823,157                                   Page 23
Art Unit: 3696

> operates in reaction to a touch of the user's
> computer device screen.

Furthermore, there is no apparent reason why applicant would be prevented from presenting claims corresponding to those of the instant application in the other copending application. See *In re Schneller*, 397 F.2d 350, 158 USPQ 210 (CCPA 1968). See also MPEP § 804.

### Conclusion

**THIS ACTION IS MADE FINAL.** Applicant is reminded of the extension of time policy as set forth in 37 CFR 1.136(a).

A shortened statutory period for reply to this final action is set to expire THREE MONTHS from the mailing date of this action. In the event a first reply is filed within TWO MONTHS of the mailing date of this final action and the advisory action is not mailed until after the end of the THREE-MONTH shortened statutory period, then the shortened statutory period will expire on the date the advisory action is mailed, and any extension fee pursuant to 37 CFR 1.136(a) will be calculated from the mailing date of the advisory action. In no event, however, will the statutory period for reply expire later than SIX MONTHS from the mailing date of this final action.

Any inquiry concerning this communication or earlier communications from the examiner should be directed to CHIKA OJIAKU whose telephone number is (571)270-3608. The examiner can normally be reached on Monday - Friday: 8.30 AM -5:00 PM EST.

Examiner interviews are available via telephone, in-person, and video conferencing using a USPTO supplied web-based collaboration tool. To schedule an

Application/Control Number: 14/823,157                                              Page 24
Art Unit: 3696

interview, applicant is encouraged to use the USPTO Automated Interview Request (AIR)

at http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Namrata Boveja can be reached on 571 272-8105. The fax phone number

for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent

Application Information Retrieval (PAIR) system.   Status information for published

applications may be obtained from either Private PAIR or Public PAIR. Status information

for unpublished applications is available through Private PAIR only. For more information

about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on

access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-

217-9197 (toll-free). If you would like assistance from a USPTO Customer Service

Representative or access to the automated information system, call 800-786-9199 (IN

USA OR CANADA) or 571-272-1000.

/CHIKAODINAKA OJIAKU/
Primary Examiner, Art Unit 3696