UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| BYTEMARK, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 1:17-cv-01803 (PGG) |
| | § | ECF CASE |
| XEROX CORP., ACS TRANSPORT | § | |
| SOLUTIONS, INC., XEROX | § | JURY TRIAL PREVIOUSLY DEMANDED |
| TRANSPORT SOLUTIONS, INC., | § | |
| CONDUENT INC., and NEW JERSEY | § | |
| TRANSIT CORP., | § | |
| | § | |
| Defendants. | § | |

## DEFENDANTS' ANSWER TO PLAINTIFF'S THIRD AMENDED COMPLAINT

Defendants XEROX Corp., ACS Transport Solutions, Inc., XEROX Transport Solutions, Inc., Conduent Inc., and New Jersey Transit Corp. ("Defendants"), hereby file their Answer to Plaintiff's Third Amended Complaint as set forth below.

### NATURE OF ACTION

1.      This is an action for patent infringement under the Patent Act, trade secret misappropriation under New York state and federal law, trade secret misappropriation under the New Jersey Trade Secret Act, breach of contract, unfair competition, and unjust enrichment under New Jersey state law.

**ANSWER:    Admitted.**

### PARTIES

2.      Bytemark, Inc. is a Delaware corporation organized and existing under the laws of the State of Delaware with a place of business at 268 W 44th Street, 3rd Floor, New York, New York 10036.

**ANSWER:   Defendants lack knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 2, and therefore deny same.**

3.      Bytemark is generally in the business of providing a secure mobile ticketing platform for transit, tourism, and events through smartphone apps, point-of-sale plugins, and open APIs. Bytemark is a market leader in providing mobile ticketing technologies to the transit industry and delivers a comprehensive platform that improves the ticket and payment experience for consumers and merchants.

**ANSWER:   Defendants lack knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 3, and therefore deny same.**

4.      On information and belief, Xerox is a New York domestic business corporation with its headquarters at 45 Glover Avenue, PO Box 4505, Norwalk, Connecticut 06850.

**ANSWER:   Denied.  The corporate headquarters address for Xerox is 201 Merritt 7, Norwalk, Connecticut 06851.**

5.      Xerox conducts business throughout the U.S., including within the State of New York and within this District. On information and belief, at all relevant times Xerox was in the business of offering for sale and selling business services and document technology products.

**ANSWER: Admitted with regard to Xerox conducting business throughout the U.S., including within the State of New York. Admitted that Xerox's business includes the sales of business services and document technology products. Defendants lack knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 5 with regard to what the Plaintiff considers "at all relevant times" as the Plaintiff has not adequately defined this time period.**

6.     On information and belief, Xerox was and continues to be the mastermind of the Xerox Entities: at all relevant times, Xerox made decisions for the Entities, and directed, implemented, and benefited from the unlawful activities pleaded within.

**ANSWER:   Denied.**

7.     On information and belief, ACS Transport Solutions, Inc. is a Georgia domestic profit corporation with its Principal Office Address at 2828 N Haskell Ave, Building 1 Floor 10, Dallas, Texas 75204.

**ANSWER: Denied. ACS Transport Solutions, Inc. was renamed Xerox Transport Solutions, Inc and subsequently renamed Conduent Transport Solutions, Inc. Conduent Transport Solutions, Inc. is a Georgia domestic profit corporation with its principal office address at 100 Campus Drive, Florham Park, NJ 07932.**

8.     On information and belief, at all relevant times, ACS was a division of Xerox, subject to its complete direction and control and, in form and substance, one and the same as Xerox. ACS was founded in 1980. In February 2010, Xerox acquired ACS's parent organization, Affiliated Computer Services, LLC in its entirety. With this acquisition, Xerox—originally a technology company—added a services operation and reorganized into two major divisions: Xerox Technology and Xerox Services. Affiliated Computer Services served as Xerox's core business process service, and, according to Xerox, the merging of the companies resulted in "shared customers, efficiencies, and technological innovation." After the merger, Affiliated Computer Services was known as "ACS, A Xerox Company" and "Xerox/ACS."

**ANSWER: Denied. However, it is admitted that Xerox acquired Affiliated Computer Services, LLC in 2010. Admitted that Affiliated Computer Services had a**

subsidiary named ACS Transport Solutions, Inc. Admitted that ACS was previously a subsidiary of Xerox. Defendants lack knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 8 with regard to what the Plaintiff considers "at all relevant times" as the Plaintiff has not adequately defined this time period, and therefore deny the same. Denied as to the attempts to improperly characterize the post acquisition nature of Affiliated Computer Services and Xerox.

9.      On information and belief, in 2016, Xerox split into two companies, "Conduent Inc." and "Xerox Corp.," spinning off the services operation it acquired when it bought Affiliated Computer Services in 2010.

ANSWER: Admitted to the extent that in 2016/2017 Xerox split into Conduent Inc. and Xerox Corp. Denied as to the remainder, including the characterization that the services split off were identical to those acquired when Xerox when it bought Affiliated Computer Services in 2010.

10.      On information and belief, Xerox Transport Solutions, Inc. is a Georgia domestic profit corporation with its principal office address at 2828 N Haskell Ave, Building 1 Floor 10, Dallas, Texas 75204.

ANSWER: Denied. ACS Transport Solutions, Inc. was renamed Xerox Transport Solutions, Inc., and subsequently renamed Conduent Transport Solutions, Inc. Conduent Transport Solutions, Inc. is a Georgia domestic profit corporation with its principal office address at 100 Campus Drive, Florham Park, NJ 07932.

11.      On information and belief, at all relevant times, Xerox Transport was a division of Xerox, subject to its complete direction and control and, in form and substance, one and the same as Xerox. Xerox Transport has undergone several name changes over the course of its

existence. In January 2014, Xerox Transport changed its name to "ACS Transport Solutions, Inc."

**ANSWER: Admitted that Xerox Transport Solutions, Inc. was previously a subsidiary of Xerox. Denied that Xerox Transport Solutions, Inc. was a division of Xerox, subject to its complete direction and control and, in form and substance, one and the same as Xerox. Defendants lack knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 11 with regard to what the Plaintiff considers "at all relevant times" as the Plaintiff has not adequately defined this time period, and therefore deny the same.**

12.    On information and belief, at all relevant times the Xerox Entities' acts were, in both form and substance, those of Xerox and were directed and fully controlled by Xerox. Xerox's divisions consented to this relationship, owed a fiduciary duty to Xerox, and possessed the power to alter the legal relations between Xerox and third parties (e.g., to enter into contracts). ACS and Xerox Transport exercised a low amount of discretion, and the dealings between the entities were at arms length. Xerox carried the gain or risk, not its divisions. Moreover, there was an overlap in ownership, officers, directors, and personnel, with, e.g., employees of Xerox concurrently working for ACS, Xerox Transport, and/or Conduent. This includes employees who worked on the infringing MyTix mobile ticketing project for NJ Transit. Additionally, the Xerox Entities shared customers, efficiencies, and technological innovation. It is believed that the Xerox Entities shared common office space, address and/or phone numbers. It is also believed that the Xerox Entities' funds, profits, and property were intermingled; that the Entities were not treated as independent profit centers; that there was

inadequate capitalization; that there was a disregard of corporate formalities; and that the other Entities' debts were guaranteed and paid by Xerox.

**ANSWER: Denied.**

13.     On information and belief, Conduent Inc. is a New York domestic business corporation with its Corporate Headquarters at 100 Campus Drive, Suite 200, Florham Park, New Jersey 07932.

**ANSWER: Admitted.**

14.     On information and belief, Conduent is a spinoff company of Xerox that formally came into existence in January 2017. Conduent was created following Xerox's separation into two publicly traded companies: the business process services company (which was named "Conduent Inc.") and the document technology company (which continues to be called "Xerox Corp.").

**ANSWER: Admitted.**

15.     On information and belief, NJ Transit is a New Jersey corporation with its Headquarters at 1 Penn Plaza East, Newark, New Jersey 07105.

**ANSWER: Admitted.**

16.     NJ Transit is a public transportation system and operates buses and light rail and commuter trains throughout New York, New Jersey, and Pennsylvania.

**ANSWER: Admitted.**

## JURISDICTION

17.     This Court has subject matter jurisdiction under Title 28, United States Code, §§ 1331 and 1338(a) because this action arises under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.* and the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 *et seq.*

**ANSWER: The allegations of paragraph 17 consist of legal conclusions to which no response is required. To the extent the Court deems a response is required, Defendants admit that the Complaint purports to state a cause of action arising under the Patent Laws of the United States and over which this Court has exclusive subject matter jurisdiction. Defendants deny that they are liable for infringement under such provisions.**

18.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

**ANSWER: The allegations of paragraph 18 consist of legal conclusions to which no response is required. To the extent the Court deems a response is required, Defendants admit that the Complaint purports to state a cause of action including state law claims under which this Court may have supplemental jurisdiction. Defendants deny that they are liable under any such provisions.**

19.     Venue in this judicial district is proper under Title 28, United States Code, §§ 1391 and 1400 because Defendants conduct business within this District and offer for sale and/or sell in this District applications and systems that infringe Plaintiff's patents. Additionally, venue is proper because Xerox and Conduent's principal places of business are in this District. Furthermore, a substantial part of the events or omissions giving rise to the claim occurred in this District: Bytemark negotiated and signed the Confidentiality Agreements (involving Xerox, ACS, Xerox Transport) in this District; all Defendants unlawfully used and/or disclosed Plaintiff's trade secrets and confidential information to prospective customers located and/or operating in this District; all Defendants infringed the Patents-in-Suit within this District; and all Defendants interfered with Plaintiff's business relationships in this District, including with Plaintiff's customer New York Waterway, which is located in this District.

Bytemark's intellectual property and trade secrets, the property that is the subject of the action, are also situated in this District.

**ANSWER: The allegations of this paragraph consist of legal conclusions to which no response is required. Admitted solely with respect to venue being proper in the district. Denied as to the remainder, including the alleged activities of Defendants. Further, Plaintiff has failed to adequately identify what it believes to be "confidential information" and "trade secrets" and as such Defendants cannot properly form a belief as to the allegations.**

20.     This Court has personal jurisdiction over Defendants because of Defendants' continuous and systematic contacts and business activities within the state of New York and within this District.

**ANSWER:  Admitted.**

## BACKGROUND

21.     Bytemark is the owner of all rights, title and interest in and to United States patent Nos. 10,346,764 ("the '764 patent"), attached hereto as Exhibit A, and 10,360,567 ("the '567 patent"), attached hereto as Exhibit B (collectively, the "Patents-in-Suit").

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 21, and therefore deny the same.**

22.     Bytemark offers for sale visual validation mobile ticketing applications and systems disclosed and claimed by the Patents-in-Suit including but not limited to the V3 Ticketing Technology.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 22, and therefore deny the same.**

23.     Bytemark has secured contracts relating to its V3 Ticketing Technology within the mass transit industry, including a contract with its first and longtime customer New York Waterway, the largest private ferry operator in the U.S.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 23, and therefore deny the same.**

24.     Bytemark's contract with New York Waterway was highly publicized and well known in the mobile ticketing market.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 24, and therefore deny the same.**

25.     Bytemark is the owner of trade secrets and confidential information relating to the design of applications and technical support systems and back-end management technical support and service of its V3 Ticketing Technology and related systems. Bytemark's trade secrets include a unique compilation of proprietary information including mobile ticketing development technology and know-how, design and implementation of mobile ticketing technology applications including those relating to its patented visual validation systems, back-end application and system management, maintenance and service, user data and account management and associated security features, and aspects of Bytemark's pricing, sales initiatives and profit generation paradigm (the "trade secrets"). [Bytemark's technology disclosed and claimed in the Patents-in-Suit as well as the trade secret aspects of the technology are hereinafter referred to as "Bytemark's proprietary technology."]

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 25, and therefore deny the same. Further, Plaintiff has failed to adequately identify with particularity "confidential information" or**

"trade secrets" whatsoever and as such Defendants cannot properly form a belief as to the allegations.

26.    Bytemark's trade secrets are not generally known or readily ascertainable nor could they be properly acquired or duplicated by others.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 26, and therefore deny the same. Further, Plaintiff has failed to adequately identify "trade secrets" and as such Defendants cannot properly form a belief as to the allegation.**

27.    Bytemark has taken reasonable measures to keep its trade secrets and other confidential information secret. Bytemark only discloses its trade secrets when necessary, and only to those who agree to keep the information secret by signing confidentiality agreements. Bytemark has ensured that any and all potential third parties to whom trade secrets and/or confidential information were disclosed were provided with, and signed, confidentiality agreements, including teaming agreements and nondisclosure agreements. Furthermore, all Bytemark employees sign employment agreements that contain confidentiality provisions relating to Bytemark's intellectual property and undergo employee training with respect to maintaining the confidentiality of Bytemark's intellectual property including its trade secrets and other confidential information. All of Bytemark's trade secrets are stored on secure servers and are password-protected and encrypted using the latest versions of MacOS X, iOS 10, Android 6 & 7. Additionally, documents containing Bytemark's trade secrets are clearly marked as "Confidential" and/or "Proprietary."

