UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BYTEMARK, INC.,

                              Plaintiff,

        -against-

XEROX CORP., ACS TRANSPORT
SOLUTIONS, INC., XEROX
TRANSPORT SOLUTIONS, INC.,
CONDUENT INC., and NEW JERSEY
TRANSIT CORP.

                              Defendants.

**MEMORANDUM OPINION**

17 Civ. 1803 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Plaintiff Bytemark, Inc. brings this action against Defendants Xerox Corp., ACS

Transport Solutions, Inc., Xerox Transport Solutions, Inc. (collectively, the "Xerox Entities"),

Conduent Inc., and New Jersey Transit Corp. (collectively, "Defendants"), asserting claims for

patent infringement, breach of contract, trade secret misappropriation, unfair competition, and

unjust enrichment.  (See Second Am. Cmplt. ("SAC") (Dkt. No. 74) ¶¶ 1, 3)

        After this litigation was commenced, the patents on which Bytemark's original

patent infringement claims were premised were found invalid in an unrelated action in the

Eastern District of Texas.  Bytemark, Inc. v. Masabi Ltd., No. 216CV00543JRGRSP, 2018 WL

7272023, at *1 (E.D. Tex. Nov. 26, 2018), report and recommendation adopted, No.

216CV00543JRGRSP, 2019 WL 7882728 (E.D. Tex. Feb. 7, 2019), aff'd, 792 F. App'x 952

(Fed. Cir. 2020).  Bytemark then stipulated to the dismissal of its patent infringement claims in

the instant case.  (Dkt. Nos. 94, 95)

        In July 2019, Bytemark obtained two new patents.  (Pltf. Br., Ex. A (Dkt. No.

105-1); Ex. B (Dkt. No. 105-2))  On May 29, 2020, Bytemark moved for leave to file a Third

Amended Complaint ("TAC") that includes patent infringement claims premised on the two new

patents.  (Dkt. No. 104)  Defendants opposed the application, arguing futility and unfair

prejudice.  (Dkt. No. 107)  On March 31, 2021, this Court issued a short order granting Bytemark

leave to amend.  (Dkt. No. 138)  The purpose of this opinion is to explain the Court's reasoning.

## BACKGROUND[1]

I.   <u>FACTS</u>[2]

Plaintiff Bytemark provides "a secure mobile ticketing platform for transit,

tourism, and events though smartphone apps, point-of-sale plugins, and open APIs."  (TAC (Dkt.

---

[1]  Familiarity with the Court's September 21, 2018 Order addressing Defendants' motion to dismiss is assumed.  (Dkt. No. 72)

[2]  The Court's factual summary is drawn from the proposed TAC.  The facts pled in the TAC are presumed true for purposes of resolving Plaintiff's motion to amend.  <u>See</u> <u>Gary Friedrich Enterprises, LLC v. Marvel Enterprises, Inc.,</u> No. 08 Civ. 1533 (BSJ) (JCF), 2011 WL 1142916, at *4 (S.D.N.Y. Mar. 22, 2011); <u>see also</u> <u>Kassner v. 2nd Ave. Delicatessen, Inc.,</u> 496 F.3d 229, 237 (2d Cir. 2007).

"Because determinations of futility on a motion for leave to amend are subject to the same standards as motions under Rule 12(b)(6), '[f]utility is generally adjudicated without resort to any . . . evidence [outside the face of the complaint].'"  <u>Gary Friedrich Enterprises, LLC,</u> 2011 WL 1142916, at *4 (quoting <u>Wingate v. Gives,</u> No. 05 Civ. 1872 (LAK) (DF), 2009 WL 424359, at *5 (S.D.N.Y. Feb. 13, 2009)).  The Court may properly consider documents attached to the complaint as exhibits, incorporated by reference, or integral to the Complaint, however.  <u>See, e.g.,</u> <u>Max Impact, LLC v. Sherwood Grp., Inc.,</u> No. 09 Civ. 902 (LMM) (HBP), 2012 WL 3831535, at *4 (S.D.N.Y. Aug. 16, 2012) ("[I]n making futility determinations, the court must limit itself to the allegations in the complaint, as well as to any documents attached to the complaint as exhibits or incorporated by reference." (citations omitted)); <u>see also</u> <u>Bldg. Indus. Elec. Contractors Ass'n v. City of N.Y.,</u> 678 F.3d 184, 187 (2d Cir. 2012).

Accordingly, in resolving Bytemark's motion to amend, the Court has considered documents attached to the proposed TAC, including the new patents.  (<u>See</u> Pltf. Br., Ex. A (Dkt. No. 105-1); Ex. B (Dkt. No. 105-2))  The Court has also taken judicial notice of public filings in proceedings brought before the United States Patent and Trademark Office.  (<u>See, e.g.,</u> Pltf. Reply Br., Ex. E (Dkt. No. 106-4); <u>see also</u> <u>Global Network Commc'ns, Inc. v. City of N.Y.,</u> 458 F.3d 150, 157 (2d Cir. 2006) ("'[In deciding a motion to dismiss,] [a] court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.'" (quoting <u>Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.,</u> 146 F.3d 66, 70 (2d Cir. 1998))); <u>Dunham v. City</u>

No. 105-4) ¶ 3)  Bytemark alleges that it entered into a series of confidentiality agreements with ACS Transport Solutions. and Xerox Transport Solutions. for the purpose of developing joint bids to provide mobile ticketing solutions to prospective clients in the mass transit industry.  (Id. ¶ 29)  After Bytemark disclosed its trade secrets and proprietary information, the Xerox Entities allegedly cut Bytemark out of the bidding process and used Plaintiff's intellectual property and trade secrets to secure a contract with New Jersey Transit.  (Id. ¶¶ 33, 35, 37-39)  Conduent has allegedly assisted the Xerox Entities in utilizing Plaintiff's proprietary technology, and worked together with the Xerox Entities and New Jersey Transit to sell Plaintiff's proprietary technology to prospective customers, including in New Jersey Transit's MyTix system.  (See id. ¶¶ 36, 47) Bytemark seeks damages related to Defendants' alleged misuse of Bytemark's patent-protected property and trade secrets.

