## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **BYTEMARK, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CASE NO. 1:17-CV-01803 (PGG) (JW)** |
| | § | |
| **XEROX CORP., ACS TRANSPORT** | § | |
| **SOLUTIONS, INC., XEROX** | § | |
| **TRANSPORT SOLUTIONS, INC.,** | § | |
| **CONDUENT INC., and NEW JERSEY** | § | |
| **TRANSIT CORP.,** | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM OF LAW IN SUPPORT OF NJ TRANSIT'S
## MOTION FOR SUMMARY JUDGMENT ON ELEVENTH AMENDMENT IMMUNITY

## Table of Contents

I.      Preliminary Statement...................................................................................................1

II.     Statement of Material Facts Not in Dispute.............................................................2

III.    Legal Standard ..........................................................................................................2

IV.     Argument ...................................................................................................................3

        A.      The Court Should Follow the Third Circuit's Guidance in
*Karns* and Find that NJ Transit is Entitled to Eleventh
Amendment Immunity. ...................................................................3

        B.      The Second Circuit's Two *Clissuras* Factors Establish that
NJ Transit is an Arm of the State of New Jersey. .....................................5

                1.      The State of New Jersey is Practically Responsible
for NJ Transit's Financial Obligations..........................................7

                2.      New Jersey controls NJ Transit .................................................12

        C.      The Additional *Mancuso* Factors Confirm NJ Transit's
Status as an Arm of the State of New Jersey. ......................................14

                1.      NJ Transit's Origin Documents Treat It as a State
Entity...........................................................................................15

                2.      NJ Transit Performs a State, Not Local, Function ....................15

V.      Conclusion ...............................................................................................................17

**Table of Authorities**

**Cases**

*Alaska Cargo Transp., Inc. v. Alaska R.R. Corp.*, 5 F.3d 378 (9th Cir. 1993) ..................... 7, 8, 9

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................. 2

*Benn v. First Judicial Dist. of Pa.*, 426 F.3d 233 (3d Cir. 2005) .................................................. 4

*Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524 (3d Cir. 2007) ................................... 1, 4

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................................ 2

*Clissuras v. City Univ. of N.Y.*, 359 F.3d 79 (2d Cir. 2004) ................................................. passim

*Delahoussaye v. City of New Iberia*, 937 F.2d 144 (5th Cir. 1991) ......................................... 13

*Fed. Maritime Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743 (2002) .................................. 17

*Fitchik v. N.J. Transit Rail Operations, Inc.*, 873 F.2d 655 (3d Cir. 1989) ......................... 3, 4, 5

*Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423 (2d Cir. 2001) ............................................... 2

*Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30 (1994) ............................................. 6, 7, 8

*Holcomb v. Iona Coll.*, 521 F.3d 130 (2d Cir. 2008) ................................................................... 2

*Irizarry-Mora v. U. of Puerto Rico*, 647 F.3d 9 (1st Cir. 2011) .......................................... 10, 13

*Karns v. Shanahan*, 879 F.3d 504 (3rd Cir. 2018) .............................................................. passim

*Kashani v. Purdue U.*, 813 F.2d 843 (7th Cir. 1987) .......................................................... 10, 14

*Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391 (1979) ................... 6

*Leitner v. Westchester Community College*, 779 F.3d 130 (2nd Cir. 2015) ......................... passim

*Mancuso v. N.Y. State Thruway auth.*, 86 F.3d 289 (2d Cir. 1996) ..................................... passim

*Maryland Stadium Authority v. Ellerbe Becket Inc.*, 407 F.3d 255 (4th Cir. 2005) ................ 13

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ................................. 2

*McGinty v. New York*, 251 F.3d 84 (2d Cir. 2001) ................................................................... 15

*Morris v. Washington Metro. Area Transit Auth.*, 781 F.2d 218 (D.C. Cir. 1986) .............. 7, 8, 9

*Pikulin v. City Univ. of N.Y.*, 176 F.3d 598 (2d Cir. 1999) ........................................................ 6

*Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44 (1996) ................................................................... 17

*Urbano v. Bd. of Managers*, 415 F.2d 247 (3d Cir. 1969) .......................................................... 4

*Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569 (10th Cir. 1996) ........................................... 14

*Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232 (2d Cir. 2006) ............... 12

**Statutes**

N.J. Stat. Ann. § 27:1A-2 ........................................................................................................... 15

N.J. Stat. Ann. § 27:25-13(h) ..................................................................................................... 14

N.J. Stat. Ann. § 27:25-16 ........................................................................................................... 15

N.J. Stat. Ann. § 27:25-17 ............................................................................................................. 7

