## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **BYTEMARK, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CASE NO. 1:17-CV-01803 (PGG) (JW)** |
| | § | |
| **XEROX CORP., ACS TRANSPORT** | § | |
| **SOLUTIONS, INC., XEROX** | § | |
| **TRANSPORT SOLUTIONS, INC.,** | § | |
| **CONDUENT INC., and NEW JERSEY** | § | |
| **TRANSIT CORP.,** | § | |
| | § | |
| **Defendants.** | § | |

## REPLY IN SUPPORT OF NJ TRANSIT'S
## MOTION FOR SUMMARY JUDGMENT ON ELEVENTH AMENDMENT IMMUNITY

While the Second Circuit has described the state-treasury factor as "most important," Bytemark asks the Court to treat it as more. Bytemark uses this description to suggest the Court should treat the factor as "outcome determinative." Bytemark has little choice but to press this argument given the clarity with which every other factor compels a finding that NJ Transit is immune under the Eleventh Amendment.[1] Bytemark is not the first plaintiff to argue that the state-treasury factor is "outcome determinative." This Court should join the long line of other courts to have rejected it. NJ Transit's motion for summary judgment should be granted.

A.    The State-Treasury Factor is Not "Outcome Determinative."

Bytemark incorrectly casts the Third Circuit's approach in *Karns v. Shannahan*[2]—where the Third Circuit found NJ Transit immune from suit in federal court—as a "minority approach" because it did not ascribe primacy to the state-treasury factor. Resp. at 1. But Bytemark asks this Court to ascribe more than mere "primacy" to the state-treasury factor; it asks that the Court make the factor dispositive. That approach would contradict Second Circuit law on the issue and the law of every other Circuit. *See*, *e.g.*, *Leitner v. Westchester Community College*, 779 F.3d 130 (2nd Cir. 2015) (instructing that when the state-treasury and state-control factors point in different directions, courts should consider the remaining *Mancuso* factors (*i.e.*, the entity's origin documents and whether the entity performs a local or state function)); *Pucci v. Nineteenth Dist. Court*, 628 F.3d 752, 761–62 (6th Cir. 2010) ("This court, *en banc*, has clarified that while there can be little doubt that the state-treasury inquiry will *generally* be the most important factor, it also seems clear that it is not the sole criterion for determining whether an agency is a state entity for

---

[1] As explained below, the state-treasury factor also supports finding NJ Transit is an arm of the state.

[2] 879 F.3d 504 (3rd Cir. 2018).

sovereign immunity purposes. Our need to inquire beyond the issue of financial liability relates back to the Supreme Court's emphasis that the Eleventh Amendment incorporates "twin reasons" for granting states sovereign immunity: the desire not to infringe either a state's purse or its dignity. . . . Therefore, in certain cases—such as the one before us here—the last three factors may demonstrate that an entity is an arm of the state entitled to sovereign immunity despite the fact that political subdivisions and not the State are potentially liable for judgments against the entity.") (cleaned up); *Thiel v. State Bar*, 94 F.3d 399, 401–403 (7th Cir. 1996), *overruled on other grounds*, *Kingstad v. State Bar of Wis.*, 622 F.3d 708, 709 (7th Cir. 2010) (given extent of control Wisconsin Supreme Court exercised over State Bar and that Bar acted as agent of Court in promulgating challenged rule, Bar was entitled to Eleventh Amendment immunity regardless of whether judgment against Bar would be satisfied by state funds); *Pellitteri v. Prine*, 776 F.3d 777, 783 (11th Cir. 2015) (finding immunity for a sheriff's office even where the state would not be responsible for paying any judgment because "the fourth *Manders* factor alone is not necessarily dispositive in any given case. Indeed, our precedent suggests that the presence of a state treasury drain is likely sufficient but certainly not necessary for a finding of immunity.").

Bytemark claims the state-treasury factor is outcome determinative based on a misunderstanding of the Third Circuit's decision in *Fitchick v. N.J. Transit Rail Operations, Inc.*, 873 F.2d 655 (3d Cir. 1989). In particular, Bytemark incorrectly contends that the only thing that separated the decisions in *Fitchick* and *Karns v. Shanahan*, 879 F.3d 504 (3d Cir. 2018), was a reweighting of the importance of the state-treasury factor. Resp. at 12 ("In those two cases, the court considered the same facts regarding NJ Transit's funding, status under state law, and autonomy; indeed, it considered the same facts presented here."). Not so.