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 27, and therefore deny the same. Further,**

Plaintiff has failed to adequately identify any particular "confidential information" or "trade secrets" and as such Defendants cannot properly form a belief as to the allegations.

28.     Bytemark's trade secrets are valuable and crucial to the implementation of its business and competitive market position and it has invested substantial time, effort, and money in developing its trade secrets. Since its founding in 2011, Bytemark has invested and continues to invest millions of dollars into research and development and implementation of its trade-secret protected systems.

ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 28, and therefore deny the same. Further, Plaintiff has failed to adequately identify any particular "trade secrets" and as such Defendants cannot properly form a belief as to the allegations.

29.     Beginning in Spring 2012, Plaintiff entered into a series of Nondisclosure Agreements ("NDAs") and Teaming Agreements (collectively "the Confidentiality Agreements") with Xerox divisions ACS and Xerox Transport for the purpose of potentially developing joint proposals and/or bids related to providing mobile ticketing solutions to prospective clients in the mass transit industry. On information and belief, ACS and Xerox Transport were subject to Xerox's complete direction and control and, were in form and substance, one and the same as Xerox at the time the Confidentiality Agreements were signed. The NDAs and Teaming Agreements between Bytemark and ACS identify ACS as "A Xerox Company," and the NDAs between Bytemark and Xerox Transport feature the "Xerox" logo.

ANSWER: Admitted that agreements were entered into between Plaintiff and ACS Transport Solutions, Inc. (at the time a subsidiary of Xerox). Admitted that agreements were entered into between Plaintiff and Xerox Transport Solutions, Inc. (at the time a

**subsidiary of Xerox). Denied with regard to the remaining allegations and to the generalized description of these agreements as well as the mischaracterization of the control and relationship of ACS Transport Solutions and Xerox.**

30.     Pursuant to the Confidentiality Agreements, the parties agreed that no title, license, intellectual property rights, or any other right of ownership or use shall be granted (expressly, by implication, or by estoppel) to the receiving party under any patent, trademark, copyright, or trade secret owned or controlled by the disclosing party by the disclosure of proprietary information.

**ANSWER: Admitted that agreements were entered into between Plaintiff and ACS Transport Solutions, Inc. (at the time a subsidiary of Xerox). Admitted that agreements were entered into between Plaintiff and Xerox Transport Solutions, Inc. (at the time a subsidiary of Xerox). Denied as to the remainder, including to the extent the allegation attempts to provide a construction of the language of the individual agreements.**

31.     While protected by the Confidentiality Agreements, Bytemark disclosed its trade secrets and confidential information to the Xerox Entities on numerous occasions between 2012 and 2015.

**ANSWER:  Denied.**

32.     Over the years and while covered by the Confidentiality Agreements, Bytemark has refined and developed its trade secret protected mobile ticketing technologies and systems and competitive knowledge in management and service of these technologies and systems, which were disclosed to the Xerox Entities.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 32, and therefore deny the same. Further,**

**Plaintiff has failed to adequately identify any particular "trade secrets" and as such Defendants cannot properly**

33.     After Plaintiff disclosed its trade secrets and other confidential information to the Xerox Entities, the Xerox Entities cut Plaintiff out of a joint bidding effort and instead used and/or disclosed Plaintiff's patents and trade secrets to bid and secure a contract with NJ Transit on their own.

**ANSWER: Denied. Further, Plaintiff has failed to adequately identify any particular "trade secrets" and as such Defendants cannot properly form a belief as to the allegations.**

34.     The Xerox Entities' actions indicate that they never intended to partner with Plaintiff. Rather, their goal was to exploit Bytemark's efforts and use Bytemark's proprietary technology for their own commercial advantage.

**ANSWER: Denied.**

35.     The Xerox Entities offered for sale and sold their infringing visual validation applications and systems, including the exemplary product/system the MyTix mobile application incorporating Bytemark's proprietary technology, to NJ Transit in Newark, New Jersey. Upon its formation, Conduent participated and continues to participate in the servicing, maintenance, and continued implementation of Bytemark's proprietary technology.

**ANSWER: Denied. Further, Plaintiff has failed to adequately identify any particular "proprietary technology" and as such Defendants cannot properly form a belief as to the allegations.**

36.     On information and belief, NJ Transit developed a cooperative transportation strategy wherein NJ Transit and New York Waterway would offer integrated bus and ferry

services to transportation passengers. As part of this scheme, NJ Transit, in collaboration with the Xerox Entities and Conduent, offered to provide New York Waterway with Bytemark's proprietary technology.

**ANSWER: Denied. Further, Plaintiff has failed to adequately identify any particular "proprietary technology" and as such Defendants cannot properly form a belief as to the allegations.**

37.    At all relevant times, NJ Transit knew that the mobile ticketing technology and services that it purchased and contracted for from the Xerox Entities—and conspired to sell to New York Waterway—belonged to Plaintiff. NJ Transit knew that Plaintiff's information consisted of confidential trade secrets and that Plaintiff's ticketing system was proprietary, trade-secret, and patent-protected property. NJ Transit was fully aware that the trade secrets technology and the patent-claimed aspects of the technology were owned by Plaintiff because the technology was originally presented to NJ Transit as a collaborative project involving both the Xerox Entities and Plaintiff, wherein the parties would use Plaintiff's technology. Plaintiff was later cut out of the bidding process.

**ANSWER: Denied. Further, Plaintiff has failed to adequately identify any particular "confidential trade secrets" and as such Defendants cannot properly form a belief as to the allegations.**

38.    Defendants are offering for sale and selling their visual validation mobile ticketing applications and systems including the MyTix mobile application that infringe at least claim 1 of the '567 patent literally and/or under the doctrine of equivalents and at least claim 1 of the '764 patent literally and/or under the doctrine of equivalents.

**ANSWER: Denied.**

39.    Defendants materially breached and/or acted in violation of the Confidentiality Agreements by using and/or disclosing Bytemark's trade secrets and other confidential information to NJ Transit and other third parties and using Bytemark's intellectual property for their own gain.

**ANSWER:  Denied.**

40.    In addition to misappropriating Plaintiff's trade secrets and other confidential information in breach of the Confidentiality Agreements, Defendants have recently begun interfering with Plaintiff's business relationship and current and prospective contracts with New York Waterway.

**ANSWER:  Denied.**

41.    Defendants have offered to sell their infringing visual validation applications and systems and implementations that use Bytemark's trade secrets to New York Waterway as part of an integrated transportation contract.

**ANSWER:  Denied.**

42.    As a result, Plaintiff's existing contract with New York Waterway, which was supposed to be renewed in accordance with the terms of the original agreement in early 2017, has not been extended. Instead, New York Waterway informed Bytemark that it had a better deal with Defendants. Only after Bytemark initiated this action did New York Waterway agree to temporary short-term extensions to the contract.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 42, and therefore deny the same.**

43.    On or about January 2015, Plaintiff notified the Xerox Entities and NJ Transit of their misappropriation and unlawful acts. Conduent, upon its formation, had knowledge of the

infringement as well. On July 2, 2019, after an investigation of the claims of the newly issued patents and Defendants' MyTix/NJ Transit Application and system, Bytemark notified Defendants that their application and system practices at least claim 1 of the '567 patent and claim 1 of the '764 patent. Despite this notice, Defendants have continued to use and offer for sale Bytemark's proprietary technology.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 42, and therefore deny the same.**

**COUNT ONE**
**INFRINGEMENT OF U.S. PATENT NO. 10,360,567**
**(Against All Defendants)**

44.     Plaintiff incorporates by reference the allegations set forth in paragraphs 1-43 herein.

**ANSWER:  Defendants hereby incorporate by reference the preceding answers.**

45.     Plaintiff alleges infringement of at least claim 1 of the '567 patent by all of the Defendants using mobile ticketing systems, including the MyTix mobile application, that include a mobile ticketing system for detecting fraudulent activity of tickets using data integrity and all claim elements recited in at least claim 1. See Exhibit B.

**ANSWER: Admitted that Plaintiff is making said allegations. With regard to the remainder of this paragraph, denied as to the substance and merit of these allegations.**

46.     Xerox was and continues to be the mastermind of the Xerox Entities: at all relevant times, it made decisions for the Entities, and directed, implemented, and benefited from their infringement of the Patents-in-Suit.

**ANSWER: Denied.**

47.     NJ Transit implemented the infringing MyTix system while fully aware that doing so would infringe the asserted claims of the Patents-in-Suit.

**ANSWER:  Denied.**

48.     Pursuant to 35 U.S.C. § 271(a), Defendants have infringed, and are continuing to infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the '567 patent by offering for sale, using, and/or selling, distributing, promoting or providing for use by others the infringing visual validation mobile ticketing applications including the exemplary product/system the MyTix mobile application in the State of New York and elsewhere in the U.S.

**ANSWER:  Denied.**

49.     In violation of 35 U.S.C. § 271(b), Defendants have infringed, and are continuing to infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the '567 patent indirectly by inducing the infringement of the '567 patent claims by third parties including but not limited to New York Waterway and its customers by encouraging these customers and others to purchase and use the infringing systems and applications including the MyTix mobile application.

**ANSWER:  Denied.**

50.     On July 2, 2019, after an investigation of the claims of the newly issued patents and Defendants' MyTix/NJ Transit Application and system, Bytemark notified Defendants that their application and system practices at least claim 1 of the '567 patent.

**ANSWER:   Admitted that on July 2, 2019, Bytemark sent a 1.25 page letter alleging, without any proof or explanation, that Defendants infringe at least one claim of the '157 and '622 applications. Otherwise denied.**

51.     Despite actual notice of infringement, Defendants continue to perform affirmative acts that constitute infringement including offering for sale, selling, distributing, promoting, or providing support and back-end management and service for their infringing applications with the knowledge or willful blindness that their conduct will induce their customers to infringe the '567 patent's asserted claims.

**ANSWER: Denied.**

52.     In violation of 35 U.S.C. § 271(c), the Xerox Entities and Conduent have infringed and are continuing to infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the '567 patent indirectly by contributing to the infringement of the '567 patent's claims, including but not limited to NJ Transit and its customers.

**ANSWER: Denied.**

53.     Defendants have contributed and continue to contribute to the infringement of at least claim 1 of the '567 patent because they knew that the applications and systems they offer for sale and sell, including but not limited to the MyTix mobile application, are infringing and are not suitable for substantial non-infringing use.

**ANSWER: Denied.**

54.     As a result of Defendants' infringement of the '567 patent's asserted claims, Plaintiff has suffered monetary losses for which Plaintiff is entitled to an award of damages that are adequate to compensate Plaintiff for the infringement under 35 U.S.C. § 284, but in no event less than a reasonable royalty.

**ANSWER: Denied.**

55.     Defendants' infringement of the '567 patent has been deliberate, willful, and with full knowledge, or willful blindness to knowledge, of the '567 patent.

**ANSWER:  Denied.**

56.     Plaintiff has suffered damages in an amount to be determined at trial by reason of Defendants' willful infringement of the '567 patent, and will suffer additional damages and will be irreparably injured unless the Court enjoins Defendants from continuing such infringement.

**ANSWER:  Denied.**

**COUNT TWO**
**INFRINGEMENT OF U.S. PATENT NO. 10,346,764**
**(Against all Defendants)**

57.     Plaintiff incorporates by reference the allegations set forth in paragraphs 1-56 herein.

**ANSWER:  Defendants hereby incorporate by reference the preceding answers.**

58.     Plaintiff alleges infringement of at least claim 1 of the '764 patent by all of the Defendants using mobile ticketing systems, including the MyTix mobile application, that include a method performed by a computer system for displaying visual validation of the possession of a previously purchased electronic ticket for utilization of a service monitored by a ticket taker and all claim elements recited in at least claim 1. See Exhibit A.

**ANSWER:  Admitted that Plaintiff is making said allegations. With regard to the remainder of this paragraph, denied as to the substance and merit of these allegations.**

59.     Xerox was and continues to be the mastermind of the Xerox Entities: at all relevant times, it made decisions for the Entities, and directed, implemented, and benefited from their infringement of the Patents-in-Suit.