In the TAC, Bytemark alleges that it owns trade secrets related to the design of applications, technical support systems, and back-end management technical support and service of its mobile ticketing applications.  (Id. ¶¶ 84, 113)  Bytemark also alleges that it owns two patents related to its visual validation mobile ticketing applications – Patent No. 10,346,764 (the "'764 patent"), and Patent No. 10,360,567 (the "'567 patent"; together, the "child patents").  (Id. ¶¶ 21-22, Ex. A ('764 Patent) (Dkt. No. 105-1), Ex. B ('567 Patent) (Dkt. No. 105-2))  The '764 Patent was issued on July 9, 2019, and the '567 Patent was issued on July 23, 2019.  (See Pltf. Br., Ex. A ('764 Patent) (Dkt. No. 105-1) at 2, Ex. B ('567 Patent) (Dkt. No. 105-2) at 2) [3]

---

of N.Y., 295 F. Supp. 3d 319, 327 (S.D.N.Y 2018) (noting that, as with a motion to dismiss, a court can "consider matters of which judicial notice may be taken" in ruling on whether a proposed amendment would be futile (quoting Kramer v. Time Warner, Inc., 937 F.2d 767, 773 (2d Cir. 1991))).
[3]  The page numbers of documents referenced in this opinion correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

The '764 patent is entitled "Method and System for Distributing Electronic Tickets with Visual Display for Verification."  (Pltf. Br., Ex. A ('764 Patent) (Dkt. No. 105-1) at 2)  According to the patent abstract, the '764 patent "discloses a novel system and method for distributing electronic ticketing such that the ticket is verified at the entrance to venues by means of an animation or other human perceptible verifying visual object that is selected by the venue for the specific event."  (Id.)  The patent abstract further explains that this ticketing technology improves the ticket and payment experience for consumers and merchants by "remov[ing] the need [for] a bar-code scanner on an LCD display," "speed[ing] up" the ticket verification process, and allowing for ticket verification "in the absence of a network connection."  (Id.)

The '764 patent contains 28 claims.  (Id. at 28-29)  Claim 1 addresses

[a] method performed by a computer system for displaying visual validation of the possession of a previously purchased electronic ticket for utilization of a service monitored by a ticket taker comprising:
    transmitting a token associated with a previously purchased electronic ticket to a remote display device, wherein the token is a unique identifier and a copy of the unique identifier is stored on a central computer system;
    validating the token by matching the token transmitted to the remote display device to the copy of the unique identifier stored on the central computing system to provide a ticket payload to the remote display device;
    transmitting to the remote display device a validation display object associated with the ticket payload, the validation display object being configured to be readily recognizable visually by the ticket taker, in order to enable the remote display device to display the validation display object so that upon visual recognition by the ticket taker, the user of the remote display device is permitted to utilize the service monitored by the ticket taker; and
    wherein the ticket payload contains code that destroys the validating visual object in a predetermined period of time after initial display or upon some pre-determined input event.

(Id. at 28)

The '567 patent is entitled "Method and System for Distributing Tickets with Data Integrity Checking."  (Pltf. Br., Ex. B (Dkt. No. 105-2) at 2)  The patent abstract states that the '567 patent "discloses a novel system and method for distributing electronic ticketing to

mobile devices such that the ticket stored on the device is checked for its integrity from

tampering and the device periodically reports on ticket usage with a central server." (Id.)

The '567 patent comprises 16 claims. (Id. at 36-37) Claim 1 addresses

[a] mobile ticketing system for detecting fraudulent activity of tickets using data
integrity, comprising:
    a mobile device in communication with a server;
    a server adapted to receive authentication data for a user account from the mobile
        device via a data network, and transmit data in the form of a ticket payload that
        contains code to the mobile device embodying a pass, wherein the pass includes a
        validation visual object that a ticket taker can rely on as a verification of the pass
        without using a scanning device and wherein the validation visual object is not
        accessible until a time selected to be close to the point in time where the ticket has
        to be presented;
    wherein the server is further configured to:
        receive the pass with the data from the mobile device and determine if there is any
          mismatch in the received data of the pass by comparing the received data with
          the data transmitted;
        block the user account in an event of the received data is mismatched with the
          transmitted data and detected as a fraudulent activity; and
        determine the occurrence of the fraudulent activity associated with the user
          account in connection with the mobile ticketing system and store in a data
          record associated with the user account a data value indicating the fraudulent
          activity and in dependence on the data value indicating fraudulent activity, the
          code in the ticket payload makes the pass, including the validation visual
          object, no longer available on the device.

(Id. at 36)

Bytemark alleges that Defendants' MyTix mobile application and other sales

offerings of visual validation mobile ticketing applications and systems "infringe at least claim 1

of the '567 patent . . . and at least claim 1 of the '764 patent." (TAC (Dkt. No. 105-4) ¶¶ 38, 48-

49-50, 53, 58, 62-64, 66-67) On July 2, 2019, "Bytemark notified Defendants that their

application and system practices" infringe "at least claim 1 of the '567 patent and claim 1 of the

'764 patent." (Id. ¶¶ 43, 50, 64) "Defendants have continued to use and offer for sale

Bytemark's proprietary technology," however. (Id. ¶¶ 43, 52-53, 65)

The TAC pleads patent infringement claims against all Defendants premised on the '567 patent (id. ¶¶ 44-56) and the '764 patent (id. ¶¶ 57-70).