N.J. Stat. Ann. § 27:25-2 ............................................................................................................. 16

N.J. Stat. Ann. § 27:25-20(a) ..................................................................................................... 13

N.J. Stat. Ann. § 27:25-20(b) ..................................................................................................... 10

N.J. Stat. Ann. § 27:25-4 ....................................................................................................... 13, 15

N.J. Stat. Ann. § 27:25-4(b) ....................................................................................................... 13

N.J. Stat. Ann. § 27:25–4(f) ....................................................................................................... 14

**Other Authorities**

U.S. Const. Amend. XI .................................................................................................................. 1

## I.    Preliminary Statement

Defendant New Jersey Transit Corp. ("NJ Transit") is an arm of the State of New Jersey, and not subject to suit under the Eleventh Amendment of the United States Constitution. As such, NJ Transit asks that the Court grant summary judgment and dismiss Plaintiff Bytemark, Inc.'s ("Bytemark") claims against it.

The Eleventh Amendment bars federal jurisdiction over private lawsuits against a state:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. Amend. XI. It applies to both non-consenting states and "those entities that are so intertwined with them as to render them 'arms of the state.'" *Karns v. Shanahan*, 879 F.3d 504 (3rd Cir. 2018) (quoting *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 545 (3d Cir. 2007), amended on reh'g (Mar. 8, 2007)). NJ Transit is an arm of the state of New Jersey and thus immune from suit.

The Third Circuit held precisely that in *Karns*, 879 F.3d 504. There, two individuals filed civil rights actions against NJ Transit. *Id*. at 510. The district court entered summary judgment in NJ Transit's favor, "concluding that NJ Transit was an 'arm of the state' entitled to claim immunity from suit in federal court under the Eleventh Amendment." *Id*. at 512. The Third Circuit affirmed. *Id*. at 512–19. After an extensive analysis, it found that New Jersey state law considers NJ Transit an arm of the state, and that NJ Transit exhibits little autonomy apart from New Jersey. *Id*. It thus held that "NJ Transit is entitled to claim the protections of Eleventh Amendment immunity[.]" *Id*. at 519. NJ Transit respectfully requests that the Court follow the Third Circuit's guidance in *Karns* and enter summary judgment in NJ Transit's favor.

## II.     Statement of Material Facts Not in Dispute

Pursuant to Local Civil Rule 56.1(a), a Statement of Material Facts Not in Dispute is separately attached.

## III.     Legal Standard

Pursuant to Fed. R. Civ. P. 56, "summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if, under the governing substantive law, a dispute about it might affect the outcome of the suit. *Id*. at 248.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 323). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (cleaned up).

## IV.  Argument

NJ Transit is an arm of the state of New Jersey and thus immune from suit in Federal Court. That proposition is well-settled across the Hudson in the Third Circuit. *See Karns*, 879 F.3d 504. Bytemark nonetheless persists in maintaining its claims against NJ Transit in this case based on the misguided notion that the Second Circuit views the Eleventh Amendment differently. In Bytemark's view, NJ Transit exists as an arm-of-the-state of New Jersey in the Third Circuit, but not the Second Circuit. *See* Dkt. 171 (Bytemark's Letter Opposition to NJ Transit's Request for Leave to File a Motion for Summary Judgment).

Bytemark's view is wrong for at least three reasons. **First**, the Third Circuit's reasoning in *Karns* applies just as well in this case, and principles of judicial comity weigh in favor of dismissing Bytemark's claims against NJ Transit here. **Second**, setting aside *Karns*, the Second Circuit's two *Clissuras* factors for determining whether an entity is an arm of the state weigh firmly in favor of finding that NJ Transit enjoys the protections of the Eleventh Amendment. **Third**, to the extent those two *Clissuras* factors point in different directions, additional factors, known as the *Mancuso* factors, resolve the issue in NJ Transit's favor.

### A.  The Court Should Follow the Third Circuit's Guidance in *Karns* and Find that NJ Transit is Entitled to Eleventh Amendment Immunity.