In the 28 years between the decisions, much had changed. Originally, in *Fitchik*, the Third Circuit found that out of the three factors it considered, one weighed strongly against immunity, and the other two offered, at most, slight support for immunity. 873 F.2d at 662 ("[T]he funding factor here weighs strongly against NJT's claim that it is entitled to immunity from suit in federal court."); *id*. ("NJT's status under New Jersey law is uncertain, so the analysis of this factor does not significantly help in determining whether NJT is entitled to immunity from suit in federal court."); *id*. at 663 ("On balance, the 'status under state law' factors seem to tilt in favor of [NJT]'s contention that [NJT] is entitled to sovereign immunity, but only slightly."); *id*. at 664 ("Although not 'highly autonomous' like *Rutgers*, NJT is significantly autonomous. Since the degree of control by the governor is fairly substantial, we think that this factor counsels slightly in favor of according immunity to NJT."). In *Karns* though, the Court found that much had changed concerning NJ Transit's status under state law. 879 F.3d at 517 ("In the twenty-eight years since our Court's decision in *Fitchik*, however, it has become much more apparent that New Jersey law regards NJ Transit as an arm of the state. The state law factor therefore weighs strongly in favor of immunity."). Both NJ Transit's statutory treatment and state case law now clearly regard NJ Transit as an agency of the state. *Id*. at 517–518 ("In light of this case law, it is apparent that the second *Fitchik* factor strongly favors a finding of immunity—a determination that has become that much more apparent since the original *Fitchik* decision."). Similarly, when analyzing the state-control factor, the *Karns* court found that it now leaned more than just slightly in favor of immunity as it had in *Fitchik*. *Karns*, 879 F.3d at 518 ("All of these facts suggest that NJ Transit is an instrumentality of the state, exercising limited autonomy apart from it. We conclude that the autonomy factor weighs in favor of immunity.") (internal citations omitted).

## B. The State-Treasury Factor Supports a Finding of Immunity.

Now, through discovery in this case, more has changed still. This Court has a more fulsome picture of NJ Transit's finances than the *Fitchik* or *Karns* courts. *See Karns*, 879 F.3d at 515 ("The *Fitchik* Court concluded that NJ Transit is financially independent from the state. The parties have not offered updated financial information to undermine this assessment.") (internal citations omitted). Several aspects of this updated picture warrant finding the state-treasury factor weighs in favor of immunity. First, it is now clear that the state controls even NJ Transit's "non-state" revenue. The vast majority of NJ Transit's non-government revenue comes from fares. But NJ Transit cannot increase fares without the approval of the Board, which the New Jersey Governor entirely appoints, and without the Governor refraining from exercising his veto power. Viqueira Dep. (Powers Ex. 2) at 44:10–13 and 54:3–14. Recently the Governor highlighted the lack of fare increases at NJ Transit as an accomplishment of his administration. Governor's Message, Feb. 23, 2021 (Stephenson Ex. 1) at PDF Page 13 ("I can stand here today and tell NJ TRANSIT's riders that, for the fourth year in a row, you will not see a fare hike. Under prior administrations, fares went up while service went down. Well, this administration is improving service and not putting the burden on the hundreds of thousands of New Jerseyans who will come back to a much improved NJ TRANSIT."). Second, the state strictly controls NJ Transit's ability to resolve litigation by requiring that any settlement be approved by the Attorney General of the State of New Jersey, NJ Transit's Board, and that the Governor declines to exercise his veto power over the Board's approval. *Id*. at 78:6–16. Third, the COVID-19 pandemic illustrated NJ Transit's reliance on the state for funding.[3] When the New Jersey legislature extended its fiscal year in 2020, NJ

---

[3] Bytemark makes much of the fact that state funds accounted for only 19% of NJ Transit's operating budget in 2022. Resp. at 6. But analyzing that budget only illustrates New Jersey's commitment to making up NJ Transit's budgetary shortfalls. In 2022, due to decreased ridership from the COVID-19 pandemic, the federal government subsidized $955 million of NJ Transit's

Transit could not pass a budget for the following year. Fourth, New Jersey state law requires that NJ Transit send its proposed budget to the Governor's Office, the New Jersey legislature, and the head of the Department of Transportation for New Jersey each year.[4] The Third Circuit did not have these facts before it in *Karns* or *Fitchik*. Each on its own warrants finding the state-treasury factor weighs in favor of immunity. Taken together, they compel such a result.