**ANSWER:  Denied.**

60.     NJ Transit implemented the infringing MyTix system while fully aware that doing so would infringe the asserted claims of the Patents-in-Suit.

**ANSWER: Denied.**

61.     Pursuant to 35 U.S.C. § 271(a), Defendants have infringed, and are continuing to infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the '764 patent by offering for sale, using, and/or selling, distributing, promoting or providing for use by others the infringing visual validation mobile ticketing applications and systems including the exemplary products/systems the MyTix mobile application in New York and elsewhere in the U.S.

**ANSWER: Denied.**

62.     In violation of 35 U.S.C. § 271(b), Defendants have infringed, and are continuing to infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the '764 patent indirectly by inducing the infringement of the '764 patent's claims by third parties including but not limited to New York Waterway and its customers by encouraging these customers and others to purchase and use the infringing systems and applications including the MyTix mobile application.

**ANSWER: Denied.**

63.     On July 2, 2019, after an investigation of the claims of the newly issued patents and Defendants' MyTix/NJ Transit Application and system, Bytemark notified Defendants that their application and system practices at least claim 1 of the '764 patent.

**ANSWER:   Admitted that on July 2, 2019, Bytemark sent a 1.25 page letter alleging, without any proof or explanation, that Defendants infringe at least one claim of the '157 and '622 applications. Otherwise denied.**

64.     Despite actual notice of infringement, Defendants continue to perform affirmative acts that constitute infringement including offering for sale, selling, distributing, promoting, or providing support and back-end management and service for their infringing applications with the knowledge or willful blindness that their conduct will induce their customers to infringe the '764 patent's asserted claims.

**ANSWER: Denied.**

65.     In violation of 35 U.S.C. § 271(c), the Xerox Entities and Conduent have infringed and are continuing to infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the '764 patent indirectly by contributing to the infringement of the '764 patent's asserted claims by NJ Transit and its customers.

**ANSWER: Denied.**

66.     Defendants have contributed and continue to contribute to the infringement of at least claim 1 of the '764 patent because they knew that the applications and systems they offer for sale and sell, including but not limited to the MyTix mobile application, are infringing and are not suitable for substantial non-infringing use.

**ANSWER: Denied.**

67.     As a result of Defendants' infringement of the '764 patent's asserted claims, Plaintiff has suffered monetary losses for which Plaintiff is entitled to an award of damages that are adequate to compensate Plaintiff for the infringement under 35 U.S.C. § 284, but in no event less than a reasonable royalty.

**ANSWER: Denied.**

68.     Defendants' infringement of the '764 patent has been deliberate, willful, and with full knowledge, or willful blindness to knowledge, of the '764 patent.

**ANSWER:  Denied.**

69.     Plaintiff has suffered damages in an amount to be determined at trial by reason of Defendants' willful infringement of the '764 patent, and will suffer additional damages and will be irreparably injured unless the Court enjoins Defendants from continuing such infringement.

**ANSWER:  Denied.**

## COUNT THREE
## <u>BREACH OF CONTRACT UNDER NEW YORK LAW</u>
### (Against Defendants Xerox, ACS, and Xerox Transport)

70.     Plaintiff incorporates by reference the allegations set forth in paragraphs 1-69 herein.

**ANSWER: Defendants hereby incorporate by reference the preceding answers.**

71.     Beginning in Spring 2012, Plaintiff entered into a series of Confidentiality Agreements with the Xerox Entities for the limited purpose of potentially developing joint proposals and/or bids relating to providing mobile ticketing solutions to prospective customers in the mass transit industry.

**ANSWER. Admitted that agreements were entered into between Plaintiff and ACS Transport Solutions, Inc. (at the time a subsidiary of Xerox). Admitted that agreements were entered into between Plaintiff and Xerox Transport Solutions, Inc. (at the time a subsidiary of Xerox). Denied as to the remainder, including the attempt to universally characterize the individual agreements.**

72.     These Confidentiality Agreements include the April 3, 2012 NDA between Bytemark and ACS; the December 7, 2012 NDA between Bytemark and ACS; the January 31, 2013 NDA between Bytemark and ACS; the February 7, 2013 NDA between Bytemark and

ACS; the November 8, 2013 NDA between Bytemark and ACS; the September 18, 2015 NDA between Bytemark and Xerox Transport; the WMATA NEPP mobile ticketing solution Teaming Agreement between Bytemark and ACS; and the Virginia Railway Teaming Agreement between Bytemark and ACS.

**ANSWER: Admitted that agreements were entered into between Plaintiff and ACS Transport Solutions, Inc. (at the time a subsidiary of Xerox). Admitted that agreements were entered into between Plaintiff and Xerox Transport Solutions, Inc. (at the time a subsidiary of Xerox). Denied as to the remainder.**

73.     Under the NDAs, the parties agreed that any trade secrets or other confidential information shall remain the property of the originating party (Paragraph 5) and that the Xerox Entities had a duty to exercise all reasonable care to preserve and protect Plaintiff's trade secrets and other confidential information from unauthorized access, use, disclosure, or theft; to restrict access to only those who agreed to be bound by the terms and conditions of the Confidentiality Agreements; to not reproduce Plaintiff's proprietary information in any form except as necessary to accomplish the NDA's intent; and to inform Plaintiff if the Xerox Entities became aware of any unauthorized access, use, disclosure, or theft of the proprietary information (Paragraph 6).

**ANSWER: Admitted that agreements were entered into between Plaintiff and ACS Transport Solutions, Inc. (at the time a subsidiary of Xerox). Admitted that agreements were entered into between Plaintiff and Xerox Transport Solutions, Inc. (at the time a subsidiary of Xerox). Denied as to the remainder, including the attempt to universally characterize the individual agreements, and that the agreements were between "Xerox Entities" as opposed to the specific parties in each specific agreement.  Further, Plaintiff**

**has failed to adequately identify any particular "trade secrets," "confidential information," or "proprietary information" and as such Defendants cannot properly form a belief as to the allegations.**

74.     Under the Teaming Agreements, the parties agreed that the inventions shall remain the property of the originating party (Paragraph 10) and that disclosure and protection of proprietary information under the agreements shall be subject to the terms and conditions of the referenced NDAs (Paragraph 11).

**ANSWER: Admitted that the teaming agreements as cited in Paragraph 72 were entered into between Plaintiff and ACS Transport Solutions, Inc. (at the time a subsidiary of Xerox). Denied as to the remainder, including the substance of the agreements. Further, Plaintiff has failed to adequately identify any particular "proprietary information" and as such Defendants cannot properly form a belief as to the allegations.**

75.     On information and belief, ACS and Xerox Transport's acts were, in both form and substance, those of Xerox and were directed and fully controlled by Xerox at the time the Confidentiality Agreements were signed. At the time the Confidentiality Agreements were signed and at all relevant times thereafter, ACS was a division of Xerox and subject to its complete control. ACS was known as "ACS, A Xerox Company" and "Xerox/ACS." The NDAs and Teaming Agreements between Bytemark and ACS identify ACS as "A Xerox Company," and the NDAs between Bytemark and Xerox Transport feature the "Xerox" logo. Similarly, Xerox Transport was a division of Xerox and subject to its complete control.

**ANSWER: Denied. ACS Transport Solutions, Inc. was previously a subsidiary of Xerox. ACS Transport Solutions, Inc. was renamed Xerox Transport Solutions, Inc and continued under this name as a subsidiary of Xerox. After the separation of Xerox and**

**Conduent in 2017, Xerox Transport Solutions, Inc. was renamed Conduent Transport Solutions, Inc. Regarding the remainder of this paragraph, denied as the Plaintiff has failed to define "all relevant times."**

76. On information and belief, at all relevant times ACS and Xerox Transport consented to their relationship with Xerox, owed a fiduciary duty to Xerox, and possessed the power to alter the legal relations between Xerox and third parties (e.g., to enter into contracts). ACS and Xerox Transport were fully controlled by Xerox, exercised a low amount of discretion, and the dealings between them were at arms length. Xerox, and not its divisions, carried the gain or risk. Moreover, there was an overlap in ownership, officers, directors, and personnel, with, e.g., employees of Xerox concurrently working for ACS, Xerox Transport, and/or Conduent. This includes employees who worked on the infringing MyTix mobile ticketing project for NJ Transit. Additionally, the Xerox Entities shared customers, efficiencies, and technological innovation. It is believed that the Xerox Entities shared common office space, address and/or phone numbers. It is also believed that the Xerox Entities' funds, profits, and property were intermingled; that the Entities were not treated as independent profit centers; that there was inadequate capitalization; that there was a disregard of corporate formalities; and that the other Entities' debts were guaranteed and paid by Xerox.

**ANSWER:  Denied.**

77. Under the protection of the Confidentiality Agreements, Plaintiff disclosed its trade secrets and other confidential information to the Xerox Entities.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 77, and therefore deny same.**

78.     The Xerox Entities breached the above-named Confidentiality Agreements by using and/or disclosing Plaintiff's trade secrets and other confidential information to outside parties without Plaintiff's consent, and solely for the Xerox Entities' own benefit.

**ANSWER:  Denied.**

79.     The Xerox Entities have used Plaintiff's trade secrets and confidential information in their contract with NJ Transit, and NJ Transit, the Xerox Entities, and Conduent are using and/or disclosing Plaintiff's trade secrets and confidential information in an attempt to gain an integrated transportation contract with New York Waterway.

**ANSWER:  Denied.**

80.     As a result of the Xerox Entities' breach, Plaintiff has suffered damages in an amount to be determined at trial.

**ANSWER:  Denied.**

**COUNT FOUR**
**VOLATION OF THE DEFEND TRADE SECRETS ACT**
**(Against all Defendants)**

81.     Plaintiff incorporates by reference the allegations set forth in paragraphs 1-80 herein.

**ANSWER:  Defendants hereby incorporate by reference the preceding answers.**

82.     The actions of Defendants as described above constitute violations of one or more provisions of the Defend Trade Secrets Act of 2016 ("DTSA"), PL 114-153, May 11, 2016, 130 Stat 376, which amends the Economic Espionage Act, 18 U.S.C. § 1831 *et seq.*

**ANSWER:  Denied.**

83.     Plaintiff is the owner of trade secrets relating to the design of applications and technical support systems and back-end management technical support and service of its V3

Ticketing Technology and related systems. These trade secrets include a unique compilation of information which includes proprietary mobile ticket development technology and know-how, design and implementation of mobile ticketing technology applications including those relating to its patented visual validation systems, back-end application and system management, maintenance and service, user data and account management and associated security features, and aspects of Bytemark's pricing, sales initiatives and profit generation paradigm.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 83, and therefore deny the same. Further, Plaintiff has failed to adequately identify any particular "trade secrets" and as such Defendants cannot properly form a belief as to the allegations.**

84.     Plaintiff's trade secrets are not generally known or readily ascertainable nor could they be properly acquired or duplicated by others. It is for this reason that Xerox, a large multinational corporation, and the other Xerox Entities sought to partner with Bytemark, a small start-up company with no assets other than its possession of this valuable, unknown and unduplicatable information and its demonstrated success in creating and achieving the implementation of its systems.

**ANSWER: Denied as to the allegations regarding Xerox motivations. For the remaining allegations Defendants lack knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 84, and therefore deny the same.**

85.     At all times, Plaintiff has taken reasonable and extensive efforts to keep its trade secrets secret through the use of Confidentiality Agreements, employment agreements, and employee training. All of Bytemark's trade secrets are stored on secure servers and are

password-protected and encrypted. Additionally, documents containing Bytemark's trade secrets are clearly marked as "Confidential" and/or "Proprietary."

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 85, and therefore deny the same. Further, Plaintiff has failed to adequately identify any particular "trade secrets" and as such Defendants cannot properly form a belief as to the allegations.**

86.     At no time did Plaintiff consent to Defendants' use or disclosure of its trade secrets or confidential information for any purpose.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 86, and therefore deny the same. Further, Plaintiff has failed to adequately identify any particular "confidential information" or "trade secrets" and as such Defendants cannot properly form a belief as to the allegations.**

87.     Plaintiff's trade secrets constitute independent economic value. Since its founding in 2011, Bytemark has invested and continues to invest millions of dollars into research and development and implementation of the trade-secret protected systems, including the V3 ticketing system used by New York Waterway. Bytemark has also invested and continues to invest significant economic resources into refining these systems.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 87, and therefore deny the same. Further, Plaintiff has failed to adequately identify any particular "trade secrets" and as such Defendants cannot properly form a belief as to the allegations.**

88.     Plaintiff's trade secrets are crucial to the success of the implementation, operation, and maintenance of Bytemark's proprietary technology and provide a decisive

competitive advantage to Bytemark and to anyone else with access to this information. Bytemark's trade secrets provide the company with a critical market advantage in attracting new contracts, and it is for this reason that the Xerox Entities sought to partner with Plaintiff.