## II.   PARENT PATENTS

Earlier in this litigation, Bytemark asserted patent infringement claims based on two patents related to its visual validation mobile ticketing applications – Patent No. 8,494,967 (the "'967 patent"), and Patent No. 9,239,993 (the "'993 patent"; together, "the parent patents"). (SAC (Dkt. No. 74) ¶¶ 21-22, Ex. A ('967 Patent) (Dkt. No. 74-2), Ex. B ('993 Patent) (Dkt. No. 74-3))  The '967 Patent was issued on July 23, 2013, while the '993 Patent was issued on January 19, 2016.  (See id., Ex. A ('967 Patent) (Dkt. No. 74-2) at 1, Ex. B ('993 Patent) (Dkt. No. 74-3) at 1)

Both patents are entitled "Method and System for Distributing Electronic Tickets with Visual Display."  (See id.)  According to the patent abstracts, each invention "discloses a novel system and method for distributing electronic ticketing such that the ticket is verified at the entrance to venues by means of an animation or other human perceptible verifying visual object that is selected by the venue for the specific event."  (Id.)  The patent abstracts further explain that this ticketing technology improves the ticket and payment experience for consumers and merchants by "remov[ing] the need [for] a bar-code scanner on an LCD display," "speed[ing] up" the ticket verification process.  (Id.)  Although the claims differ slightly, the specifications in both patents are identical.  (See id., Ex. A ('967 Patent) (Dkt. No. 74-2) at 3-25, Ex. B ('993 Patent) (Dkt. No. 74-3) at 4-26)  The '993 Patent "claims priority to U.S. patent application Ser. No. 13/475,881 [(the '967 Patent)] . . . as a continuation and . . . incorporates that application by reference in its entirety."  (See id., Ex. B ('993 Patent) (Dkt. No. 74-3) at 20)

Claim 1 of the '967 patent addresses

[a] method by a server system for obtaining visual validation of the possession of a purchased electronic ticket on a user's computer device for presentation to a ticket taker comprising:

> receiving from the user's computer device a request to verify purchase of a previously purchased electronic ticket and to obtain a visual validation display object that confirms that the user possesses the previously purchased electronic ticket for utilization of a service monitored by the ticket taker, the visual validation display object configured to be readily recognizable visually by the ticket taker;
>
> receiving from the user's computer device a token associated with the received request;
>
> determining whether a token associated with the purchased electronic ticket has been stored in a data record associated with the received request, and if it has, whether the received token is valid; and
>
> independence on the determination that the received token is valid, causing an activation of the purchased electronic ticket by transmitting to the user's computer device a data file comprising the visual validation display object that causes upon visual recognition by the ticket taker, the user to be permitted to utilize the service monitored by the ticket taker.

(Id., Ex. A ('967 Patent) (Dkt. No. 74-2) at 25)

Claim 1 of the '993 patent addresses

[a] method performed by a computer system for displaying visual validation of the possession of a previously purchased electronic ticket for utilization of a service monitored by a ticket taker comprising:

> transmitting a token associated with a previously purchased electronic ticket to a remote display device, wherein the token is a unique alphanumeric string, and wherein a copy of the unique alphanumeric string is stored on a central computer system;
>
> validating the token by matching the token transmitted to the remote display device to the copy of the unique alphanumeric string stored on the central computing system to provide a ticket payload to the remote display device;
>
> securing a validation display object prior to transmission to provide a secured validation display object;
>
> transmitting to the remote display device a secured validation display object associated; with the ticket payload; and
>
> enabling the remote display device to display the secured validation display object upon validation of the token for visual recognition by the ticket taker or preventing the remote display device from displaying the secured validation display object in the event that the token is not validated.

(Id., Ex. B ('993 Patent) (Dkt. No. 74-3) at 26)

On January 26, 2018, Defendants notified this Court that Masabi Ltd. had initiated an <u>inter partes</u> review of certain claims of the '967 patent with the U.S. Patent and Trademark Office (the "PTO").  (Notice (Dkt. No. 58) at 1, 35), and on September 21, 2018, this Court stayed the instant case pending the resolution of the PTO's <u>inter partes</u> review.  (Dkt. No. 71)

Litigation related to Masabi's invalidity allegations continued in the Eastern District of Texas, however.  (<u>See</u> PTO Decision (Dkt. No. 58-1) at 3)  In that district, Bytemark alleged that Masabi had infringed the parent patents.  <u>Bytemark, Inc. v. Masabi Ltd.</u>, No. 216CV00543JRGRSP, 2018 WL 7272023, at *1 (E.D. Tex. Nov. 26, 2018), <u>report and recommendation adopted</u>, No. 216CV00543JRGRSP, 2019 WL 7882728 (E.D. Tex. Feb. 7, 2019), <u>aff'd</u>, 792 F. App'x 952 (Fed. Cir. 2020).