In *Karns*, 879 F.3d at 518–19, the Third Circuit held that "NJ Transit is an arm of the state." The court thus found that "NJ Transit is entitled to claim the protections of Eleventh Amendment immunity, which in turn functions as an absolute bar to any claims in this case against NJ Transit and the officers in their official capacities." *Id.*

In reaching this conclusion, the court applied the Third Circuit's *Fitchik* three-part test to determine whether NJ Transit is an "arm of the state" for Eleventh Amendment purposes. *Id.* at 513 (citing *Fitchik v. N.J. Transit Rail Operations, Inc.*, 873 F.2d 655, 659 (3d Cir. 1989) (en banc)

(citing *Urbano v. Bd. of Managers*, 415 F.2d 247, 250-51 (3d Cir. 1969)). Those factors consider: "(1) whether the payment of the judgment would come from the state; (2) what status the entity has under state law; and (3) what degree of autonomy the entity has." *Id.* (citing *Bowers*, 475 F.3d at 546.) These three factors are considered "co-equal." *Benn v. First Judicial Dist. of Pa.*, 426 F.3d 233, 239 (3d Cir. 2005). As discussed in more detail below, the court in *Karns* determined that "while the state-treasury factor counsels against awarding Eleventh Amendment immunity, the state law and autonomy factors both tilt in favor of immunity." *Karns*, 879 F.3d at 518. Accordingly, the court held that "the Eleventh Amendment therefore functions as a complete bar, immunizing NJ Transit." *Id.* at 519. As shown in more detail below, the *Fitchik* factors are remarkably similar to the *Mancuso* and *Clissuras* factors considered by the Second Circuit and should compel the same conclusion.

In analyzing the first *Fitchik* factor, the court held that "the state is under no legal or other obligation to pay NJ Transit's debts or to reimburse NJ Transit for any judgments that it pays" and that "New Jersey may choose to appropriate funds to help NJ Transit cover its operating deficit, but it is not obligated to do so." *Karns*, 879 F.3d at 516. As a result, the court held that the state-treasury factor did not favor a finding of immunity. As to the second factor, the court held that "there is considerable indication that New Jersey law considers NJ Transit an arm of the state" and that "state case law also regards NJ Transit as an agency of the state." *Id.* at 517. Accordingly, the second *Fitchik* factor "strongly favors a finding of immunity." *Id.* Finally, looking to the third factor, the court held that (1) "NJ Transit is subject to several operational constraints by the New Jersey Legislature and the Governor, who is also responsible for appointing the entire NJ Transit governing board," (2) "the Commissioner of Transportation, an Executive Branch official who is the chairman of the NJ Transit governing board, has the power and duty to review NJ Transit's

expenditures and budget," (3) "NJ Transit must annually report on its condition and its budget to the Governor and the Legislature," and (4) that "the Governor can veto any action taken by NJ Transit's governing board." *Id.* at 518 (citing N.J. Stat. Ann. § 27). The court thus held that "NJ Transit is an instrumentality of the state, exercising limited autonomy apart from it," which weighs in favor of immunity. As noted above, the *Fitchik* three-factor analysis resulted in a finding that NJ Transit is an arm of the state.

Principles of judicial comity counsel in favor of the Court accepting the Third Circuit's conclusion. It would not be prudent to allow NJ Transit to be sued in federal court in New York, when it is a matter of settled law that they cannot be sued in federal court in New Jersey. In addition, in the case at bar, the same *Fitchik* three-factor test articulated by the Third Circuit in *Karns* would lead to the conclusion that NJ Transit is an arm of the state and as such, the Eleventh Amendment should immunize NJ Transit from liability in the current suit.

**B.    The Second Circuit's Two *Clissuras* Factors Establish that NJ Transit is an Arm of the State of New Jersey.**

In assessing whether an entity is an arm of the state, the Second Circuit considers similar factors to those considered by the Third Circuit in *Karns*. Specifically, "[t]he Second Circuit has applied two different tests to determine whether government entities are 'arms of the state' entitled to sovereign immunity under the Eleventh Amendment." *Leitner v. Westchester Community College*, 779 F.3d 130, 138 (2nd Cir. 2015). First, in 1996, in *Mancuso v. N.Y. State Thruway auth.*, 86 F.3d 289 (2d Cir. 1996), the court applied a six-factor test to determine whether a government entity was an arm of the state: "(1) how the entity is referred to in the documents that created it; (2) how the governing members of the entity are appointed; (3) how the entity is funded; (4) whether the entity's function is traditionally one of local or state government; (5) whether the state has a veto power over the entity's actions; and (6) whether the entity's obligations are binding

upon the state." *Id*. at 293 (citing *Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391 (1979). "If all six factors point in one direction, the analysis is complete." *Leitner*, 779 F.3d at 138 (citing *Mancuso*, 86 F.3d at 293). But "[i]f the factors point in different directions, a court must focus on the two main aims of the Eleventh Amendment, as identified by the Supreme Court: preserving the state's treasure and protecting the integrity of the state." *Id*. (citing *Mancuso*, 86 F.3d at 293; *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 47 (1994)).