In addition, the state's control over NJ Transit's ability to increase fares or otherwise raise revenue changes the *Karns* court's distinction of *Alaska Cargo Transportation, Inc. v. Alaska R.R. Corp.*, 5 F.3d 378 (9th Cir. 1993), and *Morris v. Washington Metropolitan Area Transit Authority*, 78 F.2d 218 (D.C. Cir. 1986). The Third Circuit found these cases less relevant than its own decision in *Cooper v. Se. Pa. Transp. Auth.*, 548 F.3d 296 (3d Cir. 2008), because it mistakenly believed NJ Transit to be more like the transportation agency in that case which "could 'satisfy the deficit itself by raising fares, reducing service, and/or laying off employees.'" *Karns*, 879 F.3d at 516 (quoting *Cooper*, 548 F.3d at 305). In other words, the Third Circuit thought that NJ Transit could raise funds outside of state control if it needed to satisfy a judgment. But the record before the Court now establishes NJ Transit's *inability* to raise fares or change its operations like the transportation agency in *Cooper*.

---

$2.6 billion operating budget. NJT Board Meeting March 14, 2022, *FY23 Governor's Proposed Budget - Revenue* (Powers Ex. 4). That COVID-19 relief funding was projected to decrease to $429 million in 2023, while NJ Transit's overall operating budget expanded to $2.8 billion. *Id*. That left NJ Transit needing roughly $650 million in additional funds in 2023. It expects to receive those funds from two sources: increased fare revenue from riders returning to using public transportation (accounting for an increase in roughly $250 million in funding) and greatly increased funding from the state. *Id*. (showing an increase in "Turnpike Funding" from $325 million in 2022 to $721 million in 2023).

[4] Bytemark does not address the decisions from other circuits finding that similar reporting requirements weigh strongly in favor of a finding of immunity. *See* Motion at 10 (citing *Irizarry-Mora v. U. of Puerto Rico*, 647 F.3d 9, 15 (1st Cir. 2011) and *Kashani v. Purdue U.*, 813 F.2d 843, 845–46 (7th Cir. 1987)).

Even if that were not the case, the Third Circuit's analysis of *Alaska Cargo* and *Cooper* is incomplete because it did not consider the Supreme Court's analysis of those cases in *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30 (1994). *See* Motion at 8–9. Instead, the Third Circuit held that *Alaska Cargo* and *Cooper* do not support a finding of immunity "when Congress has not put a proverbial 'gun to the head' of the State to sustain the entity even without a *legal* obligation." *Karns*, 879 F.3d at 516 (internal quotations omitted). But when the Supreme Court analyzed these cases in *Hess*, it said nothing about Congress needing to force a state to sustain an entity before the state-law factor supports an immunity finding. It simply found each state's long-term financial support of the entities in question relevant to the analysis. *Hess*, 513 U.S. at 49–50. Here, NJ Transit has received similar support from New Jersey, never once having operated at a profit in its nearly 50-year existence. The first *Clissuras* factor thus weighs in favor of immunity. *See also Ristow v. S.C. Ports Auth.*, 58 F.3d 1051, 1054 (4th Cir. 1995) ("To summarize, in the strictest sense there is no legal obligation by the State of South Carolina to cover the Ports Authority's debts. The state, however, provides whatever economic support is necessary over and above the Port Authority's net revenues to insure its continued vitality.").

C. **Each *Clissuras* and *Mancuso* Factor Supports Finding NJ Transit is an Arm of the State.**

Without arguing the state-treasury factor is "outcome determinative," Bytemark has little basis for opposing NJ Transit's motion. The second *Clissuras* factor—focusing on state control—weighs heavily in favor of a finding of immunity, as do the additional *Mancuso* factors.

1. **The State of New Jersey Controls NJ Transit.**

Bytemark makes three arguments in support of its claim that New Jersey "exerts only limited control over NJ Transit's operations": (1) the state's control is "limited to basic oversight and policy planning"; (2) NJ Transit's executive management controls the day-to-day activities at

NJ Transit; and (3) "an independent management consulting firm concluded that [NJ Transit] lacked effective leadership and meaningful State oversight." Resp. at 8–9. Bytemark is incorrect on all three counts.