**ANSWER: Denied as to the allegations regarding Xerox motivations. For the remaining allegations Defendants lack knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 88, and therefore deny the same. Further, Plaintiff has failed to adequately identify any particular "proprietary information" and as such Defendants cannot properly form a belief as to the allegations.**

89. The Xerox Entities acquired Plaintiff's trade secrets through a relationship of trust—in which they represented to Plaintiff that they would be business partners and would not divulge Plaintiff's confidential information, and by way of the Confidentiality Agreements—which imposed a duty upon the Xerox Entities to maintain the confidentiality of Bytemark's confidential information and trade secrets and to not improperly use and/or disclose confidential information and trade secrets belonging to Plaintiff. At all relevant times, the Xerox Entities knew about the confidential nature of Plaintiff's trade secrets.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 89, and therefore deny the same. Further, Plaintiff has failed to adequately identify any particular "confidential information" or "trade secrets" and as such Defendants cannot properly form a belief as to the allegations.**

90. The Xerox Entities misappropriated Plaintiff's trade secrets by improper means in violation of the Confidentiality Agreements by using the secrets and continuing to use them for their own economic benefit.

**ANSWER: Denied.**

91.     The Xerox Entities have intentionally, willfully, and maliciously misused trade secrets and/or confidential or proprietary information or knowledge of Bytemark, and continue to do so, in breach of the Confidentiality Agreements and in violation of a confidential relationship and duty. The Xerox Entities' misappropriation of Plaintiff's trade secrets and confidential information has been ongoing. Plaintiff's knowledge and information have evolved since the parties began their partnership, and the Xerox Entities have continuously misused and/or disclosed Plaintiff's information throughout all stages of its evolution and development.

**ANSWER: Denied.**

92.     Conduent has also intentionally, willfully, and maliciously misused trade secrets and/or confidential or proprietary information or knowledge of Bytemark, and continues to do so. Conduent's use of Plaintiff's trade secrets was the result of discovery by improper means because at all relevant times, Conduent knew about the confidential nature of Plaintiff's trade secrets, and the Xerox Entities shared and/or disclosed the information to Conduent in breach of the Confidentiality Agreements and in violation of a confidential relationship and duty to Plaintiff.

**ANSWER: Denied.**

93.     The Xerox Entities and Conduent continue to misuse and/or disclose Plaintiff's trade secrets and confidential information in their attempt to interfere with Plaintiff's current and prospective contracts with New York Waterway. The Xerox Entities' and Conduent's misuse and/or disclosure of Plaintiff's trade secrets with regard to New York Waterway occurred as recently as January 2017.

**ANSWER: Denied.**

94.     At all relevant times, NJ Transit knew that Plaintiff's information consisted of confidential trade secrets and that Plaintiff's ticketing system was proprietary, trade-secret and patent-protected property. NJ Transit's use of Plaintiff's trade secrets was the result of discovery by improper means because, on information and belief, NJ Transit knew of Plaintiff's dispute with Xerox and was aware that the Xerox Entities acquired Plaintiff's trade secrets by improper means and in violation of the parties' Confidentiality Agreements, and the Xerox Entities disclosed the information to NJ Transit in breach of the Confidentiality Agreements and in violation of a confidential relationship and duty to Plaintiff.

**ANSWER: Denied. Further, Plaintiff has failed to adequately identify any particular "proprietary, trade-secret" property and as such Defendants cannot properly form a belief as to the allegations.**

95.     As a consequence of the foregoing, Plaintiff has suffered and will continue to suffer irreparable harm and loss.

**ANSWER:  Denied.**

## COUNT FIVE
## MISAPPROPRIATION OF TRADE SECRETS UNDER NEW YORK LAW
### (Against all Defendants)

96.     Plaintiff incorporates by reference the allegations set forth in paragraphs 1- 95 herein.

**ANSWER:  Defendants hereby incorporate by reference the preceding answers.**

97.     The actions of Defendants as described above constitute violations of New York common law.

**ANSWER:  Denied.**

98.     Plaintiff is the owner of trade secrets relating to the design of applications and technical support systems and back-end management technical support and service of its V3 Ticketing Technology and related systems. These trade secrets include a unique compilation of information which includes proprietary mobile ticket development technology and know-how, design and implementation of mobile ticketing technology applications including those relating to its patented visual validation systems, back-end application and system management, maintenance and service, user data and account management and associated security features, and aspects of Bytemark's pricing, sales initiatives and profit generation paradigm.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 98, and therefore deny the same. Further, Plaintiff has failed to adequately identify any particular "proprietary mobile ticket development technology and know-how" and as such Defendants cannot properly form a belief as to the allegations.**

99.     Plaintiff's trade secrets are not generally known or readily ascertainable nor could they be properly acquired or duplicated by others. It is for this reason that Xerox, a large multinational corporation, and the other Xerox Entities sought to partner with Bytemark, a small start-up company with no assets other than its possession of this vital, unknown and unduplicatable information and its demonstrated success in creating and achieving the implementation of its systems.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 99, and therefore deny the same. Further, denied are the unfounded allegations regarding Xerox or Xerox Entities motivations.**

100.    At all times, Plaintiff has taken reasonable and extensive efforts to keep its trade secrets secret through the use of Confidentiality Agreements, employment agreements, and employee training. All of Bytemark's trade secrets are stored on secure servers and are password-protected and encrypted. Additionally, documents containing Bytemark's trade secrets are clearly marked as "Confidential" and/or "Proprietary."

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 100, and therefore deny the same. Further, Plaintiff has failed to adequately identify any particular "trade secrets" and as such Defendants cannot properly form a belief as to the allegations.**

101.    Plaintiff's trade secrets constitute independent economic value. Since its founding in 2011, Bytemark has invested and continues to invest millions of dollars into research and development and implementation of the trade-secret protected systems, including the V3 ticketing system used by New York Waterway. Plaintiff has also invested and continues to invest significant economic resources into refining these systems.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 101, and therefore deny the same. Further, Plaintiff has failed to adequately identify any particular "trade-secret protected systems" and as such Defendants cannot properly form a belief as to the allegations.**

102.    Plaintiff's trade secrets are crucial to the success of the implementation, operation, and maintenance of Bytemark's proprietary technology and provide a decisive competitive advantage to Bytemark and to anyone else with access to this information. Bytemark's trade secrets provide the company with a critical market advantage in attracting new contracts, and it is for this reason that the Xerox Entities agreed to partner with Plaintiff.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 102, and therefore deny the same. Further, Plaintiff has failed to adequately identify any particular "trade secrets" and as such Defendants cannot properly form a belief as to the allegations.**

103.    The Xerox Entities acquired Plaintiff's trade secrets through a relationship of trust—in which they represented to Plaintiff that they would be business partners and would not divulge Plaintiff's confidential information, and by way of the Confidentiality Agreements—which imposed a duty upon the Xerox Entities to not improperly use and/or disclose confidential information and trade secrets belonging to Plaintiff. At all relevant times, the Xerox Entities knew about the confidential nature of Plaintiff's trade secrets.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 103, and therefore deny the same. Further, Plaintiff has failed to adequately identify any particular "confidential information" or "trade secrets" and as such Defendants cannot properly form a belief as to the allegations.**

104.    The Xerox Entities misappropriated Plaintiff's trade secrets by using and/or disclosing them for their own economic benefit to secure a contract for providing mobile ticketing services to NJ Transit in violation of the Confidentiality Agreements.

**ANSWER: Denied.**

105.    The Xerox Entities have intentionally, willfully, and maliciously misused trade secrets and/or confidential or proprietary information or knowledge of Bytemark, and continue to do so, in breach of the Confidentiality Agreements and in violation of a confidential relationship and duty. The Xerox Entities' misappropriation of Plaintiff's trade secrets and confidential information has been ongoing. Plaintiff's knowledge and information have evolved

since the parties began their partnership, and the Xerox Entities have continuously misused and/or disclosed Plaintiff's information throughout all stages of its evolution and development.

**ANSWER: Denied.**

106.    Conduent has also intentionally, willfully, and maliciously misused trade secrets and/or confidential or proprietary information or knowledge of Bytemark, and continues to do so. Conduent's use of Plaintiff's trade secrets was the result of discovery by improper means because at all relevant times, Conduent knew about the confidential nature of Plaintiff's trade secrets, and the Xerox Entities shared and/or disclosed the information to Conduent in breach of the Confidentiality Agreements and in violation of a confidential relationship and duty to Plaintiff.

**ANSWER: Denied.**

107.    The Xerox Entities and Conduent continue to misuse and/or disclose Plaintiff's trade secrets and confidential information in their attempt to interfere with Plaintiff's current and prospective contracts with New York Waterway. The Xerox Entities' and Conduent's misuse and/or disclosure of Plaintiff's trade secrets with regard to New York Waterway occurred as recently as January 2017.

**ANSWER: Denied.**

108.    At all relevant times, NJ Transit knew that Plaintiff's information consisted of confidential trade secrets and that Plaintiff's ticketing system was proprietary, trade-secret and patent-protected property. NJ Transit's use of Plaintiff's trade secrets was the result of discovery by improper means because, on information and belief, NJ Transit knew of Plaintiff's dispute with Xerox and was aware that the Xerox Entities acquired Plaintiff's trade secrets by improper means and in violation of the parties' Confidentiality Agreements, and the Xerox

Entities disclosed the information to NJ Transit in breach of the Confidentiality Agreements and in violation of a confidential relationship and duty to Plaintiff.

**ANSWER:  Denied.**

109.   As a consequence of the foregoing, Plaintiff has suffered and will continue to suffer irreparable harm and loss.

**ANSWER:  Denied.**

**COUNT SIX**
**MISAPPROPRIATION OF TRADE SECRETS UNDER NEW JERSEY TADE SECRETS ACT**
**(Against all Defendants)**

110.   Plaintiff incorporates by reference the allegations set forth in paragraphs 1-109 herein.

**ANSWER: Defendants hereby incorporate by reference the preceding answers.**

111.   The actions of Defendants as described above constitute violations of the New Jersey Trade Secrets Act, N.J.S.A. § 56:15-1 *et seq.*

**ANSWER:  Denied.**

112.   Plaintiff is the owner of trade secrets relating to the design of applications and technical support systems and back-end management technical support and service of its V3 Ticketing Technology and related systems. These trade secrets include a unique compilation of information which includes proprietary mobile ticket development technology and know-how, design and implementation of mobile ticketing technology applications including those relating to its patented visual validation systems, back-end application and system management, maintenance and service, user data and account management and associated security features, and aspects of Bytemark's pricing, sales initiatives and profit generation paradigm.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 112, and therefore deny the same. Further, Plaintiff has failed to adequately identify any particular "trade secrets" and as such Defendants cannot properly form a belief as to the allegations.**

113.    At all times, Plaintiff has taken reasonable efforts and precautions to keep its trade secrets secret through the use of Confidentiality Agreements, employment agreements, and employee training. All of Bytemark's trade secrets are stored on secure servers and are password-protected and encrypted. Additionally, documents containing Bytemark's trade secrets are clearly marked as "Confidential" and/or "Proprietary."

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 113, and therefore deny the same. Further, Plaintiff has failed to adequately identify any particular "trade secrets" and as such Defendants cannot properly form a belief as to the allegations.**

114.    At no time did Plaintiff consent to Defendants' use or disclosure of its trade secrets or confidential information for any purpose.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 114, and therefore deny the same. Further, Plaintiff has failed to adequately identify any particular "trade secrets" and as such Defendants cannot properly form a belief as to the allegations.**

115.    The Xerox Entities acquired Plaintiff's trade secrets through a relationship of trust, in which they represented to Plaintiff that they would be business partners and would not divulge Plaintiff's confidential information, and by way of the Confidentiality Agreements, which imposed a duty upon the Xerox Entities to not improperly use and/or disclose

confidential information and trade secrets belonging to Plaintiff. Thus, the Xerox Entities are, and at all relevant times were, aware of the confidential nature of Plaintiff's trade secrets and that disclosure of the information would be improper.

**ANSWER: Denied.**

116.   At all relevant times, Conduent was aware of the confidential nature of Plaintiff's trade secrets, that Plaintiff's ticketing system was proprietary, trade-secret and patent-protected property, and that disclosure of the information would be improper.