In connection with Masabi's motion for summary judgment, the Texas court analyzed the parent patents' validity pursuant to 35 U.S.C. § 101.  <u>Id.</u> at *5 (explaining that "abstract ideas are not patentable") (quoting <u>Ass'n for Molecular Pathology v. Myriad Genetics, Inc.</u>, 569 U.S. 576, 589 (2013)).  Applying the analytical framework set forth in <u>Alice Corp. Pty. Ltd. v. CLS Bank Int'l</u>, 573 U.S. 208, 218 (2014), the Texas court first considered "whether the claims at issue are directed to a patent-ineligible concept," analyzing "the claim language, the specification, the prosecuting history, and past cases."  <u>Masabi</u>, 2018 WL 7272023, at *5 (citations omitted).

The Texas court determined that the parent patents' data-centric claim language – which "recite[s] the use of computers, servers, and devices" "in terms of their conventional functions, such as sending, receiving, storing, and verifying data or information" – are directed to an abstract – and therefore unpatentable – concept.  <u>Id.</u> at *6.  The court further found that "the

specification and prosecution history support the conclusion that is evident from the claims" –
i.e., that the subject matter is an abstract idea.  Id. *7.

While the parent patents' specification touts a "novel system and method for
distributing electronic ticketing such that the ticket is verified at the entrance to venues by means
of an animation or other human perceptible verifying visual object that is selected by the venue
for the specific event" – which "removes the need to use a bar-code scanner on an LCD display
of a cell phone or other device and speeds up the rate at which human ticket takers can verify
ticket holders" – the specification lacks any "indication that the image itself or the method of
creating it is a technological improvement."  Id. (citations omitted).

As to the prosecution history, the Masabi court notes the applications' emphasis
on the "validation display object," and finds that "computers are invoked merely as a tool" to
implement the abstract idea.  Id. (citations omitted).

The Texas court further finds that the parent patents are "a hybrid of two
categories of claims routinely invalidated under § 101."  Id. at *8.  The parent patents' "assert[]
claims involve collecting, storing, recognizing, and manipulating data, or encoding or decoding
data, to make the data human- or machine-readable," and reference a method that "ensures the
security of a financial transaction, and may improve the ticket-taking process."  (Id.)  The
Masabi court notes that such claims are "routinely invalidated" under Section 101.  Id.

In sum, as to the first step of the Alice analysis, the Texas court concludes that the
parent patents' "claims are directed to the abstract idea of verifying the authenticity of a ticket."
Id.

The Texas court then considers whether the parent patent claims contain
"additional features" that go beyond "well-understood, routine, conventional activities," such

that the "additional features" convert the abstract idea into a sufficiently "inventive concept."  Id.
(quoting Alice, 573 U.S. at 221).  The court concludes that the parent patent claims utilize well-
known "hardware features – a computer or server system and a mobile device."  Id.  "[T]he
concept . . . is [thus] nothing more than using these conventional tools to verify the authenticity
of an electronic ticket."  Id.

Because the parent patents use "generic computer implementation" – albeit
implementation that is "narrow" and "confined to a particular application" – the abstract idea in
the parent patent claims is not patentable.  Id.

On March 11, 2019 – after the Texas court's determination that the parent patents
are invalid – the parties in the instant case stipulated to the dismissal of Plaintiff's patent
infringement claims as to the '967 and '993 patents.  (Dkt. Nos. 94, 95)

## III.   PROCEDURAL HISTORY

The Complaint was filed on March 10, 2017 (Cmplt. (Dkt. No. 1)), and the First
Amended Complaint ("FAC") was filed on September 21, 2017.  (Dkt. No. 40)  Defendants
moved to dismiss the FAC.  (Dkt. No. 51)

Addressing Plaintiff's non-patent infringement claims, this Court granted in part
and denied in part Defendants' motion to dismiss.  (Dkt. No. 72)  On October 1, 2018, Bytemark
filed a Second Amended Complaint that addresses deficiencies in its unjust enrichment claim
under New Jersey law and in its unfair competition claim against New Jersey Transit.  (Dkt. No.
74)

On May 29, 2020, Bytemark moved for leave to file a Third Amended Complaint.
The TAC pleads two new patent infringement claims premised on Bytemark's two new patents.
(Dkt. No. 104)

## DISCUSSION

## I.    LEGAL STANDARD

District courts "ha[ve] broad discretion in determining whether to grant leave to amend." Gurary v. Winehouse, 235 F.3d 792, 801 (2d Cir. 2000). "[L]eave to amend should be freely granted when 'justice so requires.'" Pangburn v. Culbertson, 200 F.3d 65, 70 (2d Cir. 1999) (quoting Fed. R. Civ. P. 15(a)). See also Rachman Bag Co. v. Liberty Mut. Ins. Co., 46 F.3d 230, 234 (2d Cir. 1995) ("The Supreme Court has emphasized that amendment should normally be permitted, and has stated that refusal to grant leave without justification is 'inconsistent with the spirit of the Federal Rules.'" (quoting Foman v. Davis, 371 U.S. 178, 182 (1962))).

However, a court may properly deny leave to amend in cases of "'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, futility of amendment, etc.'" Ruotolo v. City of N.Y., 514 F.3d 184, 191 (quoting Foman, 371 U.S. at 182).

"'Where it appears that granting leave to amend [would be futile or] is unlikely to be productive[,] . . . it is not an abuse of discretion to deny leave to amend.'" See Lucente v. Int'l Bus. Machines Corp., 310 F.3d 243, 258 (2d Cir. 2002) (quoting Ruffolo v. Oppenheimer & Co., 987 F.2d 129, 131 (2d Cir. 1993)); Selvam v. Experian Info. Sols., Inc., No. 13 Civ. 6078 (DLI) (JO), 2015 WL 1034891, at *4 (E.D.N.Y. Mar. 10, 2015) (denying leave to amend after granting motion to dismiss, because "[t]he [amended] complaint gives no indication that Plaintiff has a colorable claim . . . [,] and Plaintiff has already had one opportunity to amend the complaint"); Murdaugh v. City of N.Y., No. 10 Civ. 7218 (HB), 2011 WL 1991450, at *2

(S.D.N.Y. May 19, 2011) ("Although . . . leave to amend complaints should be 'freely given,' leave to amend need not be granted where the proposed amendment is futile." (citations omitted)).