Then, in 2004, in *Clissuras v. City Univ. of N.Y.*, 359 F.3d 79, 82 (2d Cir. 2004) (per curiam), the court applied a two-factor test to "guide the determination of whether an institution is an arm of the state: (1) the extent to which the state would be responsible for satisfying any judgment that might be entered against the defendant entity, and (2) the degree of supervision exercised by the state over the defendant entity." *Id*. (quoting *Pikulin v. City Univ. of N.Y.*, 176 F.3d 598, 600 (2d Cir. 1999) (per curiam)) (internal quotation marks omitted).

Following those two decisions, courts in the Second Circuit lacked clarity as to which test controlled until the Second Circuit resolved the issue in *Leitner*, 779 F.3d at 137. There, the Second Circuit explained the procedure that NJ Transit follows in this Motion:

> We apply both the *Mancuso* and *Clissuras* tests. In the end, as we have seen in our review of the cases, the tests have much in common, and the choice of test is rarely outcome-determinative. The *Clissuras* test incorporates four of the six *Mancuso* factors. To the extent that the *Clissuras* factors point in different directions, the additional factors from the *Mancuso* test can be instructive. Here, we address the *Clissuras* factors first and then look to the additional *Mancuso* factors.

*Id*.

## 1. The State of New Jersey is Practically Responsible for NJ Transit's Financial Obligations[1]

The first *Clissuras* factor—whether a judgment against the entity must be satisfied out of a state's treasury—weighs in favor of finding that NJ Transit is an arm of the state. Although the state of New Jersey is not under a *legal* obligation to pay NJ Transit's debts or to reimburse NJ Transit for any judgments that it pays, it must pay them practically speaking. N.J. Stat. Ann. § 27:25-17. For example, an adverse judgment against NJ Transit risks impacting the state of New Jersey's finances, which the Supreme Court and other Circuits have found important to a sovereign immunity determination. In particular, other Circuits have found sovereign immunity for similarly funded public transportation entities for which the states in question disclaimed liability. *See, e.g.*, *Alaska Cargo Transp., Inc. v. Alaska R.R. Corp.*, 5 F.3d 378 (9th Cir. 1993); *Morris v. Washington Metro. Area Transit Auth.*, 781 F.2d 218 (D.C. Cir. 1986). And, in analyzing this question, the Supreme Court determined that Eleventh Amendment concerns are implicated when the practical effect of a legal judgment would be to require payment by the state. *See Hess*, 513 U.S. at 51 ("The proper focus is not on the use of profits or surplus, but rather is on losses and debts. If the expenditures of the enterprise exceed receipts, is the State in fact obligated to bear and pay the resulting indebtedness of the enterprise? When the answer is 'No'—both legally and **practically**— then the Eleventh Amendment's core concern is not implicated.") (Emphasis added).

In *Alaska Cargo*, the Ninth Circuit held that Alaska Railroad Corporation was entitled to sovereign immunity as an alter ego of the State of Alaska. 5 F.3d at 378. The court came to that conclusion even though Alaska had expressly disclaimed liability for the Alaska Railroad

---

[1] "This condition is also reflected in the third and sixth *Mancuso* factors, which address how the entity is funded and whether the entity's obligations are binding upon the state, respectively." *Leitner*, 779 F.3d at 137.

Corporation by statute. *Id*. at 380, 382. The court found it significant that "a money judgment against ARRC likely would impact Alaska's treasury because of the state's strong interest in keeping ARRC operationally and fiscally sound." *Id*. at 382. The State of New Jersey has the same interest with respect to NJ Transit.

The D.C. Circuit came to a similar conclusion in *Morris*. 781 F.2d at 218. The court held that the Washington Metro Area Transit Authority ("WMATA") was entitled to immunity, even though its founding states had expressly disclaimed liability. 781 F.2d at 225. The court looked both to the status of the WMATA under the founding states' law, and to the fact that the founding states anticipated that the WMATA would operate a deficit from its inception. *Id*. at 225–27. The practical effect, then, of a judgment against WMATA would be that the state would need to pay it. *Id*. at 225 ("Because we deal with 'practical consequences,' it is not necessary that the state be obligated to pay a judgment, but only that that would be the result.").

The Supreme Court in *Hess* recognized this salient feature for the entities in *Morris* and *Alaska Cargo*. It distinguished between WMATA, which the state of Washington created with the knowledge that it would run at a deficit and rely on state funding, and the bi-state Port Authority at issue in *Hess*, which New York and New Jersey created to operate at a profit. *Hess*, 513 U.S. at 49–50 ("The Port Authority's anticipated and actual financial independence—its long history of paying its own way—contrasts with the situation of transit facilities that place heavy fiscal tolls on their founding states. . . . As the *Morris* court concluded: '[W]here an agency is so structured that as a practical matter, if the agency is to survive, a judgment must expend itself against state treasuries, common sense and the rationale of the eleventh amendment require that sovereign immunity attach to the agency.'") (Quoting *Morris*, 781F.3d at 227). Ultimately the Supreme Court

found that, unlike with the entities in *Morris* and *Alaska Cargo*, a judgment against the Port Authority would not impact the finances of the states. *Id*.