Each of these arguments is based primarily on a mischaracterization of the record. Most notably, to claim that "an independent management consulting firm" found NJ Transit lacked "meaningful State oversight," Bytemark relies on a block quote, which says nothing about state oversight, from a 2018 operational assessment. Resp. at 9. But in the sentence before the excerpt Bytemark quotes, the consulting firm concluded precisely the opposite of what Bytemark claims, finding that NJ Transit operates with "intense State oversight":

> [NJ Transit] must compete in the marketplace, but cannot control its own fares. It must be nimble to respond to customer needs, but cannot change a bus route without a public meeting. It has no dedicated funding source, but carries intense State oversight.

*Comprehensive Strategic, Financial & Operational Assessment of NJ Transit October 5, 2018*, (Powers Ex. 5) at 5. Bytemark also incorrectly characterizes NJ Transit's Governor-appointed Board as uninvolved in the day-to-day operation of NJ Transit because those operations are left to NJ Transit's executive management team. But NJ Transit's CEO hand selects that executive management team and the CEO is nominated by the Governor and approved by the Board. Viqueira Dep. (Powers Ex. 2) at 23:3–14; Ex. 1 (Feb. 14, 2018 NJ Transit Board Minutes) at 17 (approving NJ Transit's current CEO). Moreover, even the CEO's hand-selected management team members require Board approval. *Id*. at 23:24–24:5 ("The CEO's direct reports are hired by the CEO. There are certain positions that require board approval, including mine.").

Ultimately, Bytemark does not identify a single case in the Second Circuit or anywhere else where a court held similar facts do not constitute state control. That is unsurprising. The Second Circuit case law often turns on whether the state appoints a simple majority of the Board

members. *Compare Leitner*, 779 F.3d at 138 (finding governor appointment of four of ten board members weighs against state control) *with Clissuras*, 359 F.3d at 82 (finding control where ten of seventeen board members appointed by the state); *see also* Motion at 13–14. Here, New Jersey's Governor appoints every NJ Transit Board member.[5] The Second *Clissuras* factor thus weighs strongly in favor of finding NJ Transit operates as an arm of the state of New Jersey.

### 2. The additional *Mancuso* factors warrant a finding of immunity.

If the Court finds the two *Clissuras* factors point in opposite directions, it should turn to the additional *Mancuso* factors. *Leitner*, 779 F.3d at 137. On the first *Mancuso* factor—how the entity is referred to in the documents that created it—Bytemark argues that the "documents are not as conclusive as NJ Transit suggests" because NJ Transit is allocated within the Department of Transportation but is independent of any supervision of control by the department. Resp. at 10. But NJ Transit's independence from the Department of Transportation does not mean NJ Transit is independent of the state. NJ Transit's founding documents characterize it "as *an instrumentality of the State* exercising public and essential governmental functions, and the exercise by the corporation of the powers conferred by this act shall be deemed and held to be an essential governmental function of the State." N.J. Stat. Ann. § 27:25-4(a) (emphasis added). It is "independent from" the Department of Transportation simply because it has direct oversight from the Executive Branch. *See id*. at §§ 27:25-4(a) and (b).

On the fourth *Mancuso* factor—whether the entity's function is state or local—Bytemark opposes NJ Transit's motion because NJ Transit got its start by absorbing and replacing a

---

[5] Bytemark also points out that the New Jersey Governor only rarely needs to exercise his or her veto authority over NJ Transit. Resp. at 9. But it is unclear why that matters. Given the Governor's role in selecting the entire Board, it makes sense that they operate in a way in which the Governor approves. The Second Circuit's decisions relating to state control do not turn on the frequency with which the state needs to exercise any veto power.

"balkanized" system of local transportation providers. Resp. at 10–11. Bytemark does not explain why NJ Transit's beginnings matter.