**ANSWER: Denied.**

117.   The Xerox Entities and Conduent have misappropriated Plaintiff's confidential information and trade secrets by using and/or disclosing such confidential information and trade secrets by improper means for their own personal gain with NJ Transit and others.

**ANSWER: Denied.**

118.   NJ Transit similarly misappropriated Plaintiff's trade secrets. On information and belief, NJ Transit developed a cooperative transportation strategy wherein NJ Transit and longtime Bytemark customer New York Waterway would offer integrated bus and ferry services to transportation passengers. As part of this scheme, NJ Transit, in collaboration with the Xerox Entities and Conduent, offered to provide New York Waterway with Bytemark's proprietary technology.

**ANSWER: Denied.**

119.   At all relevant times, NJ Transit knew that Plaintiff's information consisted of confidential trade secrets and that Plaintiff's ticketing system was proprietary, trade-secret and patent-protected property. Furthermore, on information and belief, NJ Transit knew of

Plaintiff's dispute with Xerox and was aware that the Xerox Entities acquired Plaintiff's trade secrets by improper means and in violation of the parties' Confidentiality Agreements.

**ANSWER:  Denied.**

120.    Defendants' use of Bytemark's trade secrets to secure contracts that otherwise would have been awarded to Plaintiff has been detrimental to Plaintiff. For example, Plaintiff's existing contract with New York Waterway, which was supposed to be renewed in accordance with the terms of the original agreement in early 2017, has not been extended. Instead, New York Waterway informed Bytemark that it had a better deal with Defendants.

**ANSWER:  Denied.**

121.    As a result of Defendants' actions, Plaintiff has suffered and will suffer damages and irreparable harm.

**ANSWER:  Denied.**

**COUNT SEVEN**
**UNFAIR COMPETITION UNDER NEW YORK LAW**
**(Against all Defendants)**

122.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1-121 herein.

**ANSWER: Defendants hereby incorporate by reference the preceding answers.**

123.    The foregoing acts, in which Defendants misappropriated Plaintiff's labors and expenditures, constitute unfair competition under New York state law. Defendants' practicing of the claims of the Patents-in-Suit and their unlawful use of Plaintiff's trade secrets in Defendants' applications that also have substantially the same look and feel is likely to cause confusion among consumers as to the origin of the technology.

**ANSWER:  Denied.**

124.    In misappropriating Plaintiff's labors and expenditures, Defendants acted in bad faith and exploited Bytemark's exclusive commercial advantage. Under the guise of forming a partnership with Plaintiff, Defendants led Plaintiff to disclose its valuable intellectual property, trade secrets, and other confidential information. Defendants had no intention of partnering with Plaintiff, however, and instead exploited Plaintiff's efforts and used its intellectual property and confidential information for Defendants' own commercial advantage. Ultimately, Defendants cut Plaintiff out of the joint bidding efforts and improperly used and disclosed Plaintiff's patents and trade secrets to bid on and secure their own contracts, including an integrated transportation contract with New York Waterway. In so doing, Defendants exploited the exclusive commercial advantage Plaintiff had previously held in the mobile ticketing application market.

**ANSWER:  Denied.**

125.    At all relevant times, NJ Transit knew that the mobile ticketing technology and services that it purchased and contracted for from the Xerox Entities—and conspired to sell to New York Waterway—belonged to Plaintiff. NJ Transit knew that Plaintiff's information consisted of confidential trade secrets and that Plaintiff's ticketing system was proprietary, trade-secret, and patent-protected property. NJ Transit was fully aware that the trade secrets technology and the patent-claimed aspects of the technology were owned by Plaintiff because the technology was originally presented to NJ Transit as a collaborative project involving both the Xerox Entities and Plaintiff, wherein the parties would use Plaintiff's technology. Plaintiff was later cut out of the bidding process.

**ANSWER:  Denied.**

126.    As a direct and proximate consequence of the foregoing, Plaintiff has no adequate remedy at law, has been irreparably harmed and will continue to be irreparably harmed unless Defendants are enjoined from using and/or disclosing Plaintiff's trade secrets and other confidential information, and enjoined from engaging in the infringing conduct set forth above.

**ANSWER:  Denied.**

127.    In addition, Plaintiff is entitled to all damages that it has sustained by virtue of the aforementioned conduct, in an amount to be determined at trial, including, without limitation, Defendants' profits and gains arising from the wrongful acts described herein and Plaintiff's lost profits, attorneys' fees, costs and interest.

**ANSWER:  Denied.**

128.    Furthermore, because Defendants' actions are wanton, willful, malicious, and have been undertaken in conscious disregard of Plaintiff's rights, Defendants also are liable for punitive damages.

**ANSWER:  Denied.**

**COUNT EIGHT**
**UNJUST ENRICHMENT UNDER NEW JERSEY LAW**
**(Against Defendants, Xerox, ACS, and Xerox Transport)**

129.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1-128 herein.

**ANSWER: Defendants hereby incorporate by reference the preceding answers.**

130.    Plaintiff shared its valuable intellectual property, trade secrets, and other confidential information with the Xerox Entities with the expectation of remuneration in the form of future joint ventures and business contracts.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 130, and therefore deny the same.**

131.     As a result of the Xerox Entities' unlawful conduct including but not limited to their infringement of Plaintiff's Patents-in-Suit and misappropriation of Plaintiff's trade secrets, the Xerox Entities have diverted substantial revenues from Plaintiff.

**ANSWER:  Denied.**

132.     Furthermore, the Xerox Entities have and continue to use and/or disclose Plaintiff's trade secrets and confidential information to develop and sell a competing mobile ticketing platform.

**ANSWER:  Denied.**

133.     Thus, the Xerox Entities have benefitted by saving the significant time and cost that they would otherwise have had to incur to develop their own mobile ticketing platform.

**ANSWER:  Denied.**

134.     As a direct and proximate consequence of the foregoing, the Xerox Entities have been unjustly enriched at Plaintiff's expense.

**ANSWER:  Denied.**

135.     It would be unjust and against good conscience and equity to permit the Xerox Entities to retain, without payment to Plaintiff, the substantial revenues that they have realized through the aforementioned conduct.

**ANSWER:  Denied.**

136.     Accordingly, Plaintiff is entitled to damages in an amount to be determined at trial, plus attorneys' fees, costs, and interest.

**ANSWER:  Denied.**

137.     Furthermore, because the Xerox Entities' actions are wanton, willful, malicious, and have been taken in conscious disregard of Plaintiff's rights, the Xerox Entities are also liable for punitive damages.

**ANSWER:  Denied.**

## AFFIRMATIVE DEFENSES

Defendants set forth the following affirmative defenses. Defendant's inclusion of these defenses is not a concession that Defendants bear the burden of proof with respect to any of these defenses. In addition to the defenses described below, Defendants specifically reserve the right to assert, supplement, modify, and/or amend these defenses through the course of discovery.

## FIRST AFFIRMATIVE DEFENSE – FAILURE TO STATE A CLAIM

138.     Plaintiff's Complaint fails to state a claim upon which relief can be granted, including without limitation any allegations of willful infringement.

## SECOND AFFIRMATIVE DEFENSE – EQUITABLE RELIEF

139.     Plaintiff is not entitled to equitable relief as its remedies at law, if any exist, are adequate, and Plaintiff cannot show that it has suffered or will suffer any immediate or irreparable harm from Defendants' actions.

## THIRD AFFIRMATIVE DEFENSE - INVALIDITY

140.     The asserted claims of the Patents-in-Suit are invalid for failure to comply with the requirements of one or more of the conditions for patentability specified in Title 35 of the United States Code, including, but not limited to, 35 U.S.C. §§ 101, 102, 103, 112, 116, and/or 256, and of any other applicable statutory provision or judicially created doctrines of invalidity,

including, but not limited to, obviousness-type double patenting or the Rules and Regulations of the United States Patent & Trademark Office relating thereto.

## FOURTH AFFIRMATIVE DEFENSE – NON INFRINGEMENT

141.    Defendants have not directly infringed, indirectly infringed, contributed to, or induce infringement of any valid or enforceable claim of any of Plaintiff's Patents-in-Suit, and has not otherwise committed any acts in violation of 35 U.S.C. § 271.

142.    Plaintiff has not met its burden of proof to show infringement of any of the claims of any of its Patents-in-Suit, and will be unable to meet its burden of proof to show infringement of any of the Patents-in-Suit.

143.    Defendants have not (i) directly infringed, either literally or under the doctrine of equivalents, any valid and enforceable claim of the Patents-in-Suit; (ii) contributed to the infringement by others, either literally or under the doctrine of equivalents, of any valid and enforceable claim of the Patents-in-Suit; or (iii) induced the infringement, either literally or under the doctrine of equivalents, of any valid and enforceable claim of the Patents-in-Suit.

144.    The asserted claims of the Patents-in-Suit are not entitled to any construction that would cover any product made, used, sold, offered for sale, or imported into the United States or any method practiced by Defendants. Defendants do not infringe any of the Patents-in-Suit, either directly or indirectly, either literally or under the doctrine of equivalents.

## FIFTH AFFIRMATIVE DEFENSE – PROSECUTION HISTORY ESTOPPEL

145.    The asserted claims of the Patents-in-Suit are limited by the text of the Patents-in-Suit, their prosecution histories, and/or the prior art such that Plaintiff is estopped or otherwise precluded from asserting that Defendants have infringed, directly or indirectly, any claim of the Patents-in-Suit, either literally or under the doctrine of equivalents.

## SIXTH AFFIRMATIVE DEFENSE – PATENT MISUSE

146.     The Patents-in-Suit are unenforceable because Plaintiff has misused said patents by attempting to enforce the knowingly invalid patents against products that clearly do not infringe.

## SEVENTH AFFIRMATIVE DEFENSE – EXCEPTIONAL CASE

147.     Defendants allege that Plaintiff brought this action in bad faith, making it an exception case and thereby entitling Defendants to their costs and attorneys' fees pursuant to 35 U.S.C. § 285, and/or *Octane Fitness*.

## EIGHT AFFIRMATIVE DEFENSE – FAILURE TO MARK

148.     Upon information and belief, Plaintiff's claim for damages prior to the date of the Complaint are barred because Plaintiff and/or licensees of Plaintiff failed to mark or cause to be marked products sold commercially and covered by one or more claims of the Patents-in-Suit pursuant to 35 U.S.C. § 287.

## NINTH AFFIRMATIVE DEFENSE – STATUTORILY LIMITED

149.     Plaintiff's claims for relief are statutorily barred in whole or in part by 35 U.S.C. § 1, *et seq.*, including without limitation 35 U.S.C. § 286.

## TENTH AFFIRMATIVE DEFENSE – EQUITABLE DEFENSES

150.     Plaintiff's claims are barred, in whole or in part, by an express or implied license, and/or the equitable doctrines of unclean hands, failure to disclose art, waiver, acquiescence, patent exhaustion, and/or estoppel.

## ELEVENTH AFFIRMATIVE DEFENSE – COSTS BARRED

151.     35 U.S.C. § 288 bars Plaintiff from recovering costs associated with this action.

## TWELFTH AFFIRMATIVE DEFENSE – UNENFORCEABILITY OF THE PATENTS IN SUIT

152.    For the reasons set forth below, upon information and belief, the Patents-in-Suit are each unenforceable as a result of inequitable conduct before the Patent and Trademark Office ("PTO") during examination of each of the Patents-in-Suit.

### Background of the '567 Patent's Prosecution History

153.    The '567 patent is entitled "Method and System for Distributing Electronic Tickets with Data Integrity Checking." The '567 patent was filed on May 23, 2014 as application number 14/286,622 ("the '622 application").

154.    The attorney of record prosecuting the '622 application was Jennifer Meredith currently of Meredith Attorneys, PLLC 125 Park Avenue 25th Floor New York, NY 10017. At the time the '622 application was prosecuted, Jennifer Meredith was a member of the law firm Meredith & Keyhani, PLLC.

155.    As originally filed, the first claim of the '622 application claimed as follows:

A mobile ticketing system comprising a server computer sub-system adapted to receive from a device via a data network, authentication data for a user account, and in dependence thereon, transmit to the device data embodying a pass; where the system is further adapted to determine the occurrence of fraudulent activity associated with the user account in connection with the ticketing system and in response thereto, store in a data record associated with the user a data value indicating the fraudulent activity.

156.    On April 20, 2017, the Examiner issued a non-final rejection. The Examiner rejected then pending claims 1-16 under 35 U.S.C. § 101 because the Examiner found the claimed invention "directed to a judicial exception (i.e., a law of nature, a natural phenomenon, or an abstract idea) without significantly more. Specifically, the Examiner stated that the pending claims were directed "to an abstract idea of determining fraudulent activity associated with a ticketing system."