"[Parties] opposing a motion to amend . . . bear[ ] the burden of establishing that an amendment would be futile." Bonsey v. Kates, No. 13 Civ. 2708 (RWS), 2013 WL 4494678, at *8 (S.D.N.Y. Aug. 21, 2013) (citing Blaskiewicz v. Cty. of Suffolk, 29 F. Supp. 2d 134, 137 (E.D.N.Y. 1998)). "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." Lucente, 310 F.3d at 258 (citation omitted).

## II. ANALYSIS

### A. Futility

Defendants argue that granting Bytemark leave to amend would be futile, because the child patents are invalid under Section 101 of the Patent Act for the same reason that the Masabi court found the parent patents invalid. (Def. Opp. (Dkt. No. 107) at 5, 12) Defendants further contend that Bytemark's two new patents are unenforceable because they were obtained through inequitable conduct. (Id. at 6-12) According to Defendants, Bytemark did not disclose to the PTO the Texas court's ruling that the parent patents are invalid, and the PTO would not have issued the '764 and '567 patents if it had been aware of the Texas decision. (Id. at 12)

Bytemark counters that the child patents are valid because they "contain claims and claim limitations . . . that differ from those of the parent patents" and "were granted under the PTO's Revised § 101 Guidance." (Pltf. Reply Br. (Dkt. No. 106) at 10) Bytemark also maintains that it apprised the PTO of the Masabi litigation, including the Texas court's ruling that the parent patents are invalid. (Id. at 5-7)

1.     **Patentability**

"[P]atents granted by the Patent and Trademark Office" – such as the '764 and '567 patents at issue here – "are presumptively valid." Cellspin Soft, Inc. v. Fitbit, Inc., 927 F.3d 1306, 1319 (Fed. Cir. 2019) (citing Microsoft Corp. v. i4i Ltd. P'ship, 564 U.S. 91, 100 (2011)). An alleged infringer challenging the validity of a patent "must prove that the patent does not satisfy the[ ] prerequisites" for issuance of a patent, including the requirements set forth in Section 101 of the Patent Act. Id.

Under Section 101 of the Patent Act, "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. The Supreme Court has recognized three implicit exceptions to Section 101's coverage: "laws of nature, physical phenomena, and abstract ideas." Bilski v. Kappos, 561 U.S. 593, 601 (2010) (quoting Diamond v. Chakrabarty, 447 U.S. 303, 303 (1980)).

The Supreme Court has articulated a two-step framework for determining patent validity, which is referred to as the Alice test. Under the first step, the court must "determine whether the claims at issue are directed to a patent-ineligible concept." Alice Corp. Pty., 573 U.S. at 218. Courts "consider the claims 'in their entirety to ascertain whether their character as a whole is directed to excluded subject matter.'" CardioNet, LLC v. InfoBionic, Inc, 955 F.3d 1358, 1367–68 (Fed. Cir. 2020) (quoting McRO, Inc. v. Bandai Namco Games Am. Inc., 837 F.3d 1299, 1312 (Fed. Cir. 2016)). Judges "also consider the patent's written description," which "informs [courts'] understanding of the claims." Id. at 1638.

In performing the first step of the Alice analysis, courts consider "whether the claims 'focus on a specific means or method that improves the relevant technology or are instead

directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery.'"  Id. (quoting McRO, 837 F.3d at 1314).

      In connection with the second step of the Alice analysis, a court must "examine the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application."  Alice Corp. Pty., 573 U.S. at 221 (quoting Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc., 566 U.S. 66, 72, 78 (2012)).

      Patent validity under Section 101 presents a question of law that may be determined on the pleadings.  See In re TLI Commc'ns LLC Patent Litig., 823 F.3d 607 (Fed. Cir. 2016) (granting Rule 12(b)(6) motion to dismiss where patented process was abstract, and thus patent-ineligible); Ultramercial, Inc. v. Hulu, LLC, 772 F.3d 709 (Fed. Cir. 2014) (same); Multimedia Plus, Inc. v. Playerlync, LLC, 198 F. Supp. 3d 264, 266 (S.D.N.Y. 2016) (noting that "courts have frequently decided questions of patent eligibility on the pleadings").

      **a.**    **'764 Patent**

      As to the '764 patent, the abstract notes that the invention offers a "method for distributing electronic ticketing" that allows humans to "verify[ an event-specific] visual object" and to verify event ticket purchases "in the absence of a network connection."  (Pltf. Br., Ex. A (Dkt. No. 105-1) at 2)  Claim 1 describes this method in more detail:  it involves "transmitting a token associated with a previously purchased electronic ticket to a remote display device, . . . validating the token" by matching unique identifiers in a computer system, "transmitting to the remote display device a validation display object" that would "be readily recognizable visually by the ticket taker," and then employing a "code that destroys the validating visual object" after a certain action or amount of time.  (Id. at 28)  Claim 1 of the '764 patent differs from the parent

patents in that it references a "code that destroys the validating visual object in a predetermined period of time after initial display or upon some pre-determined input event."  (Id.)