Here, NJ Transit falls firmly on the side of the entities at issue in *Morris* and *Alaska Cargo* and the first *Clissuras* factor weighs in favor of finding immunity. For instance, a judgment against it risks impacting the state of New Jersey's finances. When creating NJ Transit, the State of New Jersey understood that the entity would operate at a deficit, with the state making up any shortfalls. *See*, *e.g.*, Senate Bill 3137, Public Transportation Act of 1979, Fiscal Note, June 8, 1979, (Powers Ex. 1) at PDF page 60 (estimating that NJ Transit could save the state $5 million over the existing system, which cost roughly $50 million).

As in *Morris*, NJ Transit has since operated at a deficit in every year of its existence. Viqueira Dep. (Powers Ex. 2) at 40:2–10 ("New Jersey Transit is not profitable, has never been profitable."). In 2022, out of its $1.55 billion capital budget, $760 million came from the state of New Jersey via a fund known as the Transportation Trust Funds ("TTF"). NJ Transit FY2022 Capital Funding Appropriation (Powers Ex. 3); Viqueira Dep. (Powers Ex. 2) at 32:23–33:22. Similarly, out of its $2.65 billion operating budget in 2022, roughly one-third of the funds were provided by the state of New Jersey. NJT Board Meeting March 14, 2022, *FY23 Governor's Proposed Budget – Revenue* (Powers Ex. 4); Viqueira Dep. (Powers Ex. 2) at 29:6–30:5. To receive this funding, NJ Transit interacts directly with the New Jersey Governor's Office:

> Q. You testified a few minutes ago that New Jersey Transit requests for funding from the State of New Jersey. Those are your own words. What do you mean by that?
>
> A. We make a request as part of the development of the State's budget to the Governor's Office. We communicate what we anticipate are our financial needs, our priorities, our strategies, and to the extent the Governor's Office agrees with our assessment, they then recommend to the State legislature a number to fund New Jersey Transit on an annual basis as part of the State's development of its own $40-plus billion budget. We are part of that budget. We make a request to the Governor's

Office. The Governor and the legislature ultimately agree to a budget for the State of New Jersey, of which we are a part.

Viqueira Dep. (Powers Ex. 2) at 39:9–40:1.

NJ Transit's budgeting process is entirely dependent on the state of New Jersey. State law requires that each year NJ Transit send its proposed budget to the Governor's Office, the New Jersey legislature, and the head of the Department of Transportation in New Jersey by April 1. N.J. Stat. Ann. § 27:25-20(b); Viqueira Dep. (Powers Ex. 2) at 73:10–19; *see also Irizarry-Mora v. U. of Puerto Rico*, 647 F.3d 9, 15 (1st Cir. 2011) (finding these requirements "strongly indicate" that the state's immunity embraces the entity); *see also Kashani v. Purdue U.*, 813 F.2d 843, 845–46 (7th Cir. 1987) (noting that requirement for the entity to file a statement of expenditures with state budget agency demonstrates state supervision). Then, in May, NJ Transit employees are called to testify before the state senate and assembly budget committees to answer questions about the proposed budget. *Id*. at 73:20–74:2. In June, the state finalizes its own budget, for a fiscal year starting July 1. Once the State has passed its budget, NJ Transit then uses its July board meeting to adopt its budget based on the appropriations from the state. *Id*. at 74:3–12.

Without this state funding, NJ Transit cannot set its own budget. This issue arose at the beginning of the COVID-19 pandemic, when the state of New Jersey extended its fiscal year by three months, leaving NJ Transit at the end of its fiscal year without an appropriation of funds from the state. *Id*. at 74:13–23. NJ Transit was thus forced to operate under its prior year's budget authorization until New Jersey adopted its own budget for the year. *Id*. at 74:24–75:9. Once the state eventually passed its budget in October 2020, NJ Transit was able to do the same. *Id*.

This overlap between NJ Transit and New Jersey's finances also arises in the context of litigation, where the state of New Jersey recognizes its practical obligation to finance NJ Transit's legal obligations. As a result, the state strictly controls NJ Transit's ability to resolve litigation.