To the extent those beginnings matter, they only further establish NJ Transit's function as a state entity. At the time of NJ Transit's creation, New Jersey "own[ed] most of the buses in the State" but it did not "control the management of the bus lines." Governor Byrne's 5th Annual Message, January 9, 1979 (Powers Ex. 1) at PDF Page 124. Instead, it subsidized the bus industry operations in the amount of 34 cents for every bus ride. *Id*. Governor Byrne thus sought "to bring the subsidy program under control by replacing it with one in which *the State,* acting directly or indirectly through an independent corporation, controls not only the assets it already owns, but the management of those assets as well." *Id*. (emphasis added). From its beginnings in 1979, NJ Transit has thus operated across New Jersey under the state's control. Under Second Circuit precedent, which Bytemark again does not address, this factor thus favors immunity. *See Mancuso*, 86 F.3d at 295 (finding this factor supported immunity for the New York State Thruway Authority because, much like NJ Transit's operations, the thruway at issue in that case "stretches across the entire state and therefore the Thruway Authority performs a function that a state would normally provide."); Motion at 16.

\* \* \*

Each factor considered in the Second Circuit thus supports a finding of immunity here. So too do the "twin aims" of the Eleventh Amendment: preserving New Jersey's interest in preserving its treasury and protecting its integrity. *See Leitner*, 779 F.3d at 134.

Before the Third Circuit's decision in *Fitchik*, "every district court that has considered the question"—including the Southern District of New York—"has held that NJT is the alter ego of New Jersey." *Fitchik*, 873 F.2d at 669, n.5 (citing *Dykman v. New Jersey Transit Rail Operations,*

*Inc.*, 685 F.Supp. 79 (S.D.N.Y.1988); *Johnson v. New Jersey Transit Rail Operations, Inc.*, Civ. No. 87-0173, slip op., 1988 WL 24148 (D.N.J. Mar. 15, 1988); *Cianfrani v. New Jersey Transit Bus Operations, Inc.*, Civ. No. 87-3707, slip op., 1987 WL 15624 (E.D. Pa. Aug. 11, 1987); *Worrell v. New Jersey Transit Bus Operations, Inc.*, Civ. No. 86-2075, slip op., 1987 WL 4400 (D.N.J. Jan. 29, 1987); *Williamson v. New Jersey Transit Rail Operations, Inc.*, Civ. No. 86-5353, slip op., 1987 WL 5791 (S.D.N.Y. Jan. 9, 1987); *Dunn v. New Jersey Transit Rail Operations, Inc.*, 681 F.Supp. 246 (D.N.J.1987); *Brotherhood of Locomotive Engineers*, 608 F.Supp. 1216 (S.D.N.Y. 1985); *Brotinsky v. New Jersey Transit Auth.*, Civ. No. 85-0314, slip op. (E.D.Pa. Mar. 20, 1985); *Hightower v. New Jersey Transit Rail Operations, Inc.*, Civ. No. 84-1268, slip op. (D.N. J. Aug. 27, 1984); *Saddle River Tours Ltd. v. New Jersey Dep't of Transp.*, Civ. No. 83-1776, slip op. (D.N.J. Oct. 31, 1983), *aff'd*, 745 F.2d 48 (3d Cir.1984); *Gibson-Homans Co. v. New Jersey Transit Corp.*, 560 F.Supp. 110 (D.N.J. 1982)). Following *Karns*, the Court should join its predecessors and find that the Eleventh Amendment protects NJ Transit on both sides of the Hudson.

Dated:  November 15, 2022

Respectfully submitted,

*/s/ Ashley N. Moore*
Ashley N. Moore (admitted *pro hac vice*)
amoore@mckoolsmith.com
David Sochia (admitted *pro hac vice*)
dsochia@mckoolsmith.com
Douglas A. Cawley (admitted *pro hac vice*)
dcawley@mckoolsmith.com
Jonathan Powers (admitted *pro hac vice*)
jpowers@mckoolsmith.com
**MCKOOL SMITH, P.C.**
300 Crescent Court, Suite 1500
Dallas, Texas 75201

Telephone: (214) 978-4000
Facsimile: (214) 978-4044

Eliza Beeney
ebeeney@mckoolsmith.com
**McKool Smith, P.C.**
One Bryant Park, 47th Floor
New York, New York 10036
Telephone: (212) 402-9424
Facsimile: (212) 402-9444

*Attorneys for Defendants*


## CERTIFICATE OF SERVICE

The undersigned certifies that on November 15, 2022, the foregoing document was served

on all counsel of record via ECF.


By:     */s/ Ashley N. Moore*
        Ashley Moore