157.    On July 17, 2017, Plaintiff responded to the rejection by amending the claims to include more detail about the fraud detection aspect of the alleged invention of the '622 application. Plaintiff's amendment to pending claim 1 is reproduced below.

1. (Currently Amended) A mobile ticketing system for detecting fraudulent activity of tickets using data integrity, comprising:

    a server computer sub-system adapted to receive authentication data for a user account from a device via a data network, and authentication data for a user account, and in dependence thereon, transmit data to the device data embodying a pass, wherein the pass includes a validation visual object;

        wherein the server sub-system is further configured to:

            receive the pass with the data and determine if any mismatch in the received data of the pass by comparing the received data with the data transmitted;

            lock the user account in an event of the received data is mismatched with the transmitted data and detected as a fraudulent activity; and

    where the system is further adapted to determine the occurrence of the fraudulent activity associated with the user account in connection with the mobile ticketing system and in response thereto, store in a data record associated with the user account a data value indicating the fraudulent activity.

158.    Based on the amendment, Plaintiff argued that the amended "claims recite steps that are performed by a machine" and that the problem solved by the '622 application "is rooted in computer technology." According to Plaintiff, fraudulent tickets have been a problem in the ticketing industry. To solve this problem, the pending claims use a server to transmit a pass (i.e., a ticket) and data to a device. At the venue, the pass is redeemed "and the data associated with the pass is transmitted to the server." The server "compar[es] the received data with the data transmitted." If there is a mismatch between the data transmitted and the data received, "the server block[s] the user account" and requests a second authentication request. The server

also "store[s] in a data record associated with the user account a data value indicating the fraudulent activity."

159.    On November 16, 2017, the Examiner issued a Final Rejection again rejecting the pending claims under 35 U.S.C. § 101. The Examiner found that the amended claims of the '622 application were still directed to an abstract idea of determining fraudulent activity associated with a ticketing system."

160.    On April 15, 2018, Plaintiff again amended the claims. The text of amended claim 1 is reproduced below:

1.    (Currently Amended) A mobile ticketing system for detecting fraudulent activity of tickets using data integrity, comprising:

a server sub-system adapted to receive authentication data for a user account from a device via a data network, and transmit data to the device embodying a pass, wherein the pass includes a validation visual object that a ticket taker can rely on as verification of the pass without using a scanning device;

wherein the server sub-system is further configured to:

receive the pass with the data and determine if any mismatch in the received data of the pass by comparing the received data with the data transmitted;

lock the user account in an event of the received data is mismatched with the transmitted data and detected as a fraudulent activity; and

determine the occurrence of the fraudulent activity associated with the user account in connection with the mobile ticketing system and store in a data record associated with the user account a data value indicating the fraudulent activity and in dependence on the data value indicating fraudulent activity, making the pass, including the validation visual object, no longer available on the device.

161.    In addition to the amended claim language, Plaintiff provided over three pages of argument attempting to prove that the amended claims of the '622 application were not invalid under 35 U.S.C. § 101.

162.    On August 10, 2018, the Examiner issued a Non-Final Rejection again rejecting the pending claims under 35 U.S.C. § 101. The Examiner still maintained that the pending claims of the '622 application were "directed to an abstract idea of determining fraudulent activity associated with a ticketing system."

163.    On December 10, 2018, Plaintiff again amended its claims. The text of amended claim 1 is reproduced below:

1.    (Currently Amended) A mobile ticketing system for detecting fraudulent activity of tickets using data integrity, comprising:

a server sub-system adapted to receive authentication data for a user account from a mobile device via a data network, and transmit data in the form of a ticket payload that contains code to the mobile device embodying a pass, wherein the pass includes a validation visual object that a ticket taker can rely on as verification of the pass without using a scanning device and wherein the validation visual object is not accessible until a time selected to be close to the point in time where the ticket has to be presented;

wherein the server sub-system is further configured to:

receive the pass with the data from the mobile device and determine if there is any mismatch in the received data of the pass by comparing the received data with the data transmitted;

lock the user account in an event of the received data is mismatched with the transmitted data and detected as a fraudulent activity; and

determine the occurrence of the fraudulent activity associated with the user account in connection with the mobile ticketing system and store in a data record associated with the user account a data value indicating the fraudulent activity and in dependence on the data value indicating fraudulent activity, the code in the ticket payload makes making the pass, including the validation visual object, no longer available on the device.

164.    In addition to the amended claim, Plaintiff provided four pages of argument attempting to prove that the amended claims of the '622 application were not invalid under 35 U.S.C. § 101.

165.    On February 13, 2019, the Examiner issued a Final Rejection. The Examiner did not reject the claims as being invalid under 35 U.S.C. § 101. Instead, the Examiner states that Plaintiff's "amendments in light of the newest Updated Guidance on the subject matter eligibility have overcome the rejection and the rejection has been withdrawn."

166.    On May 13, 2019, the '622 application was granted a notice of allowance. The '622 application granted as the '567 patent.

### Background of the '764 Patent's Prosecution History

167.    The '764 patent is entitled "Method and System for Distributing Electronic Tickets With Visual Display for Verification." The '764 patent was filed by Plaintiff on August 11, 2015 as application number 14/823,157 ("the '157 application").

168.    The attorney of record prosecuting the '157 application was Jennifer Meredith, currently of Meredith Attorneys, PLLC 125 Park Avenue 25th Floor New York, NY 10017.

169.    As originally filed, the first claim of the '157 application claimed as follows:

> 1.    A method performed by a computer system for displaying visual validation of the possession of a previously purchased electronic ticket for utilization of a service monitored by a ticket taker comprising:
>
> transmitting a token associated with a previously purchased electronic ticket to a remote display device, wherein the token is a unique identifier and a copy of the unique identifier is stored on a central computer system;
>
> validating the token by matching the token transmitted to the remote display device to the copy of the unique identifier stored on the central computing system to provide a ticket payload to the remote display device;
>
> transmitting to the remote display device a validation display object associated with the ticket payload, the validation display object being configured to be readily recognizable visually by the ticket taker, in order to enable the remote display device to display the validation display object so that upon visual recognition by the ticket taker, the user of the remote display device is permitted to utilize the service monitored by the ticket taker.

170.    On October 6, 2017, the Examiner issued a non-final rejection. The Examiner rejected all pending claims under 35 U.S.C. § 101 because the Examiner found the claimed invention "directed to a judicial exception (i.e., a law of nature, a natural phenomenon, or an abstract idea) without significantly more." The Examiner explained that the claims were rejected because they were directed to "method of verifying an electronic ticket through a visual

display on the presenter's device" and that this "is a mental process that could be performed in the human mind, or by a human using a pen and paper."

171. On January 8, 2018, Plaintiff initiated an interview with the Examiner and filed lengthy arguments and remarks to the Examiner's § 101 rejection. Plaintiff did not amend the claims.

172. On June 1, 2018, the Examiner issued a Final Rejection. Despite Plaintiff's arguments, the Examiner maintained that the pending claims were not patentable under 35 U.S.C. § 101.

173. On July 23, 2018, Plaintiff amended the claims to add two additional dependent claims. These new dependent claims, claims 29 and 30, added limitations that the ticket payload contain code that destroy the validation visual object. Plaintiff also included a lengthy argument as to why the claims are not invalid over 35 U.S.C. § 101.

174. On March 18, 2019, the Examiner issued a Non-Final Rejection. The Examiner stated as follows:

> The analysis in line with current 101 guidelines. Claims 1 and 10 should be amended to recite limitations of new method claim 29 and system claim 30 respectively. The 1010 rejection is hereby withdrawn.

175. On April 10, 2019, Plaintiff amended independent claims 1 and 10 to include the limitations of new method claim 29 and system claim 30.

176. On May 22, 2019, the '157 application was granted a notice of allowance. The '157 application granted as the '764 patent.

### Inter Partes Review of the Parent to the '764 Patent

177. The '764 patent is a continuation-in-part of U.S. Patent No. 8,494,967 ("the '967 patent). The '764 patent and the '967 patent share disclosures.

178.     On May 18, 2017, Masabi LTD. Filed a Petition for Inter Partes Review ("IPR") with the United States Patent Trial and Appeals Board ("PTAB") against the '967 patent. The Petition alleged that claims 1-6, 17-23, and 34 of the '967 patent are unpatentable because they are invalid over three prior art references—Terrell, Cruz, and Dutta. IPR2017-01449.

179.     In the IPR, Plaintiff was represented by Jennifer Meredith, then of Meredith & Keyhani, PLLC.

180.     In the IPR, Bytemark, by and through its attorney, Jennifer Meredith, acknowledged that the '967 patent is the subject of a patent infringement action in the Eastern District of Texas captioned *Bytemark, Inc., v. Masabi Ltd.,* Case No. 2:16-cv-00543-JRG-RSP.

181.     On December 4, 2017, the PTAB instituted the IPR.

182.     On December 3, 2018, the PTAB issued a Final Written Decision that claims 1, 3-6, 17, 18, 20-23, and 34 of the '967 patent are unpatentable as anticipated by the Terrell prior art reference.

### Invalidity Contentions in the Eastern District of Texas

183.     On May 20, 2016, Plaintiff filed suit against Masabi Ltd. in the Eastern District of Texas (Civil Action No: 2:16-cv-00543-JRG/RSP).

184.     Plaintiff's complaint alleged infringement of the '967 patent and U.S. Patent No. 9,239,993 ("the '993 patent").

185.     The '764 patent asserted in this case is a continuation-in-part of the '967 patent. The '764 patent and the '967 patent share disclosures.

186.     The '567 patent asserted in this case is a continuation-in-part of the '993 patent. The '567 patent and the '993 patent share disclosures.

187.    As part of the Masabi litigation, Masabi provided invalidity contentions detailing, on a limitation-by-limitation basis, prior art that anticipates and/or renders obvious the claims of the '967 patent and '993 patent.

### *Invalidity of Related Patents in the Eastern District of Texas*

188.    On November 26, 2018, as part of the Masabi litigation, two of Bytemark's patents that were previously asserted in this case—the '967 patent and the '993 patent—were found invalid under 35 U.S.C. § 101 in a Report and Recommendation by Magistrate Judge Roy S. Payne in the Eastern District of Texas. *See Bytemark, Inc. v. Masabi Ltd.*, No. 216CV00543JRGRSP, 2018 WL 7272023, at *5 (E.D. Tex. Nov. 26, 2018). Specifically, the Magistrate Judge found that the claims of both patents were "directed to the abstract idea of verifying the authenticity of a ticket." *Id*. at *8.

189.    On February 7, 2019, the Magistrate's Report and Recommendation was adopted. *Bytemark, Inc. v. Masabi Ltd.*, No. 216CV00543JRGRSP, 2019 WL 7882728, at *1 (E.D. Tex. Feb. 7, 2019).

190.    On February 10, 2020, the decision to invalidate both patents under 35 U.S.C. § 101 was affirmed by the Federal Circuit. *Bytemark, Inc. v. Masabi Ltd.*, 792 F. App'x 952 (Fed. Cir. 2020).

191.    The two invalidated patents—U.S. Patent Nos. 8,494,967 and 9,239,993—are continuations-in-part of the Patents-in-Suit. Specifically, the '567 patent is a continuation-in-part of U.S. Patent No. 9,239,993 and the '764 patent is a continuation-in-part of U.S. Patent No. 8,494,967.

192.    One of the attorneys of record in the Eastern District of Texas litigation was Darius Keyhani of Meredith & Keyhani, PLLC.

193.    Upon information and belief, Jennifer Meredith and Darius Keyhani were the founding members of Meredith & Keyhani, LLC, which employed five attorneys: Jennifer Meredith, Darius Keyhani, Anya Engel, Frances Stephenson, and Sucheta Chitgopekar. Of those, at least Darius Keyhani, Anya Engel, and Frances Stephenson have or are actively working on the litigations between Bytemark and Masabi and/or Bytemark and Defendants.

194.    Bytemark appealed the Eastern District of Texas's ruling that the '967 and '933 patents were invalid under 35 U.S.C. § 101. Jennifer Meredith appeared as counsel for appellant Bytemark.

195.    At the time of the district court litigation, Mr. Keyhani was a partner of Jennifer Meredith, the attorney responsible for prosecuting both Patents-in-Suit.