As to step one of the Alice analysis, Defendants argue that "a method and system of validating a ticket by showing a ticket taker a human-readable object . . . is an abstract idea that can be performed manually by a human."  (Def. Opp. (Dkt. No. 107) at 13)  The "mere automation of manual processes using generic computers does not constitute a patentable improvement in computer technology."  Credit Acceptance Corp. v. Westlake Servs., 859 F.3d 1044, 1055 (Fed. Cir. 2017) (citation omitted).  Moreover, claims for methods that "collect[], stor[e], and recogni[ze] . . . data are directed to an abstract idea."  Smart Systems Innovations, LLC v. Chicago Transit Authority, 873 F.3d 1364, 1372 (Fed. Cir. 2017) (citation omitted).  And "claims directed to gathering and processing data," as well as transmitting data, "are [likewise] directed to an abstract idea."  iLife Techs., Inc. v. Nintendo of Am., Inc., 839 F. App'x. 534, 536-37 (Fed. Cir. 2021) (collecting cases).

As to step two of the Alice analysis, Defendants contend that the '764 patent uses conventional techniques and hardware for implementation.  (Def. Opp. (Dkt. No. 107) at 14)[4]

---

[4] Defendants cite Cleveland Clinic Found. v. True Health Diagnostics, LLC, No. 117CV198LMBIDD, 2017 WL 3381976, at *1 (E.D. Va. Aug. 4, 2017), aff'd, 760 F. App'x 1013 (Fed. Cir. 2019) ("Cleveland Clinic II") for the proposition that where "the Federal Circuit has previously invalidated a parent patent under § 101, it is appropriate to dispose of the child patent at the pleading stage."  (Def. Opp. (Dkt. No. 107) at 14)  The circumstances in Cleveland Clinic II differ from those here, however.  In invalidating the parent patents in that case, the Federal Circuit discussed in detail why the inventions were not patent-eligible, see Cleveland Clinic Found. v. True Health Diagnostics LLC, 859 F.3d 1352, 1359-64 (Fed. Cir. 2017) ("Cleveland Clinic I"), and "fully resolved all relevant factual issues as to [the patent infringement claims in that case]."  Cleveland Clinic II, 2017 WL 3381976, at *1.  By contrast, the Federal Circuit affirmed the district court's Masabi decision by summary order, see Bytemark, Inc. v. Masabi Ltd., 792 F. App'x 952 (Fed. Cir. 2020), and Claim 1 of the '764 patent contains new language that has not been passed on by the Federal Circuit.

The Court concludes that Defendants have not carried their burden to show that an amendment adding a patent infringement claim premised on the '764 patent would be futile. Defendants have not substantively addressed the effect of including – in Claim 1 – language referencing a code that destroys the validating visual object.  Defendants merely state, in a conclusory fashion, that this language in the '764 patent "does not save the claims from abstractness," analogizing to the manual function of tearing a ticket in half after use.  (Def. Opp. (Dkt. No. 107) at 14-15)  This analysis is not sufficient to demonstrate that Defendants would prevail on a motion to dismiss a patent infringement claim premised on the '764 patent.

**b.      '567 Patent**

Claim 1 of the '567 patent is directed toward "detecting fraudulent activity of tickets using data integrity," by using a server that communicates with a mobile device that is "configured to . . . determine if there is any mismatch [between ticket data and data transmitted]," and that can "block the user account" of a fraudulent ticket holder.  (Pltf. Br., Ex. B (Dkt. No. 105-2) at 36)  Bytemark argues that the '567 patent's focus on fraud detection and data integrity is a marked departure from the parent patents, which focused on "methods relating to visual validation."  (Pltf. Br. (Dkt. No. 105) at 15)

Defendants contend – as they did in connection with the '764 patent – that "sending and receiving information, and comparing the sent and received information to determine whether a transaction is authentic," is an unpatentable automation of a manual process.  (Def. Opp. (Dkt. No. 107) at 16)  According to Defendants, the claims of the '567 patent are directed to the abstract idea of "detecting fraudulent activity in a ticketing system." (Id.)  In support of this argument, Defendants cite FairWarning IP, LLC v. Iatric Systems, Inc., 839 F.3d 1089 (Fed. Cir. 2016), in which the Federal Circuit held that a claim is abstract when it

combines "collecting information, including when limited to particular content," with "analyzing information by steps people go through in their minds, or by mathematical algorithms," and "presenting the results of abstract processes of collecting and analyzing information, without more (such as identifying a particular tool for presentation)." Id. at 1093 (internal quotation marks and citations omitted). (See Def. Opp. (Dkt. No. 107) at 16)

While acknowledging that the '567 patent includes "three claim limitations of receiving, blocking, and determining," Defendants do not address the effect of these limitations on the FairWarning IP analysis. (Id. at 16 n.7) Similarly, while Defendants note that "the '567 Child Patent shares portions of its disclosure with . . . one of the Invalid Parent Patents," Defendants do not discuss how the claim language that differs from the parent patents impacts the Section 101 analysis. (Id. at 17)

"Improving security . . . can be a non-abstract computer-functionality improvement if done by a specific technique that departs from earlier approaches to solve a specific computer problem." Ancora Techs., Inc. v. HTC Am., Inc., 908 F.3d 1343, 1348 (Fed. Cir. 2018), as amended (Nov. 20, 2018) (citations omitted). The Court concludes – for purposes of the Alice step one analysis – that Defendants have not demonstrated that the '567 patent addresses an abstract matter.