"[NJ Transit's] settlements require the concurrence of the Attorney General of the State of New Jersey, approval by the board, and the board minutes themselves are subject to the veto by [the] Governor should he or she choose to veto them within a ten-business-day period." Viqueira Dep. (Powers Ex. 2) at 78:6–16. Using that veto power, the Governor of New Jersey can override any attempted settlement agreement from NJ Transit. *Id*. at 78:17–22. It is thus clear that the state of New Jersey understands the practical effects of any judgment or settlement paid by NJ Transit— ultimately, it is the state and its citizens that shoulder the burden.

Lastly, even the "non-state" revenue that NJ Transit generates is controlled by the state. Fares are the primary source of revenue for NJ Transit, aside from state and federal subsidies. Viqueira Dep. (Powers Ex. 2) at 50:6–7. In fiscal year 2022, this revenue accounted for $514 million out of NJ Transit's $2.6 billion operating budget. NJT Board Meeting March 14, 2022, *FY23 Governor's Proposed Budget – Revenue* (Powers Ex. 4). In deposing NJ Transit's corporate representative, counsel for Bytemark suggested that if NJ Transit needed to raise funds to pay any judgment in this case, it could simply raise fares. But to raise fares, NJ Transit must receive approval from a board of directors appointed entirely by New Jersey's Governor, and the Governor must then refrain from exercising his veto power over that decision. Viqueira Dep. (Powers Ex. 2) at 44:10–13 ("Yes, we can [increase fares]; subject to certain procedures, such as approval from the board, public hearings, perhaps others. Those certainly would be two critical components.") and 54:3–14 ("Fare increases at New Jersey Transit actually have been quite few. I believe the one you showed was the last time New Jersey Transit raised fares, and it was several years before that to go back to the previous fare increase. They are not common. They don't take place often and they – and in order to effectuate a fare increase, it would take a considerable period of time and

support from all the members of the board or certainly a majority of the members of the board and the Governor's Office.").

New Jersey's control over NJ Transit's primary revenue stream contrasts with the line of Second Circuit cases finding the first *Clissuras* and third and sixth *Mancuso* factors weighed against immunity. For instance, in *Clissuras* the Second Circuit found these factors weighed against finding immunity because, while the entity at issue received one-third of its budget from the state, the entity also "ha[d] the power to issue bonds and levy taxes to raise funds[.]" 779 F.3d at 137. Similarly, in *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232 (2d Cir. 2006), the court found that if the school board claiming immunity needed additional funding, it would obtain it "not from the state treasury but from levying a local property tax." *Clissuras*, 779 F.3d at 137 (citing *Woods*, 466 F.3d at 250). In contrast, if NJ Transit needed to raise money to satisfy a judgment in this case, it would either need additional funds from the state itself, or to raise fares, which requires the state's approval. This factor thus favors a finding that NJ Transit is subject to Eleventh Amendment immunity.

## 2. New Jersey controls NJ Transit

The second *Clissuras* factor—the extent of the state's supervision over the defendant entity—shows that NJ Transit is an arm of the state. This control becomes abundantly clear when placed in the context of the specific examples set forth in the corresponding *Mancuso* factors, "which consider how the governing members of the entity are appointed and whether the state has veto power over the entity's actions[.]" *Leitner*, 779 F.3d at 138.

Here, the state of New Jersey controls NJ Transit because the Governor appoints the entire seven-member[2] governing board. *See* N.J. Stat. Ann. § 27:25-4. The board is composed of the Commissioner of Transportation and the State Treasurer (both cabinet-level posts in the Executive Branch) as well as another member of the Executive Branch selected by the Governor and four public members appointed by the Governor with the consent of the Senate. N.J. Stat. Ann. § 27:25-4(b). Significantly, the Chairman of the Board (i.e., the Commissioner of Transportation) has the power and duty to review NJ Transit's expenditures and proposed budget. N.J. Stat. Ann. § 27:25-20(a).

Courts have found the Governor's appointment of even a majority of governing board members to be significant and weigh in favor of a finding of immunity. *See Clissuras*, 359 F.3d at 82 ("[U]ltimate control over how CUNY is governed and operated rests with the state. Among other things, the governor, with the advice and consent of the state senate, appoints ten of the seventeen members of CUNY's board of trustees, including the chair and vice chair.") (Internal quotations and citations omitted); *Irizarry-Mora*, 647 F.3d at 15 (finding governor's appointment of 10 of 13 board members and board's "significant role in governing the University" weigh in favor of Eleventh Amendment immunity); *Maryland Stadium Authority v. Ellerbe Becket Inc.*, 407 F.3d 255, 264 (4th Cir. 2005) ("The fact that all of the University's decisionmakers are appointed by the governor is a key indicator of state control."); *Delahoussaye v. City of New Iberia*, 937 F.2d 144, 148 (5th Cir. 1991) (finding that Governor's appointment of Board of Trustees, "the body with the authority to supervise and manage the University," and the board's appointment of the university president weigh in favor of immunity); *Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569,

---

[2] The Board has an eighth non-voting member who is also appointed by the Governor upon the recommendation of the labor organization representing the plurality of NJ Transit employees. N.J. Stat. Ann. § 27:25-4(b).