### The Inventors and Attorney(s) Prosecuting the '567 and '764 Patent Applications Were Aware of Their Duties of Candor and Good Faith in Dealing with the PTO

196.    Jennifer Meredith, the attorney responsible for prosecuting both Patents-in-Suit, had a duty to disclose material information and references to the PTO and signed an oath, acknowledging her duty to disclose material information, under 37 C.F.R. § 1.56. *See* 37 C.F.R. § 1.56. This duty "includes a duty to disclose to the [PTO] all information known to that individual to be material to patentability" during prosecution of patent applications on which they are associated. Jennifer Meredith was ware of her duty of candor and good faith in dealing with the PTO, at least because of her admission as a patent practitioner before the PTO and her acknowledgement of such duties are represented in the signed Declaration and Power of Attorney.

197.    The named inventors of the '567 patent, Micah Bergdale, Matthew Grasser, Kevin Rejko, and Nicholas Ihm, and the inventors of the '764 patent, Micah Bergdale, Matthew Grasser, Nicholas Ihm, Samuel Krueckeberg, and Gregory Valyer, had a duty to disclose

material information and references to the PTO and signed an oath, acknowledging her duty to disclose material information, under 37 C.F.R. § 1.56. *See* 37 C.F.R. § 1.56. This duty "includes a duty to disclose to the [PTO] all information known to that individual to be material to patentability" during prosecution of patent applications on which they are associated. Each of the named inventors of the '567 and '764 patents was aware of their duty of candor and good faith in dealing with the PTO, at least because they each signed a Declaration and Power of Attorney that specifically acknowledges their awareness of the duty.

### The Inventors and Attorney(s) Prosecuting the '567 and '764 Patent Applications Were Aware of the Materiality of the '967 Patent's Inter Partes Review, the District Court Invalidity Contentions, and the District Court's § 101 Decision

198.    Upon information and belief, Jennifer Meredith was, at the time the invalidity contentions were served in *Bytemark, Inc. v. Masabi Ltd.* (E.D. Tex.), a partner with Darius Keyhani, the attorney representing Bytemark in *Bytemark, Inc. v. Masabi Ltd.* (E.D. Tex.).

199.    Upon information and belief, Jennifer Meredith was, at the time the Patent Trial and Appeals Board granted institution on the '967 patent's Inter Partes Review, a partner with Darius Keyhani, the attorney representing Bytemark in *Bytemark, Inc. v. Masabi Ltd.* (E.D. Tex.).

200.    Upon information and belief, Jennifer Meredith was, at the time the Patent Trial and Appeals Board issued a final written decision that the '967 patent was unpatentable, a partner with Darius Keyhani, the attorney representing Bytemark in *Bytemark, Inc. v. Masabi Ltd.* (E.D. Tex.).

201.    Upon information and belief, Jennifer Meredith was, at the time the Magistrate Judge issued a Report and Recommendation invalidating U.S. Patent Nos. 8,494,967 and 9,239,993 under § 101 (*Bytemark, Inc. v. Masabi Ltd.*, No.

216CV00543JRGRSP, 2018 WL 7272023, at *5 (E.D. Tex. Nov. 26, 2018)), a partner with Darius Keyhani, the attorney representing Bytemark in *Bytemark, Inc. v. Masabi Ltd.* (E.D. Tex.).

202.    Notwithstanding her status as a partner with Darius Keyhani, on information and belief, Jennifer Meredith was aware of the Inter Partes Review of the '967 patent, including the decision on institution and the final written decision.

203.    Upon information and belief, the named inventors of the '567 and '764 patents were aware of the Inter Partes Review of the '967 patent, including the decision on institution and the final written decision.

204.    Notwithstanding her status as a partner with Darius Keyhani, on information and belief, Jennifer Meredith was aware of the invalidity contentions in the *Bytemark, Inc. v. Masabi Ltd.* (E.D. Tex.) that listed prior art to the '967 and '993 patents.

205.    Upon information and belief, the named inventors of the '567 and '764 patents were aware of the invalidity contentions in the *Bytemark, Inc. v. Masabi Ltd.* (E.D. Tex.) that listed prior art to the '967 and '993 patents.

206.    Notwithstanding her status as a partner with Darius Keyhani, on information and belief, Jennifer Meredith was aware of the challenges to the patentability of the '967 and '993 patents in *Bytemark, Inc. v. Masabi Ltd.* (E.D. Tex.), including the Magistrate's Report and Recommendation, the adoption of said Report and Recommendation, and the affirmance of said decision on appeal.

207.    Upon information and belief, the named inventors of the '567 and '764 patents were aware of the challenges to the patentability of the '967 and '993 patents in *Bytemark, Inc.*

*v. Masabi Ltd.* (E.D. Tex.), including the Magistrate's Report and Recommendation, the adoption of said Report and Recommendation, and the affirmance of said decision on appeal.

208.   The Inter Partes Review of the '967 patent, its institution, and its final written decision, is material to the patentability of the '764 patent because it provides a basis for determining that the '764 patent, which shares a disclosure and subject matter with the '967 patent, is invalid.

209.   The invalidity contention provided in *Bytemark, Inc. v. Masabi Ltd.* (E.D. Tex.) are material to the patentability of the '567 and '764 patents because they detail prior art that disclose some or all of the subject matter claimed in the '567 and '764 patents.

210.   The district court's decision in *Bytemark, Inc. v. Masabi Ltd.* (E.D. Tex.) with respect to the invalidity of the '967 and '993 patent under 35 U.S.C. § 101 is material to the patentability of the '567 and 764 patents because the district court's decision directly addresses the patentability of patents related to, and sharing subject matter with, the '567 and '764 patent.

### The Inventors and Attorney(s) Prosecuting the '567 and '764 Patent Applications Breached Their Duties of Candor and Good Faith in Dealing with the PTO

211.   Upon information and belief, Jennifer Meredith was specifically aware of the need to submit: (1) the institution decision in the Inter Partes Review of the '967 patent (IPR2017-01449); (2) the final written decision in the Inter Partes Review of the '967 patent (IPR2017-01449); (3) the invalidity contentions submitted in *Bytemark, Inc. v. Masabi Ltd.* (E.D. Tex.); (4) the Magistrate Judge's Report and Recommendation finding that the '967 and '993 patent were invalid under 35 U.S.C. § 101 in *Bytemark, Inc. v. Masabi Ltd.* (E.D. Tex.); and (5) the adoption of the Magistrate Judge's Report and Recommendation in *Bytemark, Inc. v. Masabi Ltd.* (E.D. Tex.).

212.    Upon information and belief, the named inventors of the '567 and '764 patents were specifically aware of the need to submit: (1) the institution decision in the Inter Partes Review of the '967 patent (IPR2017-01449); (2) the final written decision in the Inter Partes Review of the '967 patent (IPR2017-01449); (3) the invalidity contentions submitted in *Bytemark, Inc. v. Masabi Ltd.* (E.D. Tex.); (4) the Magistrate Judge's Report and Recommendation finding that the '967 and '993 patent were invalid under 35 U.S.C. § 101 in *Bytemark, Inc. v. Masabi Ltd.* (E.D. Tex.); and (5) the adoption of the Magistrate Judge's Report and Recommendation in *Bytemark, Inc. v. Masabi Ltd.* (E.D. Tex.).

213.    The Inter Partes Review of the '967 patent and the invalidity contentions provided in *Bytemark, Inc. v. Masabi Ltd.* (E.D. Tex.) are not cumulative of the art considered by the examiner in the prosecution of the '567 and '764 patents.

214.    The § 101 decision in *Bytemark, Inc. v. Masabi Ltd.* (E.D. Tex.) is not cumulative of arguments presented by the examiner and would have aided the examiner in making a properly informed decision on the patentability of the applications that led to the '567 and '993 patents.

215.    Thus, despite Jennifer Meredith's and the named inventors of the '567 and '764 patents' duty to disclose information material to the patentability of the Patents-in-Suit, their knowledge of the Inter Partes Review, the knowledge of the invalidity contentions, and their knowledge of the Eastern District's § 101 finding, and their knowledge of the materiality of the same, they failed to disclose any of these items to the PTO during prosecution of the '567 and '764 patents. Jennifer Meredith and the named inventors of the '567 and '764 patents thus breached their duty under 37 C.F.R. § 1.56.

*If the Inventors and/or the Prosecuting Attorney(s) Had Disclosed the Various Challenges to the Patentability of Related Patents to the PTO, a Reasonable Examiner Would Not Have Allowed the Asserted Claims of the Patents-in-Suit*

216.    A reasonable examiner would have wanted to know about the Inter Partes Review of the '967 patent during prosecution of the '764 patent. Had Jennifer Meredith and/or the named inventors of the '764 patent disclosed the Inter Partes Review, and in particular the institution decision and the final written decision, a reasonable examiner would not have allowed the claims. The art cited in the Inter Partes Review (Terrell, Cruz, and/or Dutta) anticipates ore renders obvious all of the asserted claims of the '764 patent.

217.    A reasonable examiner would have wanted to know about the invalidity contentions provided in *Bytemark, Inc. v. Masabi Ltd.* (E.D. Tex.). Had Jennifer Meredith and/or the named inventors of the '567 and '764 patents disclosed the invalidity contentions, a reasonable examiner would not have allowed the claims of the '567 or '764 patents. Since the invalidity contentions are directed to patents that are family members of the '567 and '764 patents, and since the subject matter claimed by the child patents is similar to that of the patent patents, at least some of the references cited in the invalidity contentions anticipates or renders obvious all of the claims of the '567 and/or '764 patents.

218.    A reasonable examiner would have wanted to know about the decision in *Bytemark, Inc. v. Masabi Ltd.* (E.D. Tex.) to invalidate the '967 and '993 patents under 35 U.S.C. § 101. Had Jennifer Meredith and/or the named inventors of the '567 and '764 patents disclosed the district court's decision, a reasonable examiner would not have allowed the claims of the '567 or '764 patent. Specifically, since the grounds for invalidity cited in *Bytemark, Inc. v. Masabi Ltd.* (E.D. Tex.) are so similar to the grounds cited by the examiner during

prosecution of the '567 and '764 patents, the district court's decision would have caused the examiner to stand by the § 101 rejections made during prosecution.

### The Inventors and/or Prosecuting Attorney(s) Intended to Deceive the PTO into Allowing the Asserted Claims of the Patents-in-Suit

219.    Jennifer Meredith failed to comply with her duty of candor and good faith before the PTO by knowingly and deliberately failing to disclose non-cumulative information that is material to the patentability of the asserted claims of the Patents-in-Suit.

220.    Upon information and belief, the failure of Jennifer Meredith to disclose: (1) the institution decision in the Inter Partes Review of the '967 patent (IPR2017-01449); (2) the final written decision in the Inter Partes Review of the '967 patent (IPR2017-01449); (3) the invalidity contentions submitted in *Bytemark, Inc. v. Masabi Ltd.* (E.D. Tex.); (4) the Magistrate Judge's Report and Recommendation finding that the '967 and '993 patent were invalid under 35 U.S.C. § 101 in *Bytemark, Inc. v. Masabi Ltd.* (E.D. Tex.); and (5) the adoption of the Magistrate Judge's Report and Recommendation in *Bytemark, Inc. v. Masabi Ltd.* (E.D. Tex.) was done with intent to deceive the PTO into issuing the '567 and '764 patents.

221.    This conduct was affirmative egregious misconduct by Jennifer Meredith.

222.    Upon information and belief, the failure of the named inventors of the '567 and '764 patent to disclose: (1) the institution decision in the Inter Partes Review of the '967 patent (IPR2017-01449); (2) the final written decision in the Inter Partes Review of the '967 patent (IPR2017-01449); (3) the invalidity contentions submitted in *Bytemark, Inc. v. Masabi Ltd.* (E.D. Tex.); (4) the Magistrate Judge's Report and Recommendation finding that the '967 and '993 patent were invalid under 35 U.S.C. § 101 in *Bytemark, Inc. v. Masabi Ltd.* (E.D. Tex.); and (5) the adoption of the Magistrate Judge's Report and Recommendation in *Bytemark, Inc. v.*

*Masabi Ltd.* (E.D. Tex.) was done with intent to deceive the PTO into issuing the '567 and '764 patents.

223.   This conduct was affirmative and egregious misconduct by the named inventors of the '567 and '764 patents.

### *Plaintiff's Violation of the Estoppel Rules of 37 C.F.R. § 42.73(d)*

224.   On December 3, 2018, the PTAB issued a Final Written Decision that claims 1, 3-6, 17, 18, 20-23, and 34 of the '967 patent are unpatentable as anticipated by the Terrell prior art reference.

225.   At least Jennifer Meredith received a copy of the Final Written Decision. On information and belief, at least some of the named inventors of the '764 patent received a copy of the Final Written Decision and/or were informed of the Final Written Decision.