Defendants have likewise not shown that the '567 patent could not be redeemed from ineligibility at step two of the Alice analysis. Defendants state that the "generic computer systems" employed in the '567 patent are not sufficient to render the claim eligible. (Def. Opp. (Dkt. No. 107) at 16) The '567 patent describes the use of a specific server configuration for fraud detection, however (Pltf. Br., Ex. B (Dkt. No. 105-2) at 36), and Defendants make no effort to distinguish the description of the server employed in Claim 1 of the '567 patent from the "use

17

of a generic . . . server" found to be ineligible in other cases.  See Innovation Scis., LLC v.

Amazon.com, Inc., 778 F. App'x 859, 864 (Fed. Cir. 2019); cf. Uniloc USA, Inc. v. ADP, LLC,

772 F. App'x 890, 899 (Fed. Cir. 2019) (finding a claim eligible when it "position[ed] . . .

components on" a specific "application server").

       Because Defendants have not demonstrated that either child patent would be

deemed ineligible under Section 101, they have not shown that the patent infringement claims in

the TAC would not survive a Rule 12(b)(6) motion to dismiss.

### 2.      Inequitable Conduct

       Defendants contend that the child patents are unenforceable because they were

obtained through inequitable conduct.  (Def. Opp. (Dkt. No. 107) at 7)  According to Defendants,

"Bytemark withheld [from the PTO] the Eastern District of Texas decisions invalidating the

Invalid Parent Patents."  (Id.)

       "Inequitable conduct is an equitable defense to patent infringement that, if proved,

bars enforcement of a patent."  Therasense, Inc. v. Becton, Dickinson & Co., 649 F.3d 1276,

1285 (Fed. Cir. 2011).

> To prevail on a claim of inequitable conduct, the accused infringer must prove that the
> patentee acted with the specific intent to deceive the PTO. A finding that the
> misrepresentation or omission amounts to gross negligence or negligence under a "should
> have known" standard does not satisfy this intent requirement. In a case involving
> nondisclosure of information, clear and convincing evidence must show that the applicant
> made a deliberate decision to withhold a known material reference. In other words, the
> accused infringer must prove by clear and convincing evidence that the applicant knew of
> the reference, knew that it was material, and made a deliberate decision to withhold it.

Id. at 1290 (quotation marks, citations, and emphasis omitted).

       "A court's determination of inequitable conduct proceeds in two parts:  the

accused infringer, who bears the burden of proof on this claim, must prove both that a

nondisclosed reference was material and that the patent applicant acted with the requisite intent."

Regeneron Pharm., Inc. v. Merus B.V., 144 F. Supp. 3d 530, 559 (S.D.N.Y. 2015), aff'd sub nom. Regeneron Pharm., Inc. v. Merus N.V., 864 F.3d 1343 (Fed. Cir. 2017).

   With respect to materiality, "as a general matter, the materiality required to establish inequitable conduct is but-for materiality." Therasense, 649 F.3d at 1291.  "[I]n assessing the materiality of a withheld reference, the court must determine whether the PTO would have allowed the claim if it had been aware of the undisclosed reference." Id.  "[A] district court may not infer intent solely from materiality.  Instead, a court must weigh the evidence of intent to deceive independent of its analysis of materiality." Id. at 1290.  Such evidence of "'intent to deceive is generally inferred from the facts and circumstances surrounding the applicant's overall conduct.'" Leviton Mfg. Co. v. Universal Sec. Instruments, Inc., 606 F.3d 1353, 1362 (Fed. Cir. 2010) (quoting Impax Lab'ys., Inc. v. Aventis Pharms Inc., 468 F.3d 1366, 1375 (Fed. Cir. 2006))  "Even if the nondisclosed information is of 'relatively high materiality,' however, inequitable conduct cannot be found where '[the patentee] offer[s] a plausible, good faith explanation for why [the undisclosed information] was not cited to the PTO.'" Id. at 1362-63 (quoting Warner–Lambert Co. v. Teva Pharms. USA, Inc., 418 F.3d 1326, 1348 (Fed. Cir. 2005)).

   Where, as here, a defendant's inequitable conduct argument is premised on the non-disclosure of information, the accused infringer must prove by "clear and convincing evidence" that the applicant "(1) knew of the withheld material information . . . , and (2) withheld . . . this information with a specific intent to deceive the PTO." Exergen Corp. v. Wal-Mart Stores, Inc., 575 F.3d 1312, 1328-29 & 1329 n.5 (Fed. Cir. 2009).  Moreover, "to plead the 'circumstances' of inequitable conduct with the requisite 'particularity' under Rule 9(b), the pleading must identify the specific who, what, when, where, and how of the material

misrepresentation or omission committed before the PTO." <u>Town & Country Linen Corp. v. Ingenious Designs LLC</u>, No. 18-CV-5075 (LJL), 2020 WL 3472597, at *6 (S.D.N.Y. June 25, 2020) (internal quotation marks and citation omitted).

Here, Defendants argue that "Bytemark withheld the [Texas] decisions invalidating the . . . parent patents" when it was "prosecuting the Children Patents." (Def. Opp. (Dkt. No. 107) at 7) Bytemark counters that it "was transparent with the PTO throughout the patent prosecution process and complied with all applicable rules," and that the PTO possessed all material information when it granted the child patents. (Pltf. Reply Br. (Dkt. No. 106) at 5)

With respect to litigation relating to a pending patent application, the Manual for Patent Examining Procedure (the "MPEP") provides as follows:

> Where the subject matter for which a patent is being sought is or has been involved in litigation . . . , the existence of such litigation and any other material information arising therefrom must be brought to the attention of the . . . Patent and Trademark Office. . . . Examples of such material information include evidence of possible prior public use or sales, questions of inventorship, prior art, allegations of "fraud," "inequitable conduct," and "violation of duty of disclosure." Another example of such material information is any assertion that is made during litigation . . . which is contradictory to assertions made to the examiner. <u>Environ Prods., Inc. v. Total Containment, Inc.</u>, 43 USPQ2d 1288, 1291 (E.D. Pa. 1997). Such information might arise during . . . depositions, and [from] other documents and testimony.