575 (10th Cir. 1996) (relying on Governor's appointment of governing boards and boards' responsibility for university as weighing in favor of immunity); *Kashani*, 813 F.2d at 847 (holding Governor's appointment of majority of board of trustees is "very significant" in considering whether university has sufficient autonomy from the state).

New Jersey further controls NJ Transit via the Governor's ability to "veto any action taken by NJ Transit's governing board." *Karns*, 879 F.3d at 518 (citing N.J. Stat. Ann. § 27:25–4(f)). Indeed, no action taken at an NJ Transit board meeting has "force or effect until approved by the Governor or until 10 days after" any board meeting minutes have been delivered to the Governor and not received a veto.[3] N.J. Stat. Ann. § 27:25-4(f). Certain of its acquisitions are also subject to legislative veto. N.J. Stat. Ann. § 27:25-13(h). These same facts led the *Karns* court to conclude that NJ Transit exercises limited autonomy apart from the State, and they heavily support a finding that NJ Transit operates as an arm of the State. 879 F.3d at 518.

### C.     The Additional *Mancuso* Factors Confirm NJ Transit's Status as an Arm of the State of New Jersey.

In the event the Court finds that the *Clissuras* factors point in different directions, then the additional *Mancuso* factors warrant granting summary judgment in NJ Transit's favor. *See Leitner*, 779 F.3d at 137 ("To the extent that the *Clissuras* factors point in different directions, the additional factors from the *Mancuso* factors can be instructive."). Both additional factors—(1) how the entity is referred to in the documents that created it, and (4) whether the entity's function is state or local—establish NJ Transit's status as an instrumentality of the state of New Jersey.

---

[3] The Governor of New Jersey exercised this veto authority as recently as 2020. Viqueira Dep. at 57:15–59:1. After a procurement process, staff at NJ Transit recommended that the entity award a contract to a private bus carrier, Academy, that had previously been accused of falsifying information about routes that it was supposed to run. *Id*. The Governor vetoed NJ Transit's board minutes related to that contract, thus precluding NJ Transit from entering into a contract with Academy. *Id*.

### 1. NJ Transit's Origin Documents Treat It as a State Entity

NJ Transit's origin documents weigh heavily in favor of immunity. According to those documents, NJ Transit "is statutorily 'constituted as an instrumentality of the State exercising public and essential governmental functions.'" *Karns*, 879 F.3d at 517 (quoting N.J. Stat. Ann. § 27:25-4). It is "allocated within the Department of Transportation," N.J. Stat. Ann. § 27:25-4, which is a principal department within the Executive Branch of the State of New Jersey, N.J. Stat. Ann. § 27:1A-2. "NJ Transit is also considered state property for tax purposes and is exempt from state taxation." *Id.* (quoting N.J. Stat. Ann. § 27:25-16); *see Mancuso*, 86 F.3d 289 (finding this factor weighs in favor of Eleventh Amendment immunity where the Legislature has accorded the entity in question "immunity from taxes.").

NJ Transit's treatment by New Jersey state courts also compels finding that NJ Transit is an agency of the state. Because while the plain language of this factor only refers to "how the entity is referred to in its documents of origin," the Second Circuit looks beyond state statutes to how state courts consider the entity in question. *See, e.g.*, *McGinty v. New York*, 251 F.3d 84, 96 (2d Cir. 2001) (finding this factor favors immunity for the New York State and Local Employees' Retirement System based on a decision from the New York Court of Appeals because "New York's highest court tells us how New York courts view the Retirement System."). With NJ Transit, New Jersey's courts have been unequivocal, consistently treating it as an agency of the state. *See Karns*, 879 F.3d at 517 (compiling eight New Jersey state court decisions supporting the proposition that state case law regards NJ Transit as an agency of the state).