226.   Upon information and belief, Jennifer Meredith and/or the named inventors of the '764 patent were aware of 37 C.F.R. § 42.73 when prosecuting the application that issued as the '764 patent.

227.   Despite the issuance of the Final Written Decision finding claims 1, 3-6, 17, 18, 20-23, and 34 of the '967 patent unpatentable, a "judgment" per 37 C.F.R. § 42.73(a), on information and belief, Jennifer Meredith and/or the named inventors of the '764 patent continued prosecuting the application that issued as the '764 patent. Such actions are in violation of the estoppel provisions of 37 C.F.R. § 42.73(d), are *per se* material, and constitute affirmative acts of egregious misconduct.

228.   But for Jennifer Meredith's and/or the named inventors of the '764 patent's violation of the estoppel provisions of 37 C.F.R. § 42.73(d), the PTO would not have issued the '764 patent.

229.    On information and belief, Jennifer Meredith and/or the named inventors of the '764 patent specifically intended to deceive the PTO into issuing the '764 patent by failing to abide by the estoppel provisions of 37 C.F.R. § 42.73(d).

*The Asserted Claims of the Patents-in-Suit are Unenforceable for Inequitable Conduct*

230.    Any one or more acts set forth above are sufficient in and of itself/themselves to demonstrate that Plaintiff committed inequitable conduct during the prosecution of the '567 and/or '764 patent, by way of the conduct of Jennifer Meredith and/or the named inventors of the '567 and '764 patents, and such inequitable conducts renders the '567 and/or '764 patents unenforceable

*The Asserted Claims of the Patents-in-Suit are Unenforceable for Unclean Hands*

231.    Any one or more acts set forth above are sufficient in and of itself/themselves to demonstrate that Plaintiff has unclean hands in relation to its assertion of the '567 and/or '764 patents, by way of the conduct of Jennifer Meredith and/or the named inventors of the '567 and '764 patents, and such unclean hands renders the '567 and/or '764 patents unenforceable.

## THIRTEENTH AFFIRMATIVE DEFENSE – INDEPENDENT DEVELOPMENT

232.    Defendants have developed their mobile ticketing technology and services independent from Plaintiff's alleged trade secrets.

## FOURTEENTH AFFIRMATIVE DEFENSE – PUBLIC INFORMATION

233.    Plaintiff's alleged trade secrets comprise public information and are therefore not protectable under trade secret laws.

## FIFTEENTH AFFIRMATIVE DEFENSE – FAILURE TO PROTECT SECRETS

234.    Plaintiff has failed to provide adequate protections to keep their alleged trade secrets a secret.

**SIXTEENTH AFFIRMATIVE DEFENSE – FAILURE TO ESTABLISH DTSA CLAIM**

235.    The allegations of misappropriation and disclosure alleged by the Plaintiff comprise activity prior to May 11, 2016, the effective date of DTSA.

**SEVENTEENTH AFFIRMATIVE DEFENSE – NO STANDING**

236.    Plaintiff lacks standing to pursue some or all of its claims against one or more Defendants.

**SEVENTEENTH AFFIRMATIVE DEFENSE – NO EXCEPTION CASE**

237.    Plaintiff cannot prove that this is an exceptional case justifying an award of attorney's fees against Defendants pursuant to 35 U.S.C. § 285.

**RESERVATION OF RIGHTS**

238.    Defendants reserve the right to add any further additional and/or affirmative defenses or counterclaims permitted under the Federal Rules of Civil Procedure, the patent laws of the United States, and/or at law or in equity which may in the future be available based on discovery and further factual investigation in this case.

**COUNTERCLAIMS**

239.    Defendants incorporate by reference its answers and affirmative defenses pleaded in paragraphs 1 through 237 of this Answer as though fully set forth herein.

240.    Counterclaimant XEROX Corp. is a New York domestic business corporation with its headquarter at 201 Merritt 7, Norwalk, Connecticut 08651.

241.    Counterclaimant ACS Transport Solutions, Inc. was renamed Xerox Transport Solutions, Inc., and subsequently renamed Conduent Transport Solutions, Inc. Conduent

Transport Solutions, Inc. is a Georgia domestic profit corporation with its principal office address at 100 Campus Drive, Florham Park, NJ 07932.

242.     Counterclaimant Conduent, Inc. is a New York domestic business corporation with its Corporate Headquarters at 100 Campus Drive, Suite 200, Florham Park, New Jersey 07932.

243.     Counterclaimant New Jersey Transit Corp is a New Jersey corporation with its Headquarters at 1 Penn Plaza East, Newark, New Jersey 07105. XEROX Corp, ACS Transport Solutions, Inc., XEROX Transport Solutions, Conduent, Inc., and New Jersey Transit Corp are collectively referred to as "Counterclaimants."

244.     Counter-Defendant, Bytemark, Inc., ("Counter-Defendant") has alleged in its complaint that it is a Delaware corporation organized and existing under the laws of the State of Delaware with a place of business at 268 W 44th Street, 3rd Floor, New York, New York 10036.

## JURISDICTION AND VENUE

245.     These Counterclaims arise under the United States patent laws, 35 U.S.C. § 101 et seq. This Court has jurisdiction over these Counterclaims pursuant to 28 U.S.C. §§ 1331, 1338, 2201 and 2202.

246.     Counter-Defendant is subject to personal jurisdiction in this District because it has availed itself of the jurisdiction of this Court, and has engaged in acts giving rise to this controversy in this judicial district.

247.     Venue in this judicial district is proper under Title 28, United States Code, §§ 1391 and 1400.

248.     Counterclaimants have a justiciable controversy with Counter-Defendant over the validity and infringement of the Patents-in-Suit. More specifically, Counter-Defendant contends that the Patents-in-Suit are valid and that Counterclaimants have infringed and continue to infringe the Patents-in-Suit. Counterclaimants dispute these contentions and seek a declaration of their rights that the '567 and '764 patents are invalid, unenforceable and not infringed.

## COUNTER CLAIM I
### (The '567 Patent is Not Infringed)

249.     Counterclaimants incorporate by reference paragraphs 1-248 above as set forth here in full.

250.     Counter-Defendant has asserted that Counterclaimants infringes at least claim 1 of the '567 patent.

251.     An actual, substantial, and continuing justiciable controversy exists between Counterclaimants and Counter-Defendant with respect to infringement of the '567 patent.

252.     Counterclaimants have not infringed and do not infringe any valid and enforceable claim of the '567 patent literally, directly, indirectly (such as contributorily or by way of inducement), willfully, or under the doctrine of equivalents.

253.     There is an actual controversy, within the meaning of 28 U.S.C. §§ 2201 and 2202, between Counterclaimants and Counter-Defendant as to whether Counterclaimants have infringed or infringe any valid and enforceable claim of the '567 patent.

254.     A judicial declaration concerning these matters is necessary and appropriate so that Counterclaimants can ascertain their rights regarding the '567 patent.

## COUNTER CLAIM II

**(The '764 Patent is Not Infringed)**

255.    Counterclaimants incorporate by reference paragraphs 1-254 above as set forth here in full.

256.    Counter-Defendant has asserted that Counterclaimants infringes at least claim 1 of the '764 patent.

257.    An actual, substantial, and continuing justiciable controversy exists between Counterclaimants and Counter-Defendant with respect to infringement of the '764 patent.

258.    Counterclaimants have not infringed and do not infringe any valid and enforceable claim of the '764 patent literally, directly, indirectly (such as contributorily or by way of inducement), willfully, or under the doctrine of equivalents.

259.    There is an actual controversy, within the meaning of 28 U.S.C. §§ 2201 and 2202, between Counterclaimants and Counter-Defendant as to whether Counterclaimants have infringed or infringe any valid and enforceable claim of the '764 patent.

260.    A judicial declaration concerning these matters is necessary and appropriate so that Counterclaimants can ascertain their rights regarding the '764 patent.

## COUNTER CLAIM III
**(The '567 Patent is Invalid)**

261.    Counterclaimants incorporate by reference paragraphs 1-260 above as set forth here in full.

262.    Each and every claim of the '567 patent is invalid and unenforceable for failure to comply with the requirements of one or more of the conditions for patentability specified in Title 35 of the United States Code, including, but not limited to, 35 U.S.C. §§ 101, 102, 103, 112, 116, and/or 256, and of any other applicable statutory provision or judicially created

doctrine of invalidity, including but not limited to, obviousness-type double patenting or the Rules and Regulations of the United States Patent & Trademark Office relating thereto.

263.    A judicial declaration concerning these matters is necessary and appropriate so that Counterclaimants can ascertain their rights regarding the '567 patent.

## COUNTER CLAIM IV
### (The '764 Patent is Invalid)

264.    Counterclaimants incorporate by reference paragraphs 1-263 above as set forth here in full.

265.    Each and every claim of the '764 patent is invalid and unenforceable for failure to comply with the requirements of one or more of the conditions for patentability specified in Title 35 of the United States Code, including, but not limited to, 35 U.S.C. §§ 101, 102, 103, 112, 116, and/or 256, and of any other applicable statutory provision or judicially created doctrine of invalidity, including but not limited to, obviousness-type double patenting or the Rules and Regulations of the United States Patent & Trademark Office relating thereto.

266.    A judicial declaration concerning these matters is necessary and appropriate so that Counterclaimants can ascertain their rights regarding the '764 patent.

## COUNTER CLAIM V
### (Unenforceability of the '567 and '764 Patents)

267.    Counterclaimants incorporate by reference paragraphs 1-266 above as set forth here in full.

268.    Counterclaimants specifically allege the pleadings set forth in paragraphs XXX-XXX.

269.    For the reasons set forth in paragraphs 152-231, the '567 and '764 patents are unenforceable due to inequitable conduct committed by Jennifer Meredith and/or the named

inventors of the '567 and '764 patents during prosecution of the '567 and '764 patents before the PTO.

270.    A judicial declaration concerning these matters is necessary and appropriate so that Counterclaimants can ascertain their rights regarding the '567 and '764 patents.

## DEMAND FOR JURY TRIAL

271.    Defendants hereby rely upon Plaintiff's jury demand previously requested for all issues triable by jury.

## PRAYER FOR RELIEF APPLICABLE TO ALL COUNTS

For the reasons states, Counterclaimants respectfully pray that the Court:

272.    Enter a take nothing judgment in favor of Counterclaimants and against Counter-Defendant on the Third Amended Complaint and dismiss all of Counter-Defendant's claims with prejudice.

273.    Enter a declaratory judgment declaring that:

    a.  the '567 patent is not infringed;

    b.  the '764 patent is not infringed;

    c.  the '567 patent is invalid and unenforceable;

    d.  the '764 patent is invalid and unenforceable

    e.  the '567 patent is unenforceable due to inequitable conduct;

    f.  the '764 patent is unenforceable due to inequitable conduct;

274.    Award Counterclaimants their respective damages incurred on their counterclaims I-V including lost business and sales along with reasonable attorneys' fees and costs.

275.     Award Counterclaimants compensatory damages, punitive damages, costs, expenses and attorneys' fees pursuant to 15 U.S.C § 1117(a), 28 U.S.C. § 1927, and the inherent authority of the Court.

276.     Award costs, expenses and attorneys' fees against Counter-Defendant pursuant to 28 U.S.C. § 1927 for vexatious, unreasonable and excessive litigation.

277.     Enter such other and further relied to which Counterclaimants may be justly entitled.

Dated:  April 28, 2021

                                                    Respectfully submitted,

                                                    */s/ Ashley N. Moore*
                                                    Ashley N. Moore (admitted *pro hac vice*)
                                                    David Sochia (admitted *pro hac vice*)
                                                    Douglas A. Cawley (admitted *pro hac vice*)
                                                    Marcus L. Rabinowitz (admitted *pro hac vice*)

                                                    **McKool Smith, P.C.**
                                                    300 Crescent Court, Suite 1500
                                                    Dallas, Texas 75201
                                                    Tel:     (214) 978-4000
                                                    Fax:    (214) 978-4044
                                                    amoore@mckoolsmith.com
                                                    dsochia@mckoolsmith.com
                                                    dcawley@mckoolsmith.com
                                                    mrabinowitz@mckoolsmith.com

                                                    David R. Dehoney (4616595)
                                                    **McKool Smith, P.C.**
                                                    One Manhattan West
                                                    395 9th Avenue, 50th Floor
                                                    New York, New York 10001
                                                    Tel:     (212) 402-9424
                                                    Fax:    (212) 402-9444
                                                    ddehoney@mckoolsmith.com

*Attorneys for Defendants*