MPEP § 2001.06(c).

The MPEP also provides that – when reviewing an application that has a parent patent – "[t]he examiner . . . will consider information which has been considered by the Office in the parent application." MPEP § 609.02. Accordingly, "[i]n view of [MPEP] § 609 it [cannot] be inequitable conduct for an applicant not to resubmit, in the divisional application, the information that was cited or submitted in the parent application." <u>ATD Corp. v. Lydall, Inc.</u>, 159 F.3d 534, 547 (Fed. Cir. 1998) (citation omitted).

Here, Defendants do not argue that Bytemark – in connection with the parent patent applications – withheld from the PTO information concerning the Texas litigation. Indeed, the record makes clear that Bytemark notified the PTO of the Texas litigation with respect to the '967 and '993 patents.  (See Pltf. Reply Br., Ex. E (Dkt. No. 106-4))  And it is undisputed that the child patents are related to the parent patents.  Indeed, the '764 patent and '567 patent each state that they are related to the '993 patent (see Pltf. Br., Ex. A (Dkt. No. 105-1) at 2; Ex. B. (Dkt. No. 105-2) at 3), and Defendants acknowledge that Plaintiffs referenced the parent patents in prosecuting the child patents (see Def. Opp. (Dkt. No. 107) at 10).  The Court thus concludes – pursuant to MPEP § 609 – that information concerning the Texas litigation was before the PTO when it considered the '764 and '567 applications, by virtue of the disclosures in the parent patents' applications.

Leviton Mfg. Co. v. Universal Sec. Instruments, Inc., 606 F.3d 1353, 1362 (Fed. Cir. 2010), cited by Defendants (Def. Opp. (Dkt. No. 107) at 8), is not to the contrary.  There, the Federal Circuit held that a patent applicant "violated the requirements of MPEP § 2001.06(c) . . . by failing to bring [related litigation regarding parent patents] to the PTO's attention."  Leviton, 606 F.3d at 1362.  Leviton is not on point here, however, because it is undisputed that Bytemark disclosed the Masabi litigation in connection with the parent patent applications.

Because Bytemark adequately disclosed the Masabi litigation to the PTO in connection with the parent patent applications, Defendants have not demonstrated that their inequitable conduct defense is meritorious.

**B.**   **Undue Prejudice to Plaintiff**

Finally, Defendants argue that they would suffer unfair prejudice if Bytemark is

permitted to amend its complaint for a third time, given that this lawsuit has been pending for

several years.  (Def. Opp. (Dkt. No. 107) at 18)  The Second Circuit has held that "mere delay,

absent a showing of bad faith or undue prejudice, does not provide a basis for the district court to

deny the right to amend."  Richardson Greenshields Sec., Inc. v. Lau, 825 F.2d 647, 653 n.6 (2d

Cir. 1987) (quotation marks and citations omitted).  Defendants' remaining objections – that the

amendment would "significantly expand the scope of the case by mandating a Markman

hearing"; that amendment would require additional discovery; and that amendment would

require having to "explain and try [patent infringement claims] to a jury" – are not persuasive.

(Def. Opp. (Dkt. No. 107) at 19)

With respect to Defendants' discovery argument, it seems clear that there would

be substantial overlap between discovery regarding Plaintiff's trade secret claims and discovery

regarding the proposed patent infringement claims.  In any event, "[t]he adverse party's burden

of undertaking discovery, standing alone, does not suffice to warrant denial of a motion to amend

a pleading."  TIG Ins. Co. v. Century Indem. Co., No. 08 Civ. 7322(JFK)(THK), 2009 WL

959653, at *3 (S.D.N.Y. Apr. 8, 2009) (citing United States v. Continental Ill. Nat'l Bank &

Trust Co. of Chi., 889 F.2d 1248, 1255 (2d Cir.1989)).  Moreover, Defendants "ha[ve] been on

notice of these claims," whose "underlying factual allegations are already a part of [the previous]

complaints," and therefore "will not be unduly prejudiced by having to litigate them."  Schiller v.

City of N.Y., No. 04 CIV. 10178 RJS JCF, 2008 WL 200021, at *7 (S.D.N.Y. Jan. 23, 2008),

aff'd, No. 04CIV7922(RJS)(JCF), 2009 WL 497580 (S.D.N.Y. Feb. 27, 2009).  Indeed, "[w]hen

a plaintiff's proposed new claims arise out of the same facts set forth in the original complaint,

'forcing plaintiffs to institute a new action against the defendant would run counter to the interests of judicial economy.'" <u>Kleeberg v. Eber</u>, 331 F.R.D. 302, 314-15 (S.D.N.Y. 2019) (quoting <u>Scott v. Chipotle Mexican Grill, Inc.</u>, 300 F.R.D. 193, 199 (S.D.N.Y. 2014)).

The Court concludes that Defendants have not demonstrated that they would suffer unfair prejudice if Bytemark's motion to amend were granted.

## **<u>CONCLUSION</u>**

It was for the reasons stated above that this Court granted Bytemark's motion to file a Third Amended Complaint.  (<u>See</u> Dkt. No. 138)

Dated: New York, New York
      January 10, 2022

SO ORDERED.

Paul G. Gardephe
United States District Judge