### 2. NJ Transit Performs a State, Not Local, Function

NJ Transit's operations are those of a state, not local, government. Indeed, in NJ Transit's founding documents, the New Jersey Legislature recognized, "[a]s a matter of public policy, it is the responsibility of **the State** to establish and provide for the operation and improvement of a

coherent public transportation system in the most efficient and effective manner." N.J. Stat. Ann. § 27:25-2 (emphasis added). It thus created NJ Transit to achieve that state-driven purpose. Today, NJ Transit's operations span the state, providing transportation to nearly a million riders every weekday. It is the nation's third largest provider of bus, rail and light rail transit, "linking major points throughout New Jersey and across State borders to New York and Pennsylvania, with daily service to New York City and Philadelphia." State of New Jersey Department of Transportation, *Comprehensive Strategic, Financial & Operational Assessment of NJ Transit October 5, 2018*, (Powers Ex. 5), at page i; *see also* Dkt. 139 (Bytemark's Third Amended Complaint) at ¶16 ("NJ Transit is a public transportation system and operates buses and light rail and commuter trains throughout New York, New Jersey, and Pennsylvania."). Under Second Circuit case law, NJ Transit's state-spanning operations indicate that it performs the work of a state governmental entity. *See Mancuso*, 86 F.3d at 295 (finding this factor favors immunity for the New York State Thruway Authority because "[a]lthough the construction and operation of roads and bridges may be viewed as either a state or local function, the thruway stretches across the entire state and therefore, the Thruway Authority performs a function that a state would normally provide.").

* * *

To date, Bytemark's basis for opposing NJ Transit's immunity claim relies on the first *Clissuras* factor and third and sixth *Mancuso* factors, relating to NJ Transit's finances and New Jersey's obligation to pay any judgment that might result from this litigation. *See* Dkt. 171 (Bytemark's Letter Opposition to NJ Transit's Request for Leave to File a Motion for Summary Judgment). According to Bytemark, "the Second Circuit gives extra weight to this [first *Clissuras*] factor." *Id*. at 2 (citing *Leitner*, 779 F.3d at 137). But *Leitner* contradicts that claim. There, the Second Circuit explained that if the two *Clissuras* factors point in opposite directions, then the

proper next step is to consider the additional *Mancuso* factors relating to NJ Transit's origin documents and whether it performs a state or local function. 779 F.3d at 137. *Leitner* says nothing about giving extra weight to the first *Clissuras* factor.

That makes sense because the Supreme Court has explicitly held that the central purpose of sovereign immunity is to accord the States the respect owed to them as joint sovereigns in our federalist system, rather than to shield state treasuries. *Fed. Maritime Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 765 (2002) ("While state sovereign immunity serves the important function of shielding state treasuries and thus preserving the States' ability to govern in accordance with the will of their citizens, the doctrine's central purpose is to accord the States the respect owed them as joint sovereigns.") (quotation marks and citations omitted). It is for that reason that "sovereign immunity applies regardless of whether a private plaintiff's suit is for monetary damages or some other type of relief."[4] *Id.* (citing *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 58 (1996) ("[W]e have often made it clear that the relief sought by a plaintiff suing a State is irrelevant to the question whether the suit is barred by the Eleventh Amendment.")). Thus, even if the first *Clissuras* factor weighs against a finding of immunity (which it does not), each of the remaining factors strongly compels the opposite result. As such, the Court should grant summary judgment and find that NJ Transit is an arm of the state of New Jersey.

## V.     Conclusion

Based on the foregoing, NJ Transit asks that the Court enter summary judgment and find Bytemark's claims against NJ Transit are barred by the Eleventh Amendment.

---

[4] Here, Bytemark seeks a permanent injunction against NJ Transit, as well as monetary relief. Dkt. 139 (Third Amended Complaint) at 29–30.

Dated: October 14, 2022

Respectfully submitted,

*/s/ Ashley N. Moore*
Ashley N. Moore (admitted *pro hac vice*)
amoore@mckoolsmith.com
David Sochia (admitted *pro hac vice*)
dsochia@mckoolsmith.com
Douglas A. Cawley (admitted *pro hac vice*)
dcawley@mckoolsmith.com
Jonathan Powers (admitted *pro hac vice*)
jpowers@mckoolsmith.com
**McKool Smith, P.C.**
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Telephone: (214) 978-4000
Facsimile: (214) 978-4044

Eliza Beeney
ebeeney@mckoolsmith.com
**McKool Smith, P.C.**
One Bryant Park, 47th Floor
New York, New York 10036
Telephone: (212) 402-9424
Facsimile: (212) 402-9444

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

The undersigned certifies that on October 14, 2022, the foregoing document was served on

counsel of record at the following email addresses:

dkeyhani@keyhanillc.com
fstephenson@keyhanillc.com


By:     */s/ Ashley N. Moore*
Ashley